UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO: 9:18-cv-81568-JIC


LATOYA WILLIAMS, and
all others similarly situated under
29 U.S.C. 216(b),

    Plaintiff(s),

vs.

TREATMENT PARTNERS OF
AMERICA LLC, a Florida Limited
Liability Company, and
SCOTT FRANKEL, individually,

    Defendants.
_____/




DEPOSITION OF SCOTT FRANKEL
TAKEN ON BEHALF OF THE PLAINTIFF

MARCH 28, 2019
10:00 A.M. TO 12:39 P.M.

USA EMPLOYMENT LAWYERS - JORDAN RICHARDS PLLC
805 EAST BROWARD BLVD., SUITE 301
FORT LAUDERDALE, FLORIDA 33301




REPORTED BY:
CHYNNA BARBOSA, FPR, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA



877.291.3376
www.UCRinc.com

Frankel, Scott  03-28-2019

**2**

APPEARANCES OF COUNSEL

ON BEHALF OF THE PLAINTIFF:

MELISSA SCOTT, ESQUIRE
JORDAN RICHARDS, ESQUIRE
USA EMPLOYMENT LAWYERS
JORDAN RICHARDS, PLLC
805 E. BROWARD BLVD. SUITE 301
FORT LAUDERDALE, FLORIDA 33301
954-871-0050
melissa@jordanrichardspllc.com

ON BEHALF OF THE DEFENDANT:

THOMAS LOFFREDO, ESQUIRE
GRAY ROBINSON, P.A.
401 EAST LAS OLAS BOULEVARD, SUITE 1000
FORT LAUDERDALE, FLORIDA 33301
954-761-8111
tom.loffredo@gray-robinson.com

**4**

INDEX OF EXHIBITS

PLAINTIFF'S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| A | NOTICE OF TAKING DEPOSITION | 8 |
| B | SUNBIZ RECORDS | 12 |
| C | TEXT MESSAGE | 13 |
| D | PLAINTIFF'S COMPLAINT | 29 |
| E | DEFENDANT'S ANSWERS TO PLAINTIFF'S COMPLAINT | 30 |
| F | EMAILS | 41 |
| G | EMAIL | 44 |
| H | CHECK | 78 |
| I | TEXT MESSAGE | 80 |
| J | LETTER | 94 |
| K | ARTICLE OF INCORPORATION | 111 |

DEFENDANT'S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | PRIORITY MAIL EXPRESS RECEIPT | 115 |

**3**

INDEX OF EXAMINATION

WITNESS:  Scott Frankel

PAGE

DIRECT EXAMINATION
    By Melissa Scott, Esquire          5

CROSS EXAMINATION
    By Thomas Loffredo, Esquire          113

RE-DIRECT EXAMINATION
    By Melissa Scott, Esquire          118

**5**

DEPOSITION OF SCOTT FRANKEL

MARCH 28, 2019

Thereupon:

SCOTT FRANKEL

was called as a witness, and after having been first duly sworn, testified as follows:

THE WITNESS:  I do.

MS. SCOTT:  For the record, my name is Melissa Scott, attorney for Jordan Richards, PLLC, USA Employment Lawyers.  And we represent the Plaintiff in this matter, Latoya Williams.

MR. LOFFREDO:  I'm Tom Loffredo, law firm of Gray Robinson, P.A.  I'm here on behalf of the Defendant, Scott Frankel.

DIRECT EXAMINATION

BY MS. SCOTT:

Q   Okay.  Hi, Mr. Frankel.  How are you?

A   I'm okay.

Q   That's good.  Have you ever been deposed before?

A   I have.

Q   When were you deposed?

A   Years ago.

Q   Can you recall the number, about how many years?



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

Frankel, Scott  03-28-2019

6

A   Three years, four years ago.
Q   Were you the Plaintiff or the Defendant?
A   Defendant.
Q   Do you understand what perjury is?
A   I do.
Q   Do you understand the penalty for perjury?
A   I do.
Q   Have you ever been arrested or convicted of a crime?
A   No.
Q   Have you ever been convicted of a crime punishable by more than one year in prison?
A   No.
Q   Are you taking any medication that may affect your memory or ability to testify truthfully today?
A   No.
Q   Okay.  So, because you have done this before, Mr. Frankel, I'll just go through this pretty briefly.  As I'm sure you are aware, your lawyer may object to my questioning, may object to the form or in other matters, but you have to answer all the questions that I give you unless you or your lawyer claims it privileged or he directs you not to answer.  You have give all verbal responses to my questions.  So you can't shake your head or nod.  You have to give me a verbal response.  Please

7

wait for me to ask the whole question before answering and don't speculate or guess.  So if you don't know the answer or you think you might know but you are not entirely sure if that's the correct one, go ahead and just tell me that you are not sure, I would have to speculate.  I don't want you to testify anything untruthfully or anything that you are uncertain of.  Do you understand?
A   I do.
Q   And finally, you can ask me to rephrase any question if you don't understand what I'm asking you.  That might happen a lot.  So go ahead and just say excuse me, can you rephrase or I don't understand what you are saying, and I will do my best to try and make sure that you understand the question.
A   Okay.
Q   Okay.  All right.  So let's dig into your preparation.  How did you prepare for this deposition today?
A   I did not prepare.
Q   You did not prepare at all?
A   I'm here just to answer questions that are brought upon me.
MS. SCOTT:  Let the record reflect I am marking this as Plaintiff's Exhibit A.

8

(Thereupon, Plaintiff's Exhibit A was entered into the record.)
MS. SCOTT:  I'm providing a courtesy copy to Mr. Loffredo.
Q   (By Ms. Scott) And I'm handing a copy to you, Mr. Frankel.  Please take your time, review it, let me know once you are done.
A   Okay.
Q   Do you recognize that document?
A   Parts of it, yes.
Q   How do you recognize it?  Which parts?
A   I received it.
Q   You received this?
A   Yes.
Q   Did you read through it when you received it?
A   I did.
Q   Did you read on Page 3, Request for Production Pursuant to Federal Rules of Civil Procedure 30(b)(2)?
A   No.  I just read it now.
Q   You did not read this page?
A   I just did.
MR. LOFFREDO:  This refers to the request for records and other communications with the Plaintiff, also w-2s, tax returns which --
THE WITNESS:  Right.

9

MR. LOFFREDO:  Do you have custody of any of these documents?
THE WITNESS:  I do not.  I do not.
Q   (By Ms. Scott) Can I ask you why you didn't read this?
A   I am not with the company.  I would not have any of these records or any way to furnish these records. They are not --
Q   But you understand under the Federal Rules, you are required to read this and do a diligent effort to produce these records that are in your possession?
A   I cannot produce them.  They are not in my possession.
MR. LOFFREDO:  He just answered your question.  He can't produce them.  He doesn't have these documents.  He's been gone from the company since before your client left.
Q   (By Ms. Scott) But how -- but you didn't prepare for this deposition so you don't know if you have the documents?
A   Oh, I know I don't have the documents.  I don't have these.
Q   Did you investigate and do a reasonable search to locate or obtain these documents, responsive to the request?



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

Frankel, Scott   03-28-2019

10

A   I am not with the company.  I was an employee and I do not work with the company.

Q   Mr. Frankel, under these rules, you still need to abide by the rules.  You need to do a diligent effort--

MR. LOFFREDO:  Now you are just making a narrative.  He has answered your question.  You can ask him now if you have any of these documents in your possession, 1 through 24, and he's answered your question and said no.  So regardless of whether he searched or not, he is telling you right now under oath that he doesn't have any of these documents.  So --

MS. SCOTT:  There is no way that we can know that if you haven't done a preparation of it beforehand.

MR. LOFFREDO:  Listen, if you have a basis to impeach his testimony, that somehow he has your client's w-2 or what have you, produce it.  Otherwise, he's answered your question; let's move on.  He doesn't have any -- he's not with the company.  The company is not here.  The company is in default.  He was gone from the company before your client was gone.  So, he doesn't have these records.  And he's telling you right now, under

11

oath, that he doesn't have these records.  So --

Q   (By Ms. Scott) Mr. Frankel, were you a manager of the company in April 2018?

A   I left in October.  I left the first week of October.  October 3rd, I believe.

Q   We'll move on even though you have not prepared for this deposition at all.

MR. LOFFREDO:  For the record, he doesn't have to prepare.  He doesn't have any of these documents. Okay?  We are not having a fight on whether he prepared or not.  But he has testified under oath because he has been gone from the company since before your client was, he doesn't have any of this stuff.  And we don't have any witness statements or anything else anyway.  So --

MS. SCOTT:  He just read the document today.

MR. LOFFREDO:  I know.  And he just answered your question and said, "I don't have any of these documents.

MS. SCOTT:  Okay.

MR. LOFFREDO:  Because he has been gone from the company for six months.  Sorry, go ahead.

MR. RICHARDS:  Just let the record reflect that Jordan Richards has also now appeared on behalf of the Plaintiff in this case.

12

(Thereupon, Plaintiff's Exhibit B was Entered into the record.)

Q   (By Ms. Scott) Mr. Frankel, I'm handing you what is now being marked as Plaintiff's Exhibit B.

MS. SCOTT:  We'll provide you with a courtesy copy, Mr. Loffredo.

MR. LOFFREDO:  That's fine.

Q   (By Ms. Scott) Please review and let me know when you are finished.

A   I'm finished.

Q   Do you recognize the document?

A   I do.

Q   How do you recognize the document?

A   It's a copy of what's on SunBiz as the managers of the company and the registered agent.

Q   Are you listed as the manager of the company?

A   I am.

Q   What's the date on the document?

A   June 27th.

Q   And the year?

A   2018.

Q   So, you were a manager of the company in 2018?

A   I was not.  They never replaced me on there, on the document.

MR. LOFFREDO:  No, she said were you a manager

13

in 2018.

A   I was in 2018.

MR. LOFFREDO:  Are you done with that?  I'm going to give it to the Court Reporter to mark.

MS. SCOTT:  Okay, go ahead.

Q   (By Ms. Scott) Mr. Frankel, you said that you were no longer employed with the company at all in October 2008 -- 2018?

A   Correct.

Q   So, you did not provide-- you did not speak with the employees that were working there, you were not involved in any sort of interaction with them?

A   No, once I was let go, that was it.

Q   Did you contact them at all?

MR. LOFFREDO:  Contact the employees?

Q   (By Ms. Scott) Yes, did you contact the employees in October 2018?

A   Not that I recall.

MS. SCOTT:  I'm marking this as Plaintiff's Exhibit C, for the record.  A courtesy copy for Mr. Frankel -- or Mr. Loffredo, excuse me.

(Thereupon, Plaintiff's Exhibit C was entered into the record.)

Q   (By Ms. Scott) Please review the document and let me know when you are finished.



Frankel, Scott  03-28-2019

**14**

A   Okay.

Q   **Do you recognize the document?**

A   Okay.  It looks like a text message.

Q   **Do you recognize it?**

A   No, I don't.

Q   **Is that your name at the top?**

A   It's my name.  I see my name there and I see TPA CEI founder, which I don't know what CEI founder is.

Q   **And do you recognize the other two people in this group message?**

A   I do.

Q   **Who --**

A   I recognize one of them.

Q   **And who do you recognize?**

A   Karyn Hurley.

Q   **And what was her affiliation -- what is her affiliation with TPA?**

A   She was part of the HR team and the educational manager.

Q   **Was she actively in that role in October, 2018?**

A   She was.

Q   **What is the date of this message?**

A   October 19, 2018.

Q   **And that is your name at the bottom in the**

**15**

**group message?**

A   It's my name but not my title.

Q   **You don't remember this message?**

A   I do not.

Q   **But your name was interacted with the employees here that are affiliated with TPA --**

A   I see it is.

Q   **-- in October 2018?**

A   I see it says Scott Frankel, CEI.  I don't know what that is.

Q   **Okay, Mr. Frankel, let's go back and discuss your background.**

A   Sure.

Q   **Okay.  How old are you?**

A   I'm 60-years-old.

Q   **And where do you live?**

A   Boca Raton, Florida.

Q   **How long have you lived there?**

A   13, 14 years.

Q   **Are you married?**

A   I am.

Q   **What is your wife's name?**

A   My wife's name is Dana Frankel.

Q   **How long have you been married?**

A   Going on 14 years.

**16**

Q   **Have you spoken with her about this lawsuit?**

A   I have.

Q   **What have you told her?**

A   I told her it's a fraudulent suit against me.

Q   **Have you said anything else to her about the lawsuit?**

A   Have I said anything to her?

Q   **Anything additionally to telling her it's a fraudulent suit.**

A   She's aware on the demands on my behalf.  That there was a demand made last Friday that if I didn't pay X amount by 12 o'clock on a suit, that I was in the Mayo Clinic last Friday with my 12-year-old sick son in Minnesota and getting a demand letter to pay a certain amount of money by 12 o'clock.

Q   **Does she know anything about the claim--**

A   Let's talk about that.

MR. LOFFREDO:  No, let's just answer her questions and then we'll get out here quicker.

Q   **(By Ms. Scott) Have you spoken with her about the claims and defenses of this lawsuit?**

A   Yes, I have.

Q   **What have you told her?**

A   I was no longer an employee and I am being sued for a fraudulent claim where the person has been

**17**

paid, to my knowledge.

Q   **Does she know the Plaintiff, Ms. Latoya Williams?**

A   She does not.

Q   **Did you ever speak to your wife about your business operations with Treatment Partners of America?**

A   Yes, I have.

Q   **What did you tell her?**

A   What did I tell her?

Q   **What did you discuss with her in a general sense?  Did you discuss your duties, the employees that worked for you?**

A   No, I never discussed employees with her.

Q   **So what do you discuss with her?**

A   General business.

Q   **Can you explain?**

A   What my day is like coming up, what I had going on.

Q   **And can you give us some examples of what you might had going on a normal day?**

A   Meetings.

Q   **Meetings with whom?**

A   Meetings with clients, potential clients, referral sources.

Q   **Did you attend high school?**



Frankel, Scott   03-28-2019

18

A   I did.

Q   Which high school did you attend?

A   Thomas Jefferson High School.

Q   Did you graduate?

A   I did.

Q   When did you graduate?

A   1976.

Q   What did you do after graduation?

A   Went to college.

Q   Where did you go to college?

A   Kean University.

Q   What was your major?

A   Business and Criminal Justice.

Q   When did you graduate?

A   1981.

Q   What degree did you earn?

A   Bachelor's.

Q   What did you do after graduation?

A   I went to polygraph school and got my degree as a master polygraph examiner.

Q   Can you explain what polygraph is?

A   It's a lie detection system.

Q   Can you elaborate a little bit more?

A   Sure.  It basically tells if you are telling the truth or if you are not telling the truth.

19

Q   And how long did you study that at grad school?

A   Two years.

Q   What degree did you earn?

A   Master of Polygraph Examiner.

Q   In addition to polygraph science, did you do hypnotherapy?

A   I did.

Q   Did you do that at grad school?

A   I did this right after that time.

Q   The following year?

A   Actually 1981 I graduated with a degree in hypnotherapy.

Q   And where did you graduate from?

A   Ethical Hypnosis Center.

Q   Do you have any professional certificates or licenses?

A   I do.

Q   What are they?

A   I'm a certified legal liaison to court system. I'm a certified national interventionist and trainer.

Q   And how many years --

A   I'm a certified crisis counselor.

Q   Anything else?

A   Not that I can think of off the top of my

20

head.

Q   How many years did it take for each of those, to procure those certificates?

A   They were all done within one year.

Q   All together?

A   Yes.

Q   Do you recall what year that was?

A   2017.

Q   Okay.  Let's talk about your work experience.

A   Sure.

Q   What jobs have you held within the past ten years?  And we'll go through each one.

A   The past ten years.  I am a professional musician.

Q   When did you enter that career?

A   Right after college.

Q   So 1982, around there?

A   '84 I started touring with numerous groups throughout the world.

Q   Wow, how many years did you do that for?

A   Since then I haven't stopped.  And that's what brought into the addiction world from losing band mates and friends to addiction.

Q   Do you still go around the world with that?

A   I still do some touring occasionally.

21

Q   So you have a band then?

A   I play with different artists.

Q   Do these artists also have affiliation or backgrounds in treatment and drug addiction?

A   Find one that doesn't.

Q   Okay.  Okay.  Anything else?  Any other employers that you worked for or other jobs that you had since 2009 up?

A   Yes.  I was part of a treatment center called The Ponds of Boca Raton.

Q   And what year was that that you began working there?

A   I want to say 2006, possibly.  It was probably a little after that.  It was probably 2008 or so.

Q   Are you still working there?

A   No.

Q   When did that employment end?

A   I think it was 2011, somewhere around there.

Q   And why did you leave?

A   I was offered a position with another company.

Q   Which company was that?

A   Dream Recovery International.

MR. LOFFREDO:  Dream like a dream?

THE WITNESS:  Dream.

MR. LOFFREDO:  Dream, okay.



Frankel, Scott   03-28-2019

22

Q   (By Ms. Scott) And were you offered a position or did you start that?

A   I was offered a position to come in as a partner.

Q   Who offered you the position?

A   A group of investors.

Q   How did they come to offer you this position? How did you get in contact with them?

A   They got in contact with me.

Q   How?

A   They knew of my previous business and basically came in and asked me if I would come in and join forces with them.

Q   Tell me a bit about the business operations of Dream Recovery International.

A   They were a dual diagnosis treatment center. I was with them for approximately two and a half years and I asked for a company buyout. I did not want to be involved with the partnership at that point.

Q   Why?

A   They weren't partners I want to be in business with. We didn't have the same outlook on business.

Q   Can you tell me a little bit more about how this broke down, that relationship?

A   I wrote them I basically didn't want to be

23

their partners and I asked for a buyout at the time.

Q   Why did you not want to be their partner?

A   We didn't have the same beliefs regarding the business.

Q   Can you elaborate a little bit, what those beliefs were that you had and they didn't?

A   My belief is running everything extremely compliant. They weren't looking to be so compliant at the time.

Q   Compliant with what?

A   On the day-to-day operations as far as -- how can I say? They were involved in other businesses and I didn't want to be part of it, basically real estate businesses. They were trying to bring everything into the same business as one group and I didn't want to be part of that.

Q   So they were trying to spread the business too thin?

A   They were, very much so. And I took a buyout, basically, and left the company.

Q   So the business had nothing to do with noncompliance with the law?

A   No, not with the law.

Q   Just with how you thought a business should be run --

24

A   Correct.

Q   -- for this type of facility?

A   Correct.

Q   Tell me again how you were involved -- and what's your position, again, with Dream Recovery International?

A   Chief Executive Officer.

Q   And what were your roles and duties in that capacity?

A   Daily operation.

Q   Can you give me specific examples of daily operation?

A   I oversaw the clinical program and I handled professional relationships.

Q   Professional relationships, does that mean you spoke with a lot of the clients and the patients?

A   I did.

Q   You did that on a day-to-day basis?

A   I did.

Q   You worked with them on the premises of the location?

A   I did.

Q   Was this also a treatment center that was inpatient?

A   It was not inpatient.

25

Q   Okay. The patients did not live on the premises?

A   They did not.

Q   When you say "Oversaw clinical program", can you tell me a little bit more about that, specific duties that you did?

A   I oversaw the clinical portion in conjunction with the Department of Children and Families, making sure the policies and procedures were in place.

Q   And how did you do that?

A   By reviewing the policies and procedures and making sure the operation was conforming to all the policies and procedures according to DCF.

Q   How did you make sure the facility was complying with the rules that you read?

A   Because I oversaw the operation

Q   So you were there every day, you watched all the ins and outs of the business?

A   I wasn't there every day. I was there the majority of the time.

Q   But you knew the majority of what was going on every day?

A   Correct.

Q   How long did you hold that position?

A   Approximately two and a half years.



877.291.3376
www.UCRinc.com

Frankel, Scott   03-28-2019

26

Q   Did you have the authority to bind the company, in contracts and entering into things like that?

A   What types of contracts?

Q   Employee contracts, contracts for maybe merging, acquisition, partnership?

A   I did.

Q   Did you interact with the employees of Dream Recovery?

A   I did.

Q   How often did you interact with them?

A   On a daily basis.

Q   You oversaw their duties?

A   In some aspects.

Q   Can you tell me a little more about that, which aspects?

A   Well, there was obviously directors in each department.  So, I would oversee certain directors.

Q   Can you recall which directors in particular?

A   Clinical director.

Q   Did you oversee the finances?

A   I did.

Q   Did you oversee the payroll?

A   No, HR did.

Q   Did you oversee HR?

27

A   I don't recall if I was above the HR, handled the HR duties at that time.  I believe the CFO handled the HR.

Q   Who was the CFO, do you remember?

A   James Coleman.

Q   Was he one of the managers that you didn't agree with how he was running things?

A   He was a partner.

Q   And did you agree with how he ran the company?

A   No.

Q   So you oversaw the directors.  Did you have any hiring and firing authority over them?

A   Yes, I did.

Q   Okay. Let's talk about TPA now.

A   Sure.

Q   And I didn't clarify earlier, I apologize. When I say TPA, you understand I mean Treatment Partners of America?

A   I do.

Q   Are you familiar with the corporate Defendant TPA?

A   I am.

Q   How are you familiar?

A   I was employed by them.

Q   When were you employed?

28

A   I believe it was from January 2016 until October.

Q   Do you remember the date, October?

A   No, I don't remember the exact date.

Q   Is TPA a limited liability company?

A   It is.

Q   Is it a member-managed or manager-managed LLC?

A   Can you repeat that question?

Q   Yes.  Is it a member-managed or manager-managed LLC?

A   I don't know that answer.

Q   What was TPA's business purpose when you worked there?

A   The purpose of the business?

Q   Yes.

A   To help people that have addiction, issues with drugs and alcohol.

Q   How does it effectuate that purpose?

A   Could you repeat that?

Q   I'm sorry, yes.  How does it effectuate that purpose?

A   By therapy.  Outpatient therapy.  The company was totally outpatient.  It did not house any of the patients on the premises.

29

Q   You are sure the company didn't house any patients on the premises?

A   Not on the premises, daily treatment center, no.

Q   Okay.  Mr. Frankel, I'm going to mark this as Plaintiff's Exhibit D, I believe?

THE COURT REPORTER:  Yes.

(Thereupon, Plaintiff's Exhibit D was entered into the record.)

MS. SCOTT:  Mr. Loffredo.

Q   (By Ms. Scott) Please review the document and let me know when you are done.

A   Okay.

Q   Do you know what this document is?

A   I read it.

Q   Do you know what it is?

A   Do I know what it is?

Q   Yes.

A   It's a complaint.

Q   Did you ever have the opportunity to read this?

A   I did.

Q   Are you familiar with the allegations alleged in this complaint?

A   I am.



877.291.3376
www.UCRinc.com

Frankel, Scott   03-28-2019

30

Q    Will you please turn to Paragraph 22 of the complaint.  Let me know when you finish.

A    Okay.  I read it.

Q    Do you understand that allegation?

A    I do.

Q    What, to your understanding, does that allegation mean?

A    That people reside at the premises.

Q    Is it your testimony that they do not?

A    What do we call the premises?

Q    The location of Treatment Partners of America.

A    No, they did not.

Q    So it's your testimony today that --

A    The patients did not reside at 1609 Southwest 18th Street in Boca Raton.  That's incorrect.

Q    And you understood at this time what premises meant when you read this complaint?

A    Yes.

Q    Mr. Frankel, I am marking this as Plaintiff's Exhibit E.

(Thereupon, Plaintiff's Exhibit E was entered into the record.)

MS. SCOTT:  That's for Mr. Loffredo.

MR. LOFFREDO:  This is our answer to the complaint.  It has the complaint allegations and

31

our response, our legal responses.  She's going to ask you about it.

A    Okay.

Q    (By Ms. Scott) Can you please turn to paragraph 22, it's Bates Stamped at the bottom --

A    I'm looking at it.

Q    -- 003.  Can you read silently and let me know when you are finished?

A    Okay.

Q    What have you -- do you admit or deny this allegation?

MR. LOFFREDO:  Just answer the question.

A    Yeah.  They did not live on the premises.

Q    (By Ms. Scott) But you understood premises at the time that you read this complaint as you just testified?

MR. LOFFREDO:  It's a pleading.  It's not under oath.

A    Yeah, it must be incorrect.  It's incorrect.

Q    (By Ms. Scott) Would you like to take the opportunity today to retract that admission?

A    Yeah.

MR. LOFFREDO:  It's not -- okay.

A    It's not an admission.  It's just --

MR. LOFFREDO:  We'll correct, for the record.

32

A    We'll correct it, yeah.  We'll correct it.

MR. LOFFREDO:  Consistent with his sworn statement here today.

Q    (By Ms. Scott) Would you like to take the time to go through your answers today and see if there is any other allegations that were incorrect?

A    No.

MR. LOFFREDO:  No.  If you want to ask him questions.

A    Ask what you want.  I don't need to.

Q    (By Ms. Scott) Are you saying that everything else you understood and you admitted or denied according to your best knowledge and belief of the allegations?

A    Correct.

Q    Okay.  Let's go back to what we were talking about.

MR. LOFFREDO:  Hold on a second, for the Court Reporter.

Q    (By Ms. Scott) Okay.  Mr. Frankel, how did you become involved with TPA?

A    I was recruited from my previous position by the owners.

Q    The previous position being Dream Recovery?

A    Correct.

Q    Was this while you were still involved with

33

Dream Recovery?

A    Correct.

Q    Who recruited you?

A    The owners.

Q    Who are the owners?

A    Mario Monello.

Q    Anyone else?

A    Just Mario.

Q    So you said owners, you just mean singular.  How did he recruit you?

A    Basically, made me an offer to come in as CEO.

Q    Mr. Frankel, can you spell the name of Mr. Monello, first and last?

A    M-A-R-I-O, M-O-N-E-L-L-O.

Q    Thank you.  Did Mr. Monello sign paychecks on behalf of the company?

A    No.

Q    Did he have hiring and firing authority over employees?

A    Excuse me?

Q    Did he have hiring or firing authority over employees?

A    He did.

Q    And what was his position in the company before you joined with him?



Frankel, Scott   03-28-2019

34

A   He was the owner of the company.

Q   Was he the CEO?

A   No.

Q   Just the owner.  Was he a manager?

A   No.

Q   And what was his official offer?  What was your position that he was offering you?

A   CEO.

Q   Have you always held that position with TPA throughout the whole time that you worked there?

A   Yes.

Q   Have you ever held any other positions with the company?

A   No.

Q   Okay.  So, in 2016 when you joined the company and became employed with TPA, you were CEO?

A   Correct.

Q   In 2017, you were also CEO?

A   Correct.

Q   In 2018 you were CEO?

A   Correct.

Q   As a CEO, what were your job duties?

A   I oversaw daily operations.

Q   Was it similar to the daily operations you had with Dream Recovery?

35

A   It was.  But I was more involved with the music program, with Treatment Partners.

MR. LOFFREDO:  You said music?

THE WITNESS:  Music program.

Q   (By Ms. Scott) So you reviewed policies similar to what you did in clinical -- or in Dream Recovery, excuse me?

A   I did.

Q   You made sure that the policies complied with--

A   I was in charge of DCF audits and the Joint Commission audits.  And I received the highest percentage of Joint Commission audits within a 17-year period for any treatment center or hospital in the United States, the highest ranking.

Q   How did you figure that out?  Did you get an award?

A   I was told that by the Joint Commission.

Q   Did they reach out to you?

A   Absolutely.

Q   Wow.  Did you get any other recognition for your work as CEO at TPA?

A   I was NYPD Humanitarian Award in 2017 and I received the NYC Mayors Council Award in 2018, for my work with TPA.

36

Q   Wow.  Do you recall specifically what type of work?  What were they saying was outstanding?

A   Community service within the NYPD, the officers first responders, and for the mayor award is a humanitarian award for helping out with the City of New York, people with drug and alcohol addiction.

Q   So TPA extended out to --

A   We were an actual company basically people came from all over.

Q   People you mean patients?

A   Patients, yes.  Patients came in.

Q   How did they contact you?

A   Through our marketing efforts, through the internet and relationships over the years.

Q   So you dealt directly with these patients that came in to the facility?

A   Some of them.

Q   So you did the intake on some of them?

A   I was not an intake person, no.

Q   So what did you do with regard to the patients?

A   I was involved with their music therapy program.

Q   And is that the community service that you got this humanitarian awards for or was there --

37

A   No, my community award is for the outreach portion of it where I would go speak at different municipalities or different police departments or be involved with the officers and NYPD.

Q   When you spoke to them, did you talk about specifically TPA?  You used examples of patients, maybe cases that you had?

A   Sure.  As long as it was HIPAA compliant.

Q   Okay.  And these cases that you talked about, obviously you knew the ins and outs, you were there from day one, I assume you had the first-hand interaction with the success stories, right?

A   Correct.

Q   Let's go over your duties as a CEO with TPA.

MR. LOFFREDO:  Any other duties that you had--

MS. SCOTT:  No, I'm still going.

MR. LOFFREDO:  Okay.  I didn't know.  I thought that was the question.  Okay.

MS. SCOTT:  No, I'm just saying let's talk about it.

Q   (By Ms. Scott) So, in your position as CEO, did you -- were you familiar with the corporate structure of the company?

A   I was.

Q   But you are not sure if it was managed -- a



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

Frankel, Scott   03-28-2019

38

member-managed firm or a manager-managed firm?

A   No.

Q   Why not?

A   I just don't have that answer.

Q   Do you know if someone would know that?

MR. LOFFREDO:  I don't know that either.

A   I don't know the definition of it.

Q   (By Ms. Scott) So you knew about the corporate structure solely?  There was no one else that would understand the corporate structure?

A   No.  Everybody would, there was a corporate chart.

Q   There was a corporate chart?

A   I'm sure, yeah.  There was.  In order to have your license with DCF, you need to produce a corporate chart.  So there was a corporate chart present in the company.

Q   As CEO, were you familiar with the divisions, departments of TPA?

A   I was.

Q   Can you list them, to the best of your knowledge?

A   Clinical, medical, HR.

Q   Any others?

A   Finance, music.

39

Q   Does finance incorporate payroll?

A   Along with HR, yes.

Q   Okay.  All right, let's start with HR.  Just a little bit.  You say you are familiar with the HR department, right?

A   Define familiar.

Q   Please describe to the best of your knowledge, how the HR department was when it was operating TPA when you were there?

A   Yes.

Q   Please describe: how many people were there, how did it run?

A   They handled employees: hiring, firing, benefits, payroll, approximately 30 employees.

Q   So, those were the duties and responsibilities of payroll?

A   Of the HR department.

Q   Excuse me, yes.  Did HR have an established policy on recruiting and hiring employees?

A   I'm sure they did.

Q   You don't know anything about that policy?

A   I'm not that fluent on it to go back and recall all the policies and procedures of the HR department.

Q   You don't know who created the policy, how it

40

was created?

A   At the time for HR department?

Q   For hiring and firing of employees.

A   No, I don't recall.

Q   Were you ever involved in the hiring process?

A   At times.

Q   How so?

A   I would meet certain individuals and just say hello to them.

Q   Where did you meet them?

A   At our premises.

Q   How did you get them on to the premises?

A   Generally when HR would hire somebody, they would always walk them around to meet all the other employees and they would bring them in and introduce them.

Q   So, you never recruited?

A   Very rarely ever.

Q   But you did?

A   Yes.

Q   So you were part of the hiring process?

MR. LOFFREDO:  Object to form.  Go ahead.

A   Very, very rare that I did.

Q   (By Ms. Scott) You can remember at least one instance when you hired an employee?

41

A   I can't recall.

Q   Mr. Frankel, do you know who the Plaintiff in this lawsuit is?

A   I do.

Q   What's her name?

A   Latoya Williams.

Q   How do you know her?

A   She worked at TPA for a few weeks.

Q   When did you first meet or interact with her?

A   I believe when she came in for an interview.

Q   Did you reach out to her, personally, to come to the interview?

A   I might have.

Q   You don't remember?

A   I don't recall.

Q   Let's see if this-- will this refresh your memory, if I have some emails?

A   Sure.

Q   I'm marking this as Plaintiff's Exhibit F for the record.  Here is a copy for you.

(Thereupon, Plaintiff's Exhibit F was entered into the record.)

Q   (By Ms. Scott) Please review that.  Take your time.  Tell me when you are finished.

A   Okay.



Frankel, Scott   03-28-2019

42

Q   Do you recognize this?
A   I do.
Q   How do you recognize it?
A   It was an email I had sent regarding a resume.
Q   And who did you send this to?
A   Latoya Williams.
Q   And when did you send this, on the date?
A   October 5th.
Q   And the year, please?
A   2018.
Q   Is it your testimony earlier that you did not work for this company or you finished working?
A   No, I left right around this time, right after this.
Q   You were still working at the company at least in October 2018?
A   For the first week I believe.  Yeah, first week or so.
Q   Tell me about this.  This is on indeed.com. Do you recall having an Indeed email account?
A   The company did.
    MR. LOFFREDO:  I'm sorry, what's the letter? Is this F?
    THE COURT REPORTER:  It's F.
Q   (By Ms. Scott) And you were the contact point,

43

not the company?
A   I was one of them.
Q   Here it's listed solely you as the contact for this job.
A   Okay.
Q   Is that correct?
A   Yeah.
Q   Did you regularly use Indeed to reach out to employees for TPA?
A   The company did, generally.
Q   But you had your own personal email account on behalf of the company?
A   Multiple people did.
Q   But you did as well?
A   Yes.
Q   Also just to clarify this, you reached out to Latoya first?
A   I don't recall.
Q   But you say here, "I want to know if you are still looking for a position.  Please respond if you are still available."
A   It might have been.
Q   You at least reached out to see if she was available to -- for a position at TPA?
A   That's possible.

44

Q   Did you or did you not?
A   I don't recall.
Q   So, the first time you interacted with Latoya was through Indeed?
A   Correct.
Q   Did you schedule her for an interview?
A   I might have.
Q   Don't speculate.
A   I don't recall if I did.
Q   I'll mark this as Plaintiff's Exhibit G for the record.
    (Thereupon, Plaintiff's Exhibit G was entered into the record.)
    MR. LOFFREDO:  What page?  This is F.
Q   (By Ms. Scott) We are going to review the second page first.  It's an email.
A   Okay.
Q   Do you recognize this document?
A   I do.
Q   How do you recognize it?
A   It's sent from my email.
Q   Can you tell me what you see here?
A   She was offered a position.
Q   I'm sorry?  I missed that.
A   She was offered a position.

45

Q   By whom?
A   By me.
Q   And as I previously asked, did you schedule her for an interview?
A   I did.
Q   And what's the location that you scheduled it for?
A   What location?
Q   Yes.
A   1609 Southwest 18th Street.
Q   And what is that location?
A   What was that location?
Q   Yes.
A   That was Treatment Partners office location.
Q   Are there other locations?
A   For Treatment Partners?
Q   Mm-hmm.
A   They had housing at a different location.
Q   Okay.  And where were those locations?
A   They were in Fort Lauderdale.
Q   Do you recall the addresses?
A   I do not.
Q   Do you know how many there are?
A   They were four houses.
Q   Can you look at this and tell me what the date



Frankel, Scott  03-28-2019

46

is on this document?  You can start with the earliest date.

A  October 9th.

Q  And the year, please?

A  2018.

MR. LOFFREDO:  She's saying-- she's asking for--

A  October 7th.

Q  (By Ms. Scott) And the year?

A  2018.

Q  What other dates do you see on that document?

A  October 14th, 2018.

Q  Any others?  You emailed Latoya first and then she responded.  Do you know the date that she responded?

A  2009 -- October 9.

Q  And the date?

A  2018.

Q  Thank you.  So, for at least two weeks of October you were working with in a hiring capacity?

A  Yes.

Q  Are you familiar with the position Ms. Williams was applying for?

A  Yes.

Q  What is the position?

A  Case manager.

47

Q  What are the duties of that position?

A  Work with clients on legal matters, helping them get back into society and get on their feet with the resources that are available.

Q  So transitional?

A  Transitional.

Q  Did she provide therapy?

A  No.

Q  She did not provide any therapy?

A  She's not a therapist.

Q  You never -- she never took the position of transitional therapist as well as case manager?

A  Not that I was aware of.

Q  But you are unaware that you hired her in the first place, right?

A  I was aware she came in for the position of case manager not therapist.

Q  But you didn't remember that you responded on her case manager ad on Indeed?

A  I do now, you showed me an email.

Q  But without me refreshing your recollection, you were not aware of her original state was to apply for the job?

A  For case manager.

Q  Right.  But you don't recall --

48

MR. LOFFREDO:  She is asking did you independently recall it before you saw the exhibit that she showed you what position she was applying for.

A  No, I did recall, it was case manager.

Q  (By Ms. Scott) But you didn't recall that you even reached out to her through Indeed?

A  Well, I do now.  You showed me the documents.

Q  So prior to me showing you the documents, you didn't remember?

A  I did not.

Q  Are there any other duties or responsibilities that Ms. Williams had with TPA?

A  I don't believe so.

Q  Are you familiar with the hours she worked?

A  Her personally, no.

Q  How much contact did you have with her on a daily basis?

A  Not much at all.

Q  Did you direct he schedule?

A  No.

Q  Did you direct her start date with the company?

A  I don't recall.

Q  Would this refresh your recollection, the

49

previous exhibit?

A  Possibly.

MR. LOFFREDO:  Oh, G.

Q  (By Ms. Scott) Take time and review it again.

A  Okay.

Q  What is the content of this email?

A  It was from October 14th and asked her if she was available to start on Tuesday.

Q  Anything else in that sentence?

A  We would like to make you an offer for the position.  Let's speak tomorrow.

Q  Did you speak with her?

A  I'm not sure if I did or someone else did.

Q  But you directed or suggested that she speak with you?

A  Correct.

Q  And you suggested she start on Tuesday?

A  Correct.

Q  And at this point, to your knowledge, you are the only contact with TPA that she's had?

A  No.  If she came in for an interview, she spoke to the people in HR.

Q  You are the only contact she had with regard to an official hiring?

A  No, not necessarily.  She might have spoken to



Frankel, Scott  03-28-2019

50

other people in HR while she was there.

Q    But at least you know for sure that you were part of that process?

A    Yes.

Q    You don't recall speaking to Latoya after that with regard to that specific discussion on October 15th, for example, the following day?

A    I don't recall.  No.

Q    I'm sorry, one more -- let's go back to that, Mr. Frankel.  I apologize.  That's her name there, correct?

A    Correct.

Q    And that's your signature line?

A    Correct.

Q    And you are listed as CEO?

A    Correct.

Q    On October 14, 2018?

A    Correct.

Q    And at least in totality of these emails, you are discussing operations of TPA from October 14th to October 15th to October 16th, potentially?

A    Yes.

Q    So you were handling operations on day-to-day basis?

A    I don't recall if I was handling all the

51

operations then on a daily basis.

Q    But these operations with regard to the company's hiring process?

A    Yes.

Q    You handled it consecutively three days in a row?

A    Yes.

Q    Do you ever recall discussing Ms. William's compensation?

A    No.

Q    Do you know who agreed that with her?

A    I do not.

Q    Do you know who would have agreed that with her?

A    I don't recall.

Q    Do you know -- do you recall who worked in HR?

A    Yes.

Q    Are you familiar with that department?

A    I do.

Q    Can you list their name, please?

A    Brandon Bey and Karyn Hurley.

Q    Are they the only two?

A    They were the only two.  Actually there is one more person that worked in HR also.

Q    Yes.

52

A    Synthia.  I'm trying to think of her name.

MS. SCOTT:  May the record reflect that Mr. Frankel is looking at his phone to find --

A    Synthia Lee is her name.

Q    (By Ms. Scott) To the best of your knowledge, can you spell that for me?

A    Last name is L-E-E.

Q    And the first name?

A    Synthia.

Q    Can you spell that, please?

A    S-Y-T-H-I-N-A I believe she spelled it.

Q    Were you involved in the hiring of any of those employees?

A    Which employees?

Q    Either Mr. Brandon Bey or Ms. Karyn Hurley or Ms. Synthia Lee or all three?

A    They were there from day one.  They were hired the same time I was hired, basically.

Q    Were you involved in the hiring process?

A    I was.

Q    Whom did you hire?  Who were you involved in hiring?

A    I was involved in hiring Brandon Bey.

Q    How were you involved?

A    How was I involved?

53

Q    Mm-hmm.

A    He was recommended through someone else.

Q    Do you remember who that person was?

A    I don't.  And I was one of the people in the interview.

Q    With Mr. Brandon Bey?

A    Yes.

Q    Did you schedule the interview?

A    I don't recall if I scheduled it.

Q    But you interviewed him?

A    I was one of the people, yes.

Q    Do you recall if you reached out to him through indeed.com?

A    No, it wasn't through Indeed.

Q    And were you involved in the hiring process of Karyn Hurley in any capacity?

A    I was.

Q    How so?

A    I was one of the people that was introduced to her when she came in for an interview.

Q    When did she come for an interview?

A    I don't recall.

Q    Give me a rough date, year.

A    2017.  She was one of the later ones.

Q    And you were in the interview with her?



Frankel, Scott  03-28-2019

54

A   Yes.

Q   You interviewed her?

A   I was one of the people.

Q   You interviewed her?

A   I was in the interview where I was introduced to her.

Q   You were in the interview, you were not --

A   HR interviewed her.

Q   You were involved in the interview process?

A   I was there -- yes, to a degree.

Q   And finally, Ms. Synthia Lee, were you involved at all in the hiring of her?

A   The same thing.  I was involved in the process where I was introduced to her during the interview.

Q   You were in the interview with her?

A   A portion of it.

Q   You were one of the interviewers?  Is that correct?

A   I didn't say I was an interviewer.  I was introduced to her.

Q   You were involved in her hiring process?

A   I was introduced to her during the interview with HR.

Q   But as you testified, you were involved in the hiring process?

55

MR. LOFFREDO:  Object to form.

Q   (By Ms. Scott) You can answer.

A   Yeah.  I mean --

MR. LOFFREDO:  He said he was introduced to her so.

Q   (By Ms. Scott) Did you know the day-to-day duties and responsibilities of these three people in HR?

A   Yes.

Q   What were they?

A   They handled benefits, payrolls, and compliance.

Q   What were their official titles?

A   Brandon Bey was CFO and also acted as HR director.

Q   How did those position differ, if at all?

A   One is in charge of the finances, one oversaw all the benefits and payroll and employee benefits.

Q   And which is which?

A   Finances was the CFO.  HR handled the employee benefits.

Q   All employee benefits?

A   Pretty much so, yeah.

Q   And what was Ms. Synthia Lee's official title?

A   Compliance officer.

Q   And what were her duties and responsibilities

56

in that capacity?

A   Policies and procedures.

Q   Can you please explain?

A   She handled operational policies and procedures along with employees' policies and procedures.

Q   What type of employee policies and procedures?

A   Employee handbooks.

Q   So TPA had an official employee handbook?

A   Correct.

Q   Did TPA always have that?

A   Always.

Q   Was it distributed to employees?

A   All employees received it.

Q   How do you know that?

A   Well, I don't know if every single one did but they are supposed to be receiving it.

Q   How do you know they are supposed to receive it?

A   It's part of our policies and procedures.

Q   So you read the policies and procedures as well?

A   I have.

Q   You read the policies and procedures of HR?

A   Correct.

57

Q   You don't recall who created those policies and procedures?

A   They were created by -- Synthia Lee was one of the people who created them and David Kent, at the time.

Q   Can you please spell his name?

A   D-A-V-I-D K-E-N-T.

Q   And what was his official position with the company?

A   He was originally the HR director.

Q   When was he the HR director?

A   2016 through a portion of 2018.  I don't recall the date he left.

Q   Were you part of the hiring process of David Kent?

A   He was brought on the same time I was.

Q   Similar to the Brandon Bey situation where he was brought on, you were also part of the interview process with him?

A   No, I wasn't part of that.  We were just brought on the same time they brought him in.

Q   Were you part of that hiring process in any way?

A   No.

Q   Is it safe to say the policy was created in 2016 with Mr. Kent and Ms. Lee?



Frankel, Scott   03-28-2019

58

A   Yes.

Q   When was the policy implemented?

A   Day one.

Q   And that day being?

A   January 1st, I believe.  January 2nd.

Q   How was it implemented?

A   It was put in place in order to obtain a license with DCF.

Q   How was it?  How did you let employees know this policy was in effect?

A   They received orientation and a copy of it.

Q   All employees received orientation?

A   Correct.  To the best of my knowledge, they do.

Q   You were a part of the orientation?

A   No.

Q   How do you know that they received the handbook or the policies?

A   It's procedure.

Q   You are privy to all the procedures of TPR?

A   TPA.

Q   TPA, excuse me.

A   Yes.

Q   You are.  Would you consider these procedures the daily operations of the company?

59

A   Yes.

Q   This policy was in effect in October 2018?

A   Correct.

Q   According to the policy, employees should have received a handbook?

A   Correct.

Q   And do you know if Ms. Williams received a handbook?

A   I do not.

Q   Do you know if Ms. Williams received an orientation?

A   I do not.

Q   Who, if anyone, is responsible for revising or modifying the policy?

A   Synthia Lee or Brandon Bey.

Q   Were you ever engaged in that process?

A   Generally, no.

Q   Can you expound?  Generally?  Sometimes you were?

A   No.  I really didn't get involved with policies and procedures as far as changing them or reforming them.

Q   But you might have been involved at some point?

A   No, I didn't say that.

60

Q   But you don't know for sure that you were never involved?

A   I wasn't.  I didn't change policies or procedures or revamp them.  It wasn't my job to do that.

Q   But you are aware of them and you know how they affect the company?

MR. LOFFREDO:  Objection to form.

Q   (By Ms. Scott) You can answer.  You can answer.

A   I'm aware of policies and procedures, yes.

Q   And you know how they affect the company?

A   Of course I do.

Q   How many people did TPA employ in 2018, to the best of your knowledge?

A   30.

Q   Are you familiar with the different positions of these employees, the generalization of the different titles?

A   Yeah.  Yeah.

Q   Can I please have them?

A   CEO, CFO, therapists, medical doctors.

Q   Are there different types of therapists at the facility?

A   Generally, no.  Licensed therapists, mental health, social media people.

61

Q   Are there any other therapists other than mental health therapists?

A   That were employed by the company?

Q   Yes.

A   No.

Q   It's your understanding that there is no other therapist, other than the type of mental health, at the facility?

A   Substance abuse and mental health therapist.

Q   Any other specialized therapist?

A   No, we did EMDR therapy but the same therapist. It all the same therapists.  Case manager.

Q   Is there such a title as transitional therapist?

A   Transitional therapist, no.

Q   Was there ever a title as transitional therapist?

A   Not that I'm aware of.

Q   Are you aware that such a title is on the website of Treatment Partners of America?

A   Transitional therapist, no.  I'm not aware of it.

Q   Are you familiar with the treatment partner of America website?

A   I was.



Frankel, Scott   03-28-2019

62

Q   Did you have any part in putting content upon that website?
A   No.
Q   But you are aware of the content?
A   I'm aware of the content at the time.
Q   Was there anything on that content that was misrepresentative?
A   Not that I am aware of.
Q   If there was something on the website that said that there were other therapists than mental health and substance abuse, such as transitional therapist, would that be misrepresentative?
A   Yeah, I've never heard that term.  I'm not aware of that term.
Q   That would be incorrect?
A   Yes.
Q   The company does not have a transitional therapist?
A   Not that I'm aware of, no.
Q   Okay.  Let's go back.  You went to their social media employees, right?
A   Nursing.
MR. LOFFREDO:  He also said case manager.
A   Case manager.  Music therapists.
Q   (By Ms. Scott) So there were therapists?

63

A   Well, there is -- it's the same therapist but we did music ourselves.  So I'm categorizing as music therapy but it's the same therapist.
Q   Yeah, explain that to me.  Are there any other that would be under that generalization but have more of a specific name?
A   No, that would be it.
Q   There is no -- there would be no other name other than music therapist, mental health therapist, substance abuse therapist?
A   Not that I can think of.
Q   How many employees worked at the premises located at 6909 Southwest 18th Street?
A   Probably about 25.
Q   25 out of the 30 in total?
A   Yeah.
Q   Did Ms. Williams work there, at that premises?
A   For that short period of time, yeah.
Q   She didn't always work there?
A   I don't know where she was before she came to TPA.
Q   When she was employed at TPA, that entire period --
A   Yes.
Q   -- she worked at the 6909 location?

64

A   Correct.
Q   How many patients or clients were at that location?
A   Maybe 20.
Q   In 2018?
A   Yeah.
Q   How many in the other areas of TPA was in operation while you were there?
A   How many?
Q   Patient or clients?
A   Can you repeat the question?
Q   Yes.  How many patients or clients were at the premises during 2016, 2017, and 2018 separately?
A   2016 the census was probably the area between 40 and -- 40 and 50 or so.
Q   Did any reside on the premises?
A   Not one.
Q   Not one?
A   No.  We were not licensed to hold clients on the premises and we were not set up for clients staying overnight there.
Q   But clients were held on premises of other TPA locations?
A   No, there was separate housing, community housing for them at a separate location.

65

Q   Was TPA in control of the housing?
A   TPA was.
Q   How many patients or clients were there in the housing that's controlled by TPA in 2017?
A   Maybe 20.
Q   And how many in 2017 of these patients were on the 6909 locations?
A   Same amount, 20.
Q   And in 2018, the housing under the control of TPA, how many clients or patients resided in that premises?
A   They fluctuated.
Q   About how many, to your best estimate?
A   15.
Q   We are going to get to the duties of HR.  Did the policies and operation of HR provide any paperwork for new employees to complete?
A   Yes.
Q   What paperwork did they have to complete?
A   I'm sure they put their background.
Q   Can you explain a little more?
A   Resume, background, previous employment, education.
Q   Any financial documents?
A   I believe so.

 UNIVERSAL COURT REPORTING

Frankel, Scott   03-28-2019

66

Q   Which documents?
A   I'm sure what their salary structure was.
Q   Do you know the documents names?
A   I do not.
Q   Did they ever have to fill out a w-2 -- or w-4, excuse me?
A   Yes.
Q   Was the policy that all employees must fill out a w-4?
A   Or a w-2 or whatever it was at the time.  Yes.
Q   Is it common practice for employees to begin working without filling the document out?
A   No, not that I'm aware of.
Q   Would it be against policy for that to happen?
A   Generally it's usually done when they are hired.
Q   The day of or the week of, can you explain?
A   I don't know the exact time that they would sign.
Q   Are you aware if Ms. Williams was asked to fill out one of these forms?
A   No, I'm not.
Q   Would it be against policy if she did not fill out one of these forms?
A   I believe she did.

67

Q   Would it be against policy if she did not fill out one of these forms?
A   Would it be?  Yes.
Q   And the policy would have an employee fill out these forms within the first days of their employment, correct?
A   I would think so.
Q   Are you familiar with when an employee would have to fill out this form?
A   They generally fill them out the first couple of days, yes.  Or the date they start their employment.
Q   And based on the hiring process you had with Ms. Williams, that would have been somewhere between the second week of October?
A   I'm not aware of when she filled it out or when she was presented it.
Q   Are you aware of when she started working there?
A   Yes.
Q   And you were working at the company as CEO and in a hiring and firing capacity at that time?
MR. LOFFREDO:  Object to form.  Go ahead.
A   Yes.
Q   (By Ms. Scott) So you would have had knowledge of any sort of documents that she would have filled out

68

at that time?
MR. LOFFREDO:  Object to form.
A   I wouldn't have.  No, I wouldn't have knowledge.  HR would have done so.
Q   (By Ms. Scott) You would have been able to conduct a reasonable investigation as to whether those documents exist?
MR. LOFFREDO:  Object to form.
A   No, I had no reason to.
Q   (By Ms. Scott) Why would you have no reason to?
A   Because that's HR's function.  I was not micromanaging the HR to see if they had all forms filled out with every employee at the time.
Q   In the Notice of Depo that we provided you specifically requested that you obtain these documents.
MR. LOFFREDO:  Wait a second.  He no longer works for the company.  How was he supposed to obtain the documents?  You could have subpoenaed them.  You could have requested the documents from the company, who is in default.  He doesn't have the documents. He hasn't been with the company since last October.
MS. SCOTT:  We could have subpoenaed but we didn't have to.

69

MR. LOFFREDO:  He doesn't have them.  Are you asserting that that he has custody of these documents, of w-4s, of personnel files of employees?  He hasn't been there in six months.
Q   (By Ms. Scott) Your testimony earlier was that you had no obligation because you didn't work at the company at that time in 2018, correct?
A   No, I don't work there.
Q   Your testimony earlier was that you did not work there in October, 2018?
A   I worked there for a portion of it, I said.  I wasn't sure of the exact date that I left.  I worked there for a portion.  And once I walked out of there-- I was just an employee.  I have no access to anything.  Nothing.  I have no email, nothing.  I was done.
Q   But your reason for not being able to do due diligence and produce these documents that we were requested you to do--
A   I can't.  I don't have access to anything.
MR. LOFFREDO:  He just answered your question.
A   I don't have access.
MR. LOFFREDO:  What would you like him to do?
A   I don't work for the company.
Q   (By Ms. Scott) You did work at the company when Latoya would have filled out these documents?



Frankel, Scott  03-28-2019

70

A   Yeah, but -- at the time.  I mean, I wouldn't go looking for the documents.

Q   So you would have knowledge if they exist?

A   Excuse me?

MR. LOFFREDO:  Object.

Q   (By Ms. Scott) You would have knowledge that these documents exist?

MR. LOFFREDO:  Object to form.  He's already said this was HR's function.

A   Yes, HR.

MR. LOFFREDO:  He's presuming she filled them out.  He doesn't know.

A   I have no idea.

Q   (By Ms. Scott) And you were affiliated with HR and knew their policies at the time that she worked there?

A   I was affiliated to a degree where I was CEO at the time.  But I had nothing to do with the HR portion for her filling out documents, no.  That was HR.  And I left the company then.

Q   It's your testimony that you were fully aware of the policies and procedures of the HR?

A   I am.  The policies and procedures are that a new employee fills them out.  Now, if HR has a duty to have them filled out by an employee, that's HR and

71

employee working on it.  I did not micromanage, as I mentioned a moment ago, that HR had them filled out.  I did not audit the charts.  I was not there long enough to audit them.

Q   It's your understanding then that if she didn't have these documents filled out, it would be against company policy?

A   It's against -- of course.  Procedure is an employee is hired, they fill out documents.

Q   Let's move on.  Is it possible you were still employed in November of 2018?

A   No.

Q   How do you know that?

A   How do I know that?

Q   Yeah.  How do you know it's not possible?

A   Because I wasn't there working.  I was not working with the company.  I was told to leave.

Q   Why whom?

A   Mario Monello.

Q   When were you told to leave?

A   I don't recall the exact date.

Q   Was it in October or November?

A   October.

Q   Were you still working when he told you to leave?

72

A   Was I still working?  Yes.

Q   Can you explain the circumstances of him telling you to leave?

A   He basically said the company was going to be acquired by another company at the time.  They were doing an acquisition deal but they are still keeping the business.  So the business is not closed.  They are still in business and good luck.  We wish you the best of luck.  I was let go.  I was not paid.

Q   Were you working in November 2018 elsewhere?

A   No.

Q   What were you doing?

A   Nothing.  I haven't worked since.

Q   Were you still touring?

A   No.

Q   Were you still in contact with anyone at TPA?

A   Occasionally people called me.

Q   Who called you?

A   I don't recall.  Numerous people called to see how I'm doing.

Q   Did Brandon Bey called you?

A   He did.

Q   And what conversations did you have

A   To see how I'm doing.

Q   Did you discuss the company?

73

A   Very little.

Q   What did you discuss?

A   That I'm no longer with the company.

Q   I'm sorry?

A   That I'm no longer with the company and that I needed to be removed from all documents at the time.

Q   So, you were still part of the company in different documents when you were speaking to Brandon Bey?

MR. LOFFREDO:  Object to form.

Q   (By Ms. Scott) You can answer.

A   I was still listed on documents, yeah.

Q   So you were having conversations with Brandon Bey about the operations of the company?

A   Yes.

Q   Did you speak with Brandon Bey about your compensation issues?

A   Yes.

Q   -- with the company?

A   Yes.

Q   Did you speak about the company's problems with paying employees?

MR. LOFFREDO:  Object to form.

A   No, I didn't go into detail with him on anything like that.  He told me company employees were



Frankel, Scott   03-28-2019

74

being paid on a certain date.

Q   (By Ms. Scott) What date was that?

A   It was a date in December.  I don't recall the date.  Before Christmas.  And every employee was paid, I was told.  Excluding me.  But every employee was paid.

Q   But you don't know for a fact-- Brandon Bey told you that?

A   Yes.  Including Ms. Williams.

Q   When you were discussing this with Brandon Bey and he told you about the date in December when employees would be paid, it was your understanding that no employees had been paid up until then?

A   I wasn't sure who was paid and who was not paid.

Q   But at least some employees hadn't been paid when you spoke with Brandon Bey?

A   Correct.  And there was a date set and everybody was paid, I was told.

Q   Why were you discussing the compensation with the employers if you were no longer with the company?

A   Why?  Because there was people talking about lawsuits and he called me and told me about it.

Q   He told you about all those discussions?

A   He said people were looking to get paid and there were going to be lawsuits.

75

Q   And what lawsuits was he discussing?

A   Just employees, that they were threatening to sue people.

Q   Do you know which employees?

A   I believe Ms. Williams was one.

Q   So you discussed Ms. Williams' lawsuit with Brandon Bey?

A   Yes.

MR. RICHARDS:  You want to take a five-minute break maybe?

THE WITNESS:  Sure.

MR. RICHARDS:  So okay, let's do a quick five-minute break, off the record.

(Brief recess.)

(Deposition resumed.)

MR. LOFFREDO:  We'll stipulate to Enterprise coverage with regards to the company, at least from his standpoint.  We don't represent the company but, you know.

Q   (By Ms. Scott) As we left off, we were talking that you were discussing with Brandon Bey the lawsuits against TPA right after you left the company, according to you?

A   Brandon Bey explained to me that he spoke with Jordan and let him know that the Plaintiff is going to

76

be paid on a certain date and a check was being sent to her.

Q   But, you have no idea when the check was sent, if at all?

A   Actually I do.

Q   How do you know that?

A   I had a receipt that she received the check in the mail.

Q   You received the receipt?

A   We have a copy of it.

Q   Did you receive the receipt?

A   Me, personally?

Q   Yes.

A   I did.  I received an email.

Q   When did you receive the email?

A   Yesterday or the day before.

Q   Why would you-- are you still affiliated with the company?

A   No.

Q   Why are you getting emails --

A   I asked for proof that she was paid.

Q   When you spoke with Brandon Bey back when you were discussing the lawsuit and he said that employees were going to be paid and in particular Ms. Williams was going to be paid and the check was to be sent, you had

77

no idea --

A   At that time, no.

Q   -- if the check was sent?

A   No.

Q   You had no idea of when the check would be sent?

A   I had no idea at that time.

Q   You had no idea if she would be paid -- or if she had been paid?

A   I had no idea.

Q   You had no idea if she actually cashed the check?

A   Do I know if she cashed the check?  I have no idea.

Q   But, you were still in communication with Brandon Bey about the operations of TPA?

MR. LOFFREDO:  Objection to form.

A   Well, not the operations.

Q   (By Ms. Scott) Do you recall you testified that there was no way you were employed with TPA in November 2018?

A   Correct.

Q   As a CEO, is one of your duties to sign paychecks to individuals, individual employees?



Frankel, Scott   03-28-2019

78

A    It is.

Q    As the CEO of TPA, one of your duties is to sign paychecks?

A    Correct.

Q    You were no longer a CEO of TPA in November 2018?

A    No, I was not. So what you are getting at was my name on a check.

MS. SCOTT:  I'm going to introduce --

MR. LOFFREDO:  Let her introduce the exhibit then you can explain.

MS. SCOTT:  -- Plaintiff's Exhibit --

MR. LOFFREDO:  H.

MS. SCOTT:  H?

(Thereupon, Plaintiff's Exhibit H was entered into the record.)

Q    (By Ms. Scott) Please review the document.

A    Yes.

Q    Do you recognize this document?

A    I do.

Q    How do you recognize it?

A    These are checks with my signatures on it.

Q    Did you sign these checks?

A    No, I did not. They use a stamp with my signature.

79

Q    Who is they?

A    Brandon Bey.

Q    Why would your signature be on a stamp with the company if you are no longer affiliated with the company?

A    I can't answer that. They were instructed not to use it and they still do.

Q    And you are aware that your name was being stamped on checks?

A    I was not aware of it.

Q    When you discussed the checks being sent by Brandon Bey, did you ask who signed the checks?

A    No.

Q    But you were aware that checks were beings sent out and that the company -- it was practice to stamp your name on these checks?

A    No, they were supposed to have it switched over with someone else by then.

Q    But you are aware that the company there is a possibility of continuing to do that?

A    No. I am aware now it was but no, they were not supposed to be using my name. I have no affiliation with the company.

Q    So, then why were you discussing the terms of the company's operations with Brandon Bey regarding

80

these checks that were sent to employees?

MR. LOFFREDO:  Objection to form. Asked and answered. Go ahead.

A    Because he mentioned to me that everybody was getting paid. I was concerned was I also getting paid because I was owed a large sum of money for months of not being paid.

Q    (By Ms. Scott) Were you still in contact with employees of TPA during November 2018?

A    Occasionally.

Q    Who did you contact?

A    I didn't contact anyone. People called me, just friendly --

Q    You never contacted anyone yourself?

A    I might have. I don't recall.

Q    Did you contact anyone involved in the lawsuit against you in November 2018?

A    I don't recall.

MS. SCOTT:  I'm going to introduce Plaintiff's Exhibit I.

(Thereupon, Plaintiff's Exhibit I was entered into the record.)

Q    (By Ms. Scott) Please review the document.

A    Okay.

Q    Do you recognize this document?

81

A    I do.

Q    How do you recognize that?

A    It's a text message.

Q    From whom?

A    It's from me.

Q    To whom?

A    I don't know who the person is.

Q    The person was Latoya Williams.

A    Okay, could be. I see because of what she has here. I might have recommended a few people for positions to other people.

Q    So you did reach out to individuals of TPA that were involved in the lawsuit against you in November 2018?

MR. LOFFREDO:  Object to form and foundation. Go ahead.

A    I don't recall the lawsuit being against me at the time with anyone. I don't recall.

Q    (By Ms. Scott) Is that your number?

A    It is.

Q    That is your cell phone number?

A    It is. And I was trying to help people that were looking for jobs to get jobs. If there is anything I knew about, a job position, I was always trying to help people get jobs.



Frankel, Scott   03-28-2019

82

Q   It's your testimony that you weren't doing anything on November 2018?

A   I was not working for anyone.

Q   But you were soliciting employees?

A   I wasn't soliciting, I was trying to help people out.

Q   Are you aware that you were not to communicate with Ms. Williams after she filed this suit against you?

A   No, I don't believe I had a suit against me.

Q   What is the date on that text message, please?

A   November 16, 2018.

MR. LOFFREDO:  There is no prohibition against clients talking to each other after a lawsuit is filed.  It's only counsel.

Q   (By Ms. Scott) Were you in contact with Brandon Bey in November 2018?

A   Yes.

Q   Were you-- did you discuss the payment period-- the repayment period before November 16, 2018 with him?

A   About getting paid from the company?

Q   Yes.

A   I did about myself.

Q   You have testified that you spoke about the other employees, specifically the ones that were suing

83

you and when they were going to be paid.

A   Other people, yes.

Q   So. you did discuss the compensation and the repayment plan for employees --

A   I asked him --

MR. LOFFREDO:  Hold on.  Let her finish her question before you answer.

Q   (By Ms. Scott) -- on or before November 16th, 2018?

A   No.  What we talked about at that time was that he had spoken to this law firm and discussed that all employees were getting paid and there was no claim against TPA or myself at the time.  I didn't know there was any lawsuit at that time against me.  And that there was a date set that they would all be getting paid.

Q   And you knew that because Brandon Bey explained to you?

A   He explained it to me.

Q   Do you agree that you have a fraud claim against TPA -- do you believe our client has a fraud claim against TPA?  Do you believe you have a fraud claim against TPA and Brandon Bey based on the checks that you weren't paid?

MR. LOFFREDO:  Object to form.

Q   (By Ms. Scott) Do you believe you have a fraud

84

claim based on the fact that they misrepresented --

A   I think I have a fraud claim against you, this firm.

Q   Do you believe you may have a fraud claim against them for misrepresenting your authority and stamping checks --

A   No, I think --

Q   -- on behalf of the company?

A   No, I think I have a fraud claim against this firm.  Your client was paid.  You instructed her not to cash her check probably, I would think.

Q   You have no knowledge of whether our client has been paid.

A   Do I have any knowledge of --

MR. LOFFREDO:  Whether their client has been paid, she said.

A   Do I have knowledge of it?  Just from what I have been told by Brandon Bey that she was paid and a copy of the receipt that she received.

Q   (By Ms. Scott) Which you have no knowledge of the check being sent with it having being signed with your signature?

MR. LOFFREDO:  Object to form.  I think he has answered --

Q   (By Ms. Scott) The check wouldn't have been

85

sent without your signature stamped on it.

A   I wouldn't know that.  I don't know who would sign the check to the client.  It was not supposed to be my signature on any check from the day I left.

Q   As a CEO of TPA, it's common practice that your signature was on the checks sent out to employees?

A   While I was there.  While I was employed.  Once I was no longer employed, my signature was not to be used.

Q   But once again, you would have no knowledge of whether those checks were sent without Brandon Bey telling you about the operations of the company?

A   Correct.

Q   Do you trust Brandon Bey not to use your signature to issue checks without your consent?

MR. LOFFREDO:  Object to form.

A   I don't think I can answer that.

Q   (By Ms. Scott) Are you aware if the company is still doing so?

A   Doing so what?

MR. LOFFREDO:  Using your signature.

Q   (By Ms. Scott) Issuing checks with your signature?

A   I am not aware.

Q   So you are not aware of the checks being sent



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

Frankel, Scott   03-28-2019

86

by the company?

A   I do not, no.

Q    Please answer if you believe that Brandon Bey- - please answer if you believe Brandon Bey even know who used your signature.  You still trust him?  Answer if you trust him or not.

MR. LOFFREDO:  Objection to form and the foundation of the question.  Go ahead.

A   Do I trust him in what sense?  Can you define that.

Q   (By Ms. Scott) Do you believe him?  Is he an honest person?

MR. LOFFREDO:  Object to form.

Q   (By Ms. Scott) To your understanding.

A   I believe he is.

Q   Even if he is fraudulent using your signature?

MR. LOFFREDO:  Objection to form. Mischaracterization.  Go ahead.

A   I don't have that answer about my signature, why they are still using or why they did up to that period or up to today.

Q   (By Ms. Scott) So it doesn't really matter to you --

A   Oh, it does.

Q   That they are using --

87

A   Oh, it does.

Q   -- your signature --

A   Of course it does.

Q   -- to effect decisions on behalf of the company?

A   Of course it does.

Q   So you are aware that the company is still using your name and your authority to issue payment?

A   I'm not aware they are still using it.  They have been instructed not to.

Q   But you are not aware if they are still using it?  They may be?

MR. LOFFREDO:  He said he is not aware.

A   I'm not aware.

Q   As you weren't in November 2018?

A   I wasn't aware they were using it then either. They were instructed by me and other counsel not to use it.

Q   When were they instructed not to use it?

A   When I left.

Q   When you left in October 2018?

A   When I left in October they were instructed no longer to use my signature.

Q   And yet in November 2018 they were still using your signature?

88

A   Correct.

Q    Did you see these checks with your signature before they were sent out?

A   No.

Q    So you've had no knowledge that they were sent out without Brandon Bey telling you the operations of the payment plan?

MR. LOFFREDO:  Objection to form.  Asked and answered.  Go ahead.

A   Yes.

Q   (By Ms. Scott) So then you knew Ms. Williams had not been paid in November 2018?

A   I didn't know specifically her.  I know employees haven't been paid.

Q    You testified that Brandon Bey was issuing payment on a future date, December 11, 2018?

A   Correct.

Q    You testified that you spoke with him in this regard in November 2018.  Therefore, you were aware that employees and Ms. Williams were not paid at the time that you spoke?

A   Correct.  Yes.

Q    After the filing of the lawsuit?

MR. LOFFREDO:  Object to form.  You haven't established when the lawsuit was filed and when he

89

knew about it.

A   I knew about the lawsuit --

MS. SCOTT:  We are introducing Plaintiff's Exhibit C.

MR. LOFFREDO:  You don't have to reintroduce it, you just to refer to it.  He has already testified he didn't know when the lawsuit was filed.  He had no knowledge of it at that time. It's over here.  I don't need it.  Just pull up C.

Q   (By Ms. Scott) Please review the document.

MR. LOFFREDO:  Yeah, D.

Q   (By Ms. Scott) If you would like to refresh your memory on Exhibit D. you Please look at the top of the document.

MR. LOFFREDO:  Start with the date up there. The filing date of the complaint.  November 14.

Q   (By Ms. Scott) Read the date for the record.

A   11/14/2018.

Q    So, do you understand that Ms. Williams filed the complaint on November 14th, 2018?

A   I was not aware of it at the time, no.

Q    Are you aware of it now?

A   Yes, I am.

Q    So you understand the time that Ms. Williams filed the complaint?



Frankel, Scott   03-28-2019

90

A   Mm-hmm.

Q   And do you understand that based on what you have testified with your discussion with Brandon Bey, she had still not been paid and would not be paid until December 11, 2018 at earliest?

A   Okay.

Q   Do you understand that?

A   I do.

Q   So, you understand that she had not been paid prior to the filing of this lawsuit and continuing thereafter?

A   I understand she was not paid, yes.

Q   Okay.

A   And I understand I had no control of it.  I was an employee no longer with the company --

Q   But you are still aware --

A   -- and in the same situation that I wasn't paid and all employees were paid excluding me, to this date.

Q   So, you are aware of all employees, their situations, and whether or not they have been paid?

A   Yeah.  I heard everybody was paid.  That's what I was told.

Q   Are you aware of any communications with Brandon Bey and his law firm?

91

A   Yes.

Q   Were you aware those communications when you spoke with him in November 2018?

A   Yes.

Q   What were you aware of?

A   That Jordan, is it Jordan?

MR. LOFFREDO:  Yes.

A   Had a conversation with Brandon Bey.  And he had a very heated conversation.

Q   (By Ms. Scott) Were you aware of the substance of the negotiations?

A   I was aware that he told Jordan that she was getting paid, there w as a  date and the check was being sent out and that you were a part of it, you wanted to get paid your fees.

Q   So, you weren't involved in the negotiations?

A   No, I was not.

MR. LOFFREDO:  It's not what he said.

Q   (By Ms. Scott) You were aware of those negotiations?

A   I was not aware of the number, the fees or anything.  I didn't even know how much was owed.

Q   You were aware that Ms. Williams had not been paid at that point, from those conversations?

A   Yes.

92

Q   Let's refer to I think Plaintiff's Exhibit A.  I'm sorry, Plaintiff's Exhibit C.

MS. SCOTT:  Is C the answer to affirmative defenses?

MR. LOFFREDO:  No, that's probably E.  If D was the complaint.  Yes, E.

MS. SCOTT:  I apologize.

Q   (By Ms. Scott) Can you please review the document.  Please look at affirmative defense number 17.

MR. LOFFREDO:  Go to the end.  It's at the end.

A   Okay.

Q   (By Ms. Scott) Please read the defense and let me know when you are done.

A   Okay.

Q   Do you understand that defense?

A   I do.

Q   Can you explain the defense to me, to your understanding, you own words?

A   The treatment partner owed -- paid wages that are owed to the Plaintiff.

Q   How did you know that -- what basis of knowledge did you have for that defense?

A   I'm not treatment partners, so I don't.

Q   So you don't know anything about this, the

93

foundation of this?

A   How much he was paid or what was owed?

Q   Yes.

MR. LOFFREDO:  And whether she was paid.

A   Okay.

Q   (By Ms. Scott) So please answer.

A   I don't understand the question.

Q   Did you -- did you know that Ms. Williams hadn't been -- do you have knowledge of the affirmative defense in number 17?

A   I understood employees were not paid.  That's all I understood at the time.

Q   So you had no knowledge that the corporation TPA had paid money or tendered full amount of wages to Ms. Williams?

A   I was told she was paid in full.

Q   But you did not have knowledge yourself?

A   Me, no.

Q   And who told you she was paid in full?

A   Brandon Bey.

Q   So you had no knowledge yourself of this defense?

A   No.

MR. LOFFREDO:  Other than what he was told.

A   Other than what I was told.



Frankel, Scott   03-28-2019

94

Q   (By Ms. Scott) We'll go back to the communications that you are aware of between Mr. Bey and Mr. Richards and his firm.  You testified that you knew some of the discussions and the substance.  So you knew that Mr. Bey admitted that our client had not been paid?

MR. LOFFREDO:  Object to form.  Go ahead.

A   Yes.

Q   (By Ms. Scott) You knew that he never intended to pay our client before or until the filing of her lawsuit on November 14, 2018?

A   I don't know if that was true.  I know that that there was a date set, he told me, to pay all employees.

Q   You knew that there was a date set after November 14, 2018?

A   Correct.

Q   And this date was explained to you after she filed the lawsuit?

A   I don't recall the date when I was told this. The only thing I knew that they were getting paid sometime in December before Christmas.  That's what I was told.

MS. SCOTT:  I'm going to introduce as Plaintiff's Exhibit J, I believe.

(Thereupon, Plaintiff's Exhibit J was entered

95

into the record.)

Q   (By Ms. Scott) Please review the document and let me know when you are ready.

A   Okay.

Q   Do you recognize this document?

A   I didn't receive this.  I don't believe I have a copy of it from them.

Q   Do you recognize it at all?

A   Yes, I can see what it is.

Q   Have you seen it before?

A   I don't recall seeing this.

Q   You don't recognize it?

A   No.

Q   Can you tell me a little bit about the substance of it, to your understanding?

A   It's basically saying that all employees are getting paid by a certain date.

Q   And what's that date?

A   December 11th.

Q   The same date that Mr. Bey told you they would all be paid?

A   I believe so.  Right around then, yeah.

Q   And who sent that letter out?

A   Brandon Bey.

Q   And when is that letter dated?

96

A   16th of November, 2018.

Q   And that's after the filing of Ms. Williams's lawsuit?

A   Yes.  I guess.

Q   Okay.  Just a few more.  Mr. Bey, earlier you testified that you don't have any access to any company--

A   I'm not Mr. Bey.

Q   Oh, I'm so sorry.  Mr. Frankel.  You testified that you don't have access to company documents, correct?

A   Correct.

Q   You have no access to any company documents?

A   Nothing.

Q   Except the ones that you requested from Mr. Bey?

MR. LOFFREDO:  She's asking -- she's saying you asked Bay for documents that he provided you?

A   Correct.

Q   (By Ms. Scott) So you have the ability to request documents of the company?

A   No.

Q   Why do you not have the ability to do that?

A   I'm not a lawyer with the company.

Q   How did you request the document of Ms.

97

Latoya's check receipt -- Ms. Williams's receipt of her check?

A   I asked Mr. Bey was she paid, he said "Yes, I'll send you ever proof she was paid."

Q   So you were receiving documents from Mr. Bey that reflect the operation goings of the company to this day?

MR. LOFFREDO:  Objection to form. Mischaracterization.

A   No.

Q   (By Ms. Scott) In 2019?

A   No.  I asked him for a receipt because I was coming in today and I said this is a bogus lawsuit and it's a fraud case and he said, "I can help you out with this because she was paid and there is no leg to stand on here" and he spoke to Jordan about this and you still want to go through with a false claim knowing your client was already paid and had a check in her hand and did not cash it.

Q   So, you did produce documents today in preparation of this deposition?

MR. LOFFREDO:  Object to form.  That's not what he said.

A   That's not what I said.  I sent it to my Counsel.



Frankel, Scott  03-28-2019

98

Q   (Ms. Scott) You were able to get company documents from TPA that are responsive to the request that we asked you in the notice for depo?

MR. LOFFREDO:  Object to form.  Go ahead.

A   I did receive a proof --

MR. LOFFREDO:  A document.

A   -- of document that they received the check and gave it to my attorney.

Q   (By Ms. Scott) Okay, can you produce it today?

MR. LOFFREDO:  Sure.

MS. SCOTT:  Thank you.

MR. LOFFREDO:  I'm surprised you didn't produce it in disclosures.  Here you go.  I was going to have a question about it.  There you go.  There is multiple copies.

Q   (By Ms. Scott) Going back quickly, Mr. Frankel, you said this is a fraudulent lawsuit?

A   It is.

Q   You discussed that with Mr. Bey not too long ago?

A   Yes.

Q   You testified earlier that Ms. Williams had not been paid until after she filed the lawsuit?

A   Prior to the lawsuit against me.  Against me.  Against me.  Not TPA.  TPA is not my concern.  My

99

concern is me.

Q   She had filed claims of not being paid under Florida law?

MR. LOFFREDO:  Are you asking a question or are you telling him?

Q   (By Ms. Scott) It's your understanding that she hasn't been paid?

A   No, my understanding is she was paid.  There is a receipt right there.  She received the check.  You don't have to sit there and look like you saw a ghost.  You were aware of it when you took on the case.

Q   But you have no knowledge --

MR. LOFFREDO:  All right, all right, let's just answer the questions.

A   Listen, listen, I'm going to back off.

MR. LOFFREDO:  Yeah, chill.

Q   (By Ms. Scott) -- cashed her check, correct?

A   True.

MR. LOFFREDO:  I'm sorry, what was the question?

Q   (By Ms. Scott) You have no knowledge that she cashed her check?

A   I have no knowledge.

Q   And you do have knowledge that she had not been paid prior to the filing of the lawsuit?

100

A   Correct.  Just from what I had been told.  Do I have personal knowledge seeing that she wasn't paid?  No.  Just that I was told that employees that were owed money were getting paid on a certain date.  Same way I'm in the same category.  I'm an employee and I wasn't paid.

Q   So, you are still involved in the day-to-day operations of the company?

MR. LOFFREDO:  Object to form.

A   No, I'm not.

Q   The letter that you have seen from Mr. Bey, proves that they did attempt to pay until after the filing of the lawsuit, any employees?

A   Okay.

Q   Is that correct?

A   I have no idea.  I was not part of this letter.  I did not draft the letter.  My name is not on it.  I did not receive a copy of that to me.

Q   But you knew of the substance of the letter?

A   Just from what I read just now.

Q   Mr. Bey discussed the substance of the letter with you over the phone or in person?

A   No, he just told me that all employees were getting paid by a certain date in December and that was it.  And I assumed I would be paid as well at that time.

101

Q   And this was in November 2018?

A   In November, correct.

Q   Which is the same month that Ms. Williams filed the lawsuit?

A   Yes.

Q   Going back to the checks that you-- that Mr. Bey stamped on your behalf.

MR. LOFFREDO:  Here you go.  It's Exhibit H.

Q   (By Ms. Scott) Can you tell me the dates on these checks, please?

A   It's like November 2nd and November 9th and November 9th, I believe.

Q   Why were these checks backdated?

A   I have no idea.  I did not sign them.  I don't know.  I can't answer that.  I have no knowledge of the checks.

Q   Other than what Mr. Bey told you in November 2018?

A   Just that employees were getting paid, that was it.  I had no knowledge of anyone's check.

MR. RICHARDS:  A question for clarification, Tom, is there any -- do you have the contents of whatever was furnished?

MR. LOFFREDO:  Everything that I have is right there.



Frankel, Scott  03-28-2019

102

MR. RICHARDS:  So just for the record, we have one sheet that looks like a USPS priority mail express that's sent from Treatment Partners of America, 6909 Southwest 18th Street, Boca Raton, Florida 33433.  Appears to be addressed to Latoya Williams with an address listed and all it says is "Scheduled delivery date: 12/14/18.  Date accepted 12/13/18.  Time accepted: 4:30 p.m.  And postage and fee is $24.70."  Does that accurately state what you see on that mail?

MR. LOFFREDO:  I mean, I don't have it in front of me but yeah, that sounds like it's one page and it's a typical United States priority mail express receipt for delivery date accepted on December 13th, 2018.

Q   (By Ms. Scott) So, that date is even after the date that Mr. Bey said that he would -- promised to pay the employees, correct?

A   I don't know what the date is except from your letter.

Q   You reviewed the letter.  Would you like to refresh your memory?

A   No, I saw it.

Q   What's the date?

103

A   11th of December.

Q   And what is the date that your attorney provided us with that the check got to Ms. Latoya?

MR. LOFFREDO:  I'm not -- this is an exhibit of the record.  It was delivered on the 13th.  It doesn't -- I believe it doesn't say when it was shipped.  Unless I am missing something.  But it was obviously shipped before December 13th, so.

Q   (By Ms. Scott) But Mr. Frankel, as you look at that and understand that, it was received after December 11th?

A   Yes.

Q   The date that Mr. Bey promised --

A   And if I had to make a guess why, I would think that she was to pick up her check on the 11th and didn't show up to pick her check.  So, he sent it or mailed to her, certified mail or priority mail.

Q   But she was no longer working at the company then, correct?

A   Not to my knowledge.

Q   And the company had the obligation to pay her?

A   Yeah, but if you don't show up to pick up your check, I guess he made arrangements, I would think.  I was not part of it, I am just speculating.

Q   I don't want you to speculate.

104

A   Then, I don't have the answer.

Q   Okay.  Was there any proof that the check was cashed?

A   I wouldn't have that answer.

Q   So you don't know?

A   No.

Q   You don't know if Ms. Williams was ever paid those -- whatever funds were involved in that envelope?

A   I'm no longer with the company.  I don't know what goes on with their banking.

Q   But, you have received that she received payment --

A   I was told verbally.

Q   -- that she received that envelope?

A   Correct.

Q   So, you are aware that she received the envelope but you don't know if she was paid?

A   I do not know.

Q   I just want to go back.  I skipped this earlier, I apologize.  Just duties that you had when you were CEO of TPA that you understand, just some duties that I didn't go over.  Did you ever conduct morning meetings with the employees?

A   Yes.

Q   How often did you do that?

105

A   Regularly.

Q   What is regularly, every day?

A   Three days out of the five-day week.

Q   Did you lead those meetings?

A   No, I didn't lead them.  Generally, I had the program director lead the meetings.

Q   Did you discuss operational tasks and duties in those meetings that the employees had to do for the day?

A   I observed, basically.

Q   Did you speak during those meetings?

A   At times.

Q   What did you say?

A   What did I say?

Q   Yes, just give me some generalization of what you would say during those meetings.

A   I would talk about just how the day was looking and what I had going on and new things for the company that were coming up.

Q   What new things, like clients?

A   No, I didn't discuss generally the clients.  I was more the clinical team.

Q   And what encompassed the clinical team?  What things did you discuss?

A   Would I discuss?  Where I see the company



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

Frankel, Scott   03-28-2019

106

going in the future, new relationships I was building for the company.

Q   So decisions on behalf of the company?

A   Outlook on the company, basically.

Q   Which involves?

A   Where the focus was going, where we were going to focus in the future, other markets that we possibly might go into in the future.

Q   And you were actively engaging in those outreach efforts?

A   Correct.

Q   Who was at these meetings?

A   Generally the clinical team, case manager. That's basically it.  The clinical team would come in.

Q   So Ms. Latoya was the case manager, she was in those meetings with you?

A   She was supposed to be in the meetings.  Was she there, I don't recall if she was ever at all of the meetings.  I don't think she was.

Q   But, she was in the group for the meetings? She was supposed to be there.  You were supposed to discuss operations of the company with her?

A   Not with her, no.

Q   With the case manager of TPA?

A   We didn't discuss operations in our morning

107

meetings.  We discussed some daily schedules or the clinical team would meet and discuss clients, which I was not part of.

Q   Tell me what you mean by daily schedules.

A   What was going on that day with the clientele.

Q   Client intel?

A   Clientele.

MR. LOFFREDO:  Clientele.

Q   (By Ms. Scott) Okay.  And would that be, so you would discuss the clients individually and the patients?

A   I would not, clinical team would.

Q   But you were involved in those discussions?

A   No, I was not.  Clinicals, was clinical.

Q   You testified that you would discuss with the team where the company was going in the future and daily schedules.

A   But I didn't say I discussed the clientele. You asked me if I discussed the clients.  I did not discuss the clients.

Q   Okay.  So you discussed clientele, you discussed daily schedules?

A   I said not clientele.  I discussed the-- what's planned --

Q   I'm sorry, clarify.  I'm a little confused.

108

A   -- the scheduling.  Scheduling.  I did not discuss the clients.

Q   Okay.  So daily schedules, you said you testified -- you talked about that with the employees. You said what was going on that day.  Can you tell me if that's not clientele, what that means?

A   Sure.  If we had a guest coming in to the treatment center to take tours, musical guests coming in. That's basically it.

Q   Okay.  So, goings on in the day-to-day at the treatment facility?

A   Yeah.

Q   Did -- could the meeting go on before you arrived?

A   It could have.

Q   Did it?

A   At times, sure.

Q   But for the most part, the employees had to wait for you before they began the meeting?

A   No, they don't wait for me.

Q   How were the meetings organized?  We discussed what you said and the substance but how did you organize the meeting?

A   Basically, the meetings were held in the conference room and each person that was present in the

109

meeting would speak about what's going on in their department.

Q   You would go around the room and ask each employee to speak about what was going on for them?

A   Somebody would, yeah.

Q   You did sometimes?

A   At times I would but generally I was not the one running the meetings.

Q   But you would run the meeting sometimes?

A   Very rarely.

Q   Did you discuss client intake, what drug programs they are coming from, and why they are coming in?

A   Usually the clinical team would do that. That's a clinical question.

Q   You had no affiliation with the clinical team?

A   I did not sit there and break down the clientele, no.

Q   But, you were involved in those discussions?

A   What type discussions?

Q   The discussions of clients coming in, what drug programs they are coming from and why they are coming in?

A   At times.

Q   Okay.  You would direct tasks through Karen?



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

Frankel, Scott  03-28-2019

110

You would say -- you would delegate tasks to Karen to Latoya, is that correct?

A   No.

Q   Did you ever tell Karen -- assign duties to Karen to assign to the other employees?

A   No.

Q   Did you ever assign duties to the employees?

A   No, I was not the one running those departments. I did not run the employees.

Q   You did not run the employees at all?

A   Did I run the employees at all?

Q   Yeah, you didn't assign any tasks to employees at all?

A   No.  No.

Q   So you never controlled the tasks of Brandon Bey, Synthia Lee or Karyn Hurley?

A   No, I didn't control their tasks, their schedules.

Q   But, you did control the date that Latoya started working?

A   I suggested the date she would start.

Q   How did TPA inform its employees of the company layoff?

A   How did they inform her?

Q   Yeah, was that in one of those morning

111

meetings?

A   I don't know.  I wasn't part of that.  I was just brought in with the owner and he told me I was pretty much done that day.  That was it.  Whatever that day was.

Q   Okay.  For the record, you said you were brought in with the owner.  Did the owner solely bring you in or did you incorporate the company with him?

A   No, it was just me and the owner.

Q   You never incorporated your own incorporation and his, into one separate entity?

A   My corporation?

Q   Did you control a corporation before Treatment Partners of America LLC?

A   What do you mean did I control it?

Q   Did you manage a corporation?

A   Did I manage a corporation?  I don't understand the question.

Q   Give me a moment I will clarify.  This is Exhibit K.  We are introducing it as Plaintiff's Exhibit K, for the record.

(Thereupon, Plaintiff's Exhibit K was entered into the record.)

A   Okay.

Q   Do you recognize the document?

112

A   It was the article of incorporation for the company.

Q   For which company?

A   Treatment Partners of America.

Q   And how do you recognize it?

A   It's what was formed when the company was formed.

Q   Say that one more time, I'm sorry.

A   It's when the company was formed by the attorney.

Q   But how did you recognize it?

A   I have seen it before.

Q   When did you see it before?

A   At the time when it was formed.

Q   Which was when?

MR. LOFFREDO:  You have the stamp date of the date signed.

A   December 29th, 2016.

Q   (By Ms. Scott) And what are you listed as?

A   As incorporator.

Q   Of which company?

A   Treatment Partners, I believe.  Treatment Partners of America, Inc.

Q   Is that a corporation?

A   I'm sorry, LLC.

113

MR. LOFFREDO:  LLC.

A   LLC.

Q   (By Ms. Scott) But you were the incorporator of Treatment Partners of America, Inc., the separate business entity?

A   It's not a separate business.  When he registered the companies, the attorney, he made a mistake. He made it as an Inc., incorporated it over to an LLC.

Q   LLC.  But you are still an incorporator then for Treatment Partners of America, LLC?

A   Right, at the time.

Q   Okay.  So you weren't brought in, you were actually involved in the process of creating the company?

A   I was brought in from day one.

Q   You participated in the incorporation of the company?

A   Yeah, I guess so.

Q   Who was responsible for paying employees during the time that you were at TPA?

A   What do you mean paying employees?

Q   Who signed the checks from TPA from 2015 to 2018?

A   HR did with my stamp.



Frankel, Scott   03-28-2019

114

Q   HR always stamped checks with your signature?

A   For employees, yes.

Q   Okay.  When did you create the policy of your signature stamp?  When did that begin operating?

A   In, I believe 2017.

Q   And why didn't you take the stamp with you when you left?

A   It's a good question.

Q   In 2016 -- can you please answer the question.

A   I don't have an answer.  I was asked to leave and that was it, and I gathered my belongings, and I walked out the door.

Q   You didn't gather the --

A   I requested at that time no use of my name.  I needed to be off the website.  No use of my signature.

Q   But why didn't you take it with you if you knew that that was the practice of signing checks with TPA?

A   It was just something wasn't thought of at that moment when I left.  I was in shock that I was being let go at that time.

Q   But you took other things with you?

A   Just a few things I had in my office, in my bag; that was it.

Q   Is there any document that would refresh your

115

memory as to when your affiliation with Treatment Partners of America ended?

A   No.

Q   Who is Brad Estra?

A   He was a manager of the business listed also.  He is a close friend of the owner.

Q   The owner Mario Monello?

A   Monello, yes.

Q   Is he still working at the company?

A   I can't answer that.  I don't know.  I don't have knowledge of it.

Q   Okay, I have no further questions.

MR. LOFFREDO:  Okay.  First let's -- this is J?  What was the last one?

THE COURT REPORTER:  No, it's K.

MR. LOFFREDO:  Okay.  I just want to make sure it's marked.  I just have a couple of questions.  And then can we mark this as Defendant's 1 just to put it on the record.  Whatever.  Put it on the back.

(Thereupon, Defendant's Exhibit 1 was entered into the record.)

CROSS EXAMINATION

BY MR. LOFFREDO:

Q   Mr. Frankel, real quick.  Defendant's Exhibit

116

1, that is the priority mail receipt reportedly for the payroll check sent to Ms. Williams that was provided to--

MS. SCOTT:  Objection to form.

MR. LOFFREDO:  Let me finish the question.

Q   (By Mr. Loffredo) -- that was provided to you by Mr. Bey, correct?

A   Correct.

MS. SCOTT:  Object to form.

Q   (By Mr. Loffredo) And you've testified to that?

A   Correct.

MS. SCOTT:  Object to form.

Q   (By Mr. Loffredo) Exhibit H, these are the checks that were purportedly addressed to Samantha Vanderhoof.  One is dated November 2nd, one is dated November 9th.  Just so I'm clear, were you acting in any capacity with Treatment Partners of America on November 2nd or November 9th?

A   No, none whatsoever.

Q   And you already testified that the stamps -- that the signature is on a stamp that was used by the company for payrolls when you were CEO, correct?

A   Correct.

Q   Was that stamp your personal property or was

117

that company property?

A   Company property.

Q   So if you took it, they could actually accuse you of theft, correct?

A   They could.

Q   You were asked some questions about Exhibit J which is a letter you first saw today from Mr. Bey to employees dated November 16th, correct?

A   Correct.

Q   And Counsel had you identify the complaint, which is Exhibit D, that bears the filing date of 11/14, two days prior, correct?

A   Correct.

Q   And their point is, well, the lawsuit was filed first, correct?  Is that -- the lawsuit was filed two days before?

A   Correct.

Q   Do you know whether-- do you know when Treatment Partners of America was filed that lawsuit?

A   I have no idea.

Q   Were you served that lawsuit November of 2018?

A   Not that I'm aware of.

Q   And to your knowledge, based upon what you've been told by Mr. Bey, who is in charge of HR at the company, every employee has been paid with the exception



Frankel, Scott   03-28-2019

118

of you?

A   Correct.

MS. SCOTT:  Object to form.

A   Correct.

Q   (By Mr. Loffredo) That's it.  That's all I have.

MR. LOFFREDO:  And he'll read.

THE COURT REPORTER:  Okay.

MR. LOFFREDO:  Okay, we are done.  Unless -- I'm sorry, unless you have any questions.

MS. SCOTT:  Yeah, I do.

RE-DIRECT EXAMINATION

BY MS. SCOTT:

Q   So, Mr. Loffredo just questioned you that Ms. Vanderhoof, her checks are dated from November 2nd, November 9th, correct?

MR. LOFFREDO:  Exhibit H.

A   Yeah.  Yeah.

Q   (By Ms. Scott) And you testified that you had left the company at that time and you had no affiliation?

A   Correct.

Q   But there is no documentation that you had disengaged from the company that you can show?

MR. LOFFREDO:  Okay, that's the question.

119

A   I do not believe so.

Q   With regard to the company property of the stamps that the company used with your name to sign issued payment for employees.  You would have a fraud claim against Mr. Bey and the company for misappropriating your name, correct?

MR. LOFFREDO:  Object to form.  It calls for a legal conclusion.  Speculation.  Go ahead.

A   I'm not an attorney but possibly.

Q   (By Ms. Scott) For using your name without consent?

A   Possibly.

Q   Mr. Bey did in fact use your name without your consent?

A   Correct.

Q   The company used your name without your consent?

A   They did.

Q   And you were aware of that?

A   I'm aware of it.  Now I am.

Q   And finally, although you testified that you were the only employee that hasn't been paid, you don't know that for a fact?

A   I don't know that for a fact.

Q   You have no idea --

120

A   Just from what I have been told.

Q   You have no idea who has been paid and who hasn't been paid?

A   Correct.  I do not know.

Q   Okay.  No further questions.

MR. LOFFREDO:  Okay, that's it.  He'll read.

MR. RICHARDS:  We are off the record.

(Reading and signing of the deposition transcript has been reserved.)

(Deposition concluded at 12:39 p.m.)

121

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF BROWARD

I, CHYNNA BARBOSA, Court Reporter and Notary Public for the State of Florida, do hereby certify that I was authorized to and did digitally report and transcribe the foregoing proceedings, and that the transcript is a true and complete record of my notes.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Witness my hand this 1st day of APRIL, 2019.

_____

CHYNNA BARBOSA, FPR, COURT REPORTER

NOTARY PUBLIC, STATE OF FLORIDA

COMMISSION NO.:  GG 060702

COMMISSION EXP:  01/28/2021



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

Frankel, Scott   03-28-2019

122

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF BROWARD

I, CHYNNA BARBOSA, the undersigned authority, certify that SCOTT FRANKEL, personally appeared before me and were duly sworn on the 28th day of March, 2019.

Witness my hand this 1st day of April, 2019.

_____

CHYNNA BARBOSA, FPR, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA
COMMISSION NO.:  GG 060702
COMMISSION EXP:  01/28/2021

124

ERRATA SHEET

I wish to make the following changes, for the following reasons:

PAGE NO.  LINE NO.

_____  _____ CHANGE_____

REASON_____

_____  _____ CHANGE_____

REASON_____

_____  _____ CHANGE_____

REASON_____

_____  _____ CHANGE_____

REASON_____

_____  _____ CHANGE_____

REASON_____

_____  _____ CHANGE_____

REASON_____

_____  _____ CHANGE_____

REASON_____

_____  _____ CHANGE_____

REASON_____

_____  _____ CHANGE_____

REASON_____

_____  _____ CHANGE_____

REASON_____

_____  _____ CHANGE_____

REASON_____

_____        _____
SIGNATURE                DATE

123

DATE:   4/1/19
TO:     Scott Frankel
        C/O
        Thomas Loffredo, Esquire
        Gray Robinson, P.A.
        401 East Las Olas Blvd, Suite 1000
        Fort Lauderdale, Florida 33301
IN RE:   Latoya Williams, and all other similarly situated under 29 U.S.C. 216(b) v. Treatment Partners of America, LLC, a Florida Limited Liability Company, and Scott Frankel, individually,

CASE NO:  9:18-cv-81568-JIC

Dear Mr. Frankel,

Please take notice that on 3/28/19, you gave your deposition in the above-referenced matter.  At that time, you did not waive signature.  It is now necessary that you sign your deposition.  You may do so by contacting your own attorney or the attorney who took your deposition and make an appointment to do so at their office.  You may also contact our office at the below number, Monday - Friday, 9:00 AM - 5:00 PM, for further information and assistance.

If you do not read and sign your deposition within thirty (30) days, the original, which has already been forwarded to the ordering attorney, may be filed with the Clerk of the Court.

If you wish to waive your signature, sign your name in the blank at the bottom of this letter and promptly return it to us.

Very truly yours,

_____
Chynna Barbosa, FPR, COURT REPORTER
Universal Court Reporting
(954)712-2600

I do hereby waive my signature.

_____
Scott Frankel, Esquire
Cc: via transcript:     Melissa Scott, Esquire



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

Frankel, Scott  03-28-2019        Page 1 of 40

**$**

**$24.70** 102:10

**0**

**003** 31:7

**01/28/2021**
  121:25 122:19

**060702** 121:24
  122:19

**1**

**1** 4:16 10:9
  115:18,21
  116:1

**10:00** 1:17

**1000** 2:9 123:3

**11** 88:16 90:5

**11/14** 117:11

**11/14/2018**
  89:18

**111** 4:13

**113** 3:5

**115** 4:16

**118** 3:6

**11th** 95:19
  103:1,11,15

**12** 4:4
  16:12,15

**12/13/18** 102:9

**12/14/18** 102:7

**12:39** 1:17
  120:10

**12-year-old**
  16:13

**13** 4:5 15:19

**13th** 102:16
  103:5,8

**14** 15:19,25
  50:17 89:16
  94:10,15

**14th** 46:12
  49:7 50:20
  89:20

**15** 65:14

**15th** 50:6,21

**16** 82:11,19

**1609** 30:14
  45:10

**16th** 50:21
  83:8 96:1
  117:8

**17** 92:9 93:10

**17-year** 35:13

**18th** 30:15
  45:10 63:13
  102:4

**19** 14:24

**1976** 18:7

**1981** 18:15
  19:12

**1982** 20:17

**1st** 58:5
  121:15 122:8

**2**

**20** 64:4 65:5,8

**2006** 21:13

**2008** 13:8
  21:14

**2009** 21:8
  46:15

**2011** 21:18

**2015** 113:23

**2016** 28:1
  34:15
  57:11,25
  64:13,14
  112:18 114:9

**2017** 20:8
  34:18 35:23
  53:24 64:13
  65:4,6 114:5

**2018** 11:3
  12:21,22
  13:1,2,8,17
  14:21,24 15:8
  34:20 35:24
  42:10,16
  46:5,10,12,17
  50:17 57:11
  59:2 60:13
  64:5,13 65:9
  69:7,10 71:11
  72:10 77:22
  78:6 80:9,17
  81:14
  82:2,11,16,19
  83:9
  87:15,21,24
  88:12,16,19
  89:20 90:5
  91:3 94:10,15
  96:1 101:1,18
  102:16 113:24
  117:21

**2019** 1:16 5:2
  97:11 121:15
  122:7,8

**216(b** 1:6
  123:5

**22** 30:1 31:5

**24** 10:9

**25** 63:14,15

**27th** 12:19

**28** 1:16 5:2

**28th** 122:7

**29** 1:6 4:6
  123:5

**29th** 112:18

**2nd** 58:5
  101:11
  116:16,19
  118:15

**3**

**3** 8:17

**3/28/19** 123:9

**30** 4:7 39:14
  60:15 63:15
  123:14

**30(b)(2** 8:18

**301** 1:18 2:5

**33301** 1:19
  2:5,10 123:4

**33433** 102:5

**3rd** 11:5

**4**

**4** 66:6

**4/1/19** 123:1

**4:30** 102:9

**40** 64:15

**401** 2:9 123:3

**41** 4:8

**44** 4:9



877.291.3376
www.UCRinc.com

**5**

**5** 3:3

**5:00** 123:12

**50** 64:15

**5th** 42:8

**6**

**60-years-old** 15:15

**6909** 63:13,25 65:7 102:4

**7**

**78** 4:10

**7th** 46:8

**8**

**8** 4:3

**80** 4:11

**805** 1:18 2:5

**84** 20:18

**9**

**9** 46:15

**9:00** 123:12

**9:18-cv-81568-JIC** 1:3 123:7

**94** 4:12

**954)712-2600** 123:21

**954-761-8111** 2:10

**954-871-0050** 2:6

**9th** 46:3

101:11,12 116:17,19 118:16

**A**

**A.M** 1:17

**abide** 10:4

**ability** 6:15 96:20,23

**able** 68:5 69:16 98:1

**about** 5:24 16:1,5,16,17, 20 17:5 20:9 22:14,23 25:5 26:15 27:14 31:2 32:16 37:5,9,20 38:8 39:21 42:19 63:14 65:13 73:14,16,21 74:10,21,22,2 3 77:16 81:24 82:21,23,24 83:10 85:12 86:19 89:1,2 92:25 95:14 97:16 98:14 105:17 108:4 109:1,4 117:6

**above** 27:1

**above-referenced** 123:9

**Absolutely** 35:20

**abuse** 61:9 62:11 63:10

**accepted** 102:8,9,15

**access** 69:14,19,21 96:6,10,13

**according** 25:13 32:12 59:4 75:22

**account** 42:20 43:11

**accurately** 102:10

**accuse** 117:3

**acquired** 72:5

**acquisition** 26:6 72:6

**acted** 55:13

**acting** 116:17

**action** 121:13,14

**actively** 14:20 106:9

**actual** 36:8

**actually** 19:12 51:23 76:5 77:11 113:14 117:3

**ad** 47:19

**addiction** 20:22,23 21:4 28:17 36:6

**addition** 19:6

**additionally** 16:8

**address** 102:6

**addressed**

102:5 116:15

**addresses** 45:21

**admission** 31:21,24

**admit** 31:10

**admitted** 32:12 94:5

**affect** 6:14 60:6,11

**affiliated** 15:6 70:14,17 76:17 79:4

**affiliation** 14:16,17 21:3 79:22 109:16 115:1 118:21

**affirmative** 92:3,9 93:9

**after** 5:5 18:8,18 19:10 20:16 21:14 42:13 50:5 75:22 82:8,13 88:23 94:14,17 96:2 98:23 100:12 102:17 103:10

**again** 24:4,5 49:4 85:10

**against** 16:4 66:14,23 67:1 71:7,8 75:22 80:17 81:13,17 82:8,9,12 83:13,14,20,2 1,22 84:2,5,9 98:24,25

 UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

119:5

**agent** 12:15

**ago** 5:23 6:1
71:2 98:20

**agree** 27:7,9
83:19

**agreed**
51:11,13

**ahead** 7:4,12
11:22 13:5
40:22 67:22
80:3 81:16
86:8,18 88:9
94:6 98:4
119:8

**alcohol** 28:18
36:6

**all** 1:5
6:21,23
7:17,21 11:7
13:7,14
20:4,5
25:12,17 36:9
39:3,23 40:14
48:19 50:25
52:16 54:12
55:15,17,21
56:14
58:12,20
61:12 66:8
68:13 73:6
74:23 76:4
83:12,15
90:18,20
93:12 94:12
95:8,16,21
99:13 100:23
102:6 106:18
110:10,11,13
118:5 123:4

**allegation**
30:4,7 31:11

**allegations**
29:23 30:25
32:6,13

**alleged** 29:23

**along** 39:2
56:5

**already** 70:8
89:6 97:18
116:21 123:14

**also** 8:24
11:24 21:3
24:23 34:18
43:16 51:24
55:13 57:17
62:23 80:5
115:5 123:12

**although**
119:21

**always** 34:9
40:14
56:11,12
63:19 81:24
114:1

**am** 7:24 9:6
10:1 12:17
15:21 16:24
20:13 27:22
29:25 30:19
62:8 70:23
79:21 85:24
89:23
103:7,24
119:20
121:10,12,13
123:12

**America** 1:9
17:6 27:18
30:11

61:20,24
102:4 111:14
112:4,23
113:4,11
115:2 116:18
117:19 123:5

**amount**
16:12,15 65:8
93:14

**another** 21:20
72:5

**answer** 6:21,23
7:3,22 16:18
28:12 30:24
31:12 38:4
55:2 60:8,9
73:11 79:6
83:7 85:17
86:3,4,5,19
92:3 93:6
99:14 101:15
104:1,4
114:9,10
115:10

**answered** 9:14
10:7,9,20
11:17 69:20
80:3 84:24
88:9

**answering** 7:1

**answers** 4:7
32:5

**any** 6:14 7:10
9:1,7
10:8,12,21
11:9,14,18
13:12 19:16
21:6 27:12
28:24 29:1
32:5 34:12

35:14,21
37:15 38:24
46:13 47:9
48:12 52:12
53:16 57:21
61:1,10 62:1
63:4 64:16
65:16,24
67:25 83:14
84:14 85:4
90:24 96:6,13
100:13 101:22
104:2 110:12
114:25 116:17
118:10
121:11,12

**anyone** 33:7
59:13 72:16
80:12,14,16
81:18 82:3

**anyone's**
101:20

**anything** 7:6,7
11:15
16:5,7,8,16
19:24 21:6
39:21 49:9
62:6 69:14,19
73:25 81:23
82:2 91:22
92:25

**anyway** 11:15

**apologize**
27:16 50:10
92:7 104:20

**APPEARANCES**
2:1

**appeared** 11:24
122:6

**Appears** 102:5



877.291.3376
www.UCRinc.com

**apply** 47:22

**applying** 46:22 48:3

**appointment** 123:11

**approximately** 22:17 25:25 39:14

**April** 11:3 121:15 122:8

**area** 64:14

**areas** 64:7

**around** 20:17,24 21:18 40:14 42:13 95:22 109:3

**arrangements** 103:23

**arrested** 6:8

**arrived** 108:14

**article** 4:13 112:1

**artists** 21:2,3

**ask** 7:1,10 9:4 10:8 31:2 32:8,10 79:12 109:3

**asked** 22:12,18 23:1 45:3 49:7 66:20 76:21 80:2 83:5 88:8 96:18 97:3,12 98:3 107:19 114:10 117:6

**asking** 7:11

46:6 48:1 96:17 99:4

**aspects** 26:14,16

**asserting** 69:2

**assign** 110:4,5,7,12

**assistance** 123:13

**assume** 37:11

**assumed** 100:25

**attempt** 100:12

**attend** 17:25 18:2

**attorney** 5:9 98:8 103:2 112:10 113:7 119:9 121:11 123:11,15

**attorneys** 121:13

**audit** 71:3,4

**audits** 35:11,12,13

**authority** 26:1 27:12 33:18,21 84:5 87:8 122:5

**authorized** 121:7

**available** 43:21,24 47:4 49:8

**award** 35:17,23,24 36:4,5 37:1

**awards** 36:25

**aware** 6:19 16:10 47:13,16,22 60:5,10 61:18,19,21 62:4,5,8,14,19 66:13,20 67:15,17 70:21 79:8,10,14,19,21 82:7 85:18,24,25 87:7,9,11,13,14,16 88:19 89:21,22 90:16,20,24 91:2,5,10,12,19,21,23 94:2 99:11 104:16 117:22 119:19,20

---
B
---

**Bachelor's** 18:17

**back** 15:11 32:15 39:22 47:3 50:9 62:20 76:22 94:1 98:16 99:15 101:6 104:19 115:20

**backdated** 101:13

**background** 15:12 65:20,22

**backgrounds** 21:4

**bag** 114:24

**band** 20:22 21:1

**banking** 104:10

**Barbosa** 1:24 121:5,23 122:5,18 123:20

**based** 67:12 83:22 84:1 90:2 117:23

**basically** 18:24 22:12,25 23:13,20 33:11 36:8 52:18 72:4 95:16 105:10 106:4,14 108:9,24

**basis** 10:17 24:18 26:12 48:18 50:24 51:1 92:22

**Bates** 31:5

**Bay** 96:18

**BEACH** 1:2

**bears** 117:11

**became** 34:16

**because** 6:17 11:12,21 25:16 68:12 69:6 71:16 74:21 80:4,6 81:9 83:16 97:12,15

**become** 32:20

**before** 5:20

 UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

6:17 7:1 9:17 10:23 11:13 33:25 48:2 63:20 74:4 76:16 82:19 83:7,8 88:3 94:9,21 95:10 103:8 108:13,19 111:13 112:12,13 117:16 122:6

**beforehand** 10:16

**began** 21:11 108:19

**begin** 66:11 114:4

**behalf** 1:15 2:2,7 5:13 11:24 16:10 33:16 43:12 84:8 87:4 101:7 106:3

**beings** 79:14

**belief** 23:7 32:13

**beliefs** 23:3,6

**believe** 11:5 27:2 28:1 29:6 41:10 42:17 48:14 52:11 58:5 65:25 66:25 75:5 82:9 83:20,21,25 84:4 86:3,4,11,15 94:24 95:6,22 101:12 103:6

112:22 114:5 119:1

**belongings** 114:11

**below** 123:12

**benefits** 39:14 55:10,17,20,21

**best** 7:14 32:13 38:21 39:7 52:5 58:13 60:14 65:13 72:8

**between** 64:14 67:13 94:2

**Bey** 51:21 52:15,23 53:6 55:13 57:16 59:15 72:21 73:9,14,16 74:6,9,16 75:7,21,24 76:22 77:16 79:2,12,25 82:16 83:16,22 84:18 85:11,14 86:3,4 88:6,15 90:3,25 91:8 93:20 94:2,5 95:20,24 96:5,8,16 97:3,5 98:19 100:11,21 101:7,17 102:18 103:13 110:16 116:7 117:7,24

119:5,13

**bind** 26:1

**bit** 18:23 22:14,23 23:5 25:5 39:4 95:14

**blank** 123:17

**Blvd** 1:18 2:5 123:3

**Boca** 15:17 21:10 30:15 102:4

**bogus** 97:13

**bottom** 14:25 31:5 123:17

**BOULEVARD** 2:9

**Brad** 115:4

**Brandon** 51:21 52:15,23 53:6 55:13 57:16 59:15 72:21 73:8,13,16 74:6,9,16 75:7,21,24 76:22 77:16 79:2,12,25 82:16 83:16,22 84:18 85:11,14 86:3,4 88:6,15 90:3,25 91:8 93:20 95:24 110:15

**break** 75:10,13 109:17

**Brief** 75:14

**briefly** 6:18

**bring** 23:14 40:15 111:7

**broke** 22:24

**brought** 7:23 20:22 57:15,17,20 111:3,7 113:13,16

**BROWARD** 1:18 2:5 121:3 122:3

**building** 106:1

**business** 17:6,15 18:13 22:11,14,21,22 23:4,15,17,21,24 25:18 28:13,15 72:7,8 113:5,6 115:5

**businesses** 23:12,14

**buyout** 22:18 23:1,19

---
C
---

**C/O** 123:2

**call** 30:10

**called** 5:5 21:9 72:17,18,19,21 74:22 80:12

**calls** 119:7

**came** 22:12 36:9,11,16 41:10 47:16



49:21 53:20
63:20

can 5:24
7:10,13 9:4
10:7,14
17:16,19
18:21,23
19:25 22:23
23:5,12 24:11
25:4 26:15,19
28:8 31:4,7
33:12 38:21
40:24 44:22
45:25 46:1
51:20 52:6,10
55:2 56:3
57:5 59:18
60:8,20 63:11
64:11 65:21
66:17 72:2
73:11 78:11
85:17 86:9
92:8,18
95:9,14 97:14
98:9 101:9
108:5 114:9
115:18 118:24

cannot 9:12

can't 6:24
9:15 41:1
69:19 79:6
101:15 115:10

capacity 24:9
46:19 53:16
56:1 67:21
116:18

career 20:15

case 1:3 11:25
46:25
47:12,17,19,2
4 48:5 61:12

62:23,24
97:14 99:11
106:13,15,24
123:7

cases 37:7,9

cash 84:11
97:19

cashed
77:11,13
99:17,22
104:3

categorizing
63:2

category 100:5

Cc 123:25

CEI 14:8 15:9

cell 81:21

census 64:14

center 19:15
21:9 22:16
24:23 29:3
35:14 108:8

CEO 33:11
34:2,8,16,18,
20,22 35:22
37:14,21
38:18 50:15
60:21 67:20
70:17 77:24
78:2,5 85:5
104:21 116:23

certain 16:14
26:18 40:8
74:1 76:1
95:17
100:4,24

CERTIFICATE
121:1 122:1

certificates
19:16 20:3

certified
19:20,21,23
103:17

certify
121:6,10
122:6

CFO 27:2,4
55:13,19
60:21

change 60:3
124:4,6,8,10,
12,14,16,18,2
0,22

changes 124:2

changing 59:21

charge 35:11
55:16 117:24

chart
38:12,13,16

charts 71:3

check 4:10
76:1,3,7,25
77:3,5,12,13
78:8
84:11,21,25
85:3,4 91:13
97:1,2,18
98:7
99:9,17,22
101:20
103:3,15,16,2
3 104:2 116:2

checks
78:22,23
79:9,11,12,14
,16 80:1
83:22 84:6

85:6,11,15,22
,25 88:2
101:6,10,13,1
6 113:23
114:1,17
116:15 118:15

Chief 24:7

Children 25:8

chill 99:16

Christmas 74:4
94:21

Chynna 1:24
121:5,23
122:5,18
123:20

circumstances
72:2

City 36:5

Civil 8:18

claim 16:16,25
83:12,19,21,2
2 84:1,2,4,9
97:17 119:5

claims 6:22
16:21 99:2

clarification
101:21

clarify 27:16
43:16 107:25
111:19

clear 116:17

Clerk 123:15

client 9:17
10:24 11:13
83:20
84:10,12,15
85:3 94:5,9



97:18 107:6 109:11

**clientele** 107:5,7,8,18,21,23 108:6 109:18

**clients** 17:23 24:16 47:2 64:2,10,12,19,20,22 65:3,10 82:13 105:20,21 107:2,10,19,20 108:2 109:21

**client's** 10:19

**Clinic** 16:13

**clinical** 24:13 25:4,7 26:20 35:6 38:23 105:22,23 106:13,14 107:2,12,14 109:14,15,16

**Clinicals** 107:14

**close** 115:6

**closed** 72:7

**Coleman** 27:5

**college** 18:9,10 20:16

**come** 22:3,7,12 33:11 41:11 53:21 106:14

**coming** 17:17 97:13 105:19 108:7,8 109:12,21,22,

23

**Commission** 35:12,13,18 121:24,25 122:19

**common** 66:11 85:5

**communicate** 82:7

**communication** 77:15

**communications** 8:23 90:24 91:2 94:2

**community** 36:3,24 37:1 64:24

**companies** 113:7

**company** 1:10 9:6,16 10:1,2,22,23 11:3,13,22 12:15,16,22 13:7 21:20,21 22:18 23:20 26:2 27:9 28:5,23 29:1 33:16,24 34:1,13,15 36:8 37:23 38:17 42:12,15,21 43:1,10,12 48:23 57:8 58:25 60:6,11 61:3 62:17 67:20 68:18,21,22 69:7,23,24

70:20 71:7,17 72:4,5,25 73:3,5,7,14,19,25 74:20 75:17,18,22 76:18 79:4,5,15,19,23 82:21 84:8 85:12,18 86:1 87:5,7 90:15 96:7,10,13,21,24 97:6 98:1 100:8 103:18,21 104:9 105:19,25 106:2,3,4,22 107:16 110:23 111:8 112:2,3,6,9,21 113:15,18 115:9 116:23 117:1,2,25 118:20,24 119:2,3,5,16 123:6

**company's** 51:3 73:21 79:25

**compensation** 51:9 73:17 74:19 83:3

**complaint** 4:6,7 29:19,24 30:2,17,25 31:15 89:16,20,25 92:6 117:10

**complete** 65:17,19 121:9

**compliance** 55:11,24

**compliant** 23:8,10 37:8

**complied** 35:9

**complying** 25:15

**concern** 98:25 99:1

**concerned** 80:5

**concluded** 120:10

**conclusion** 119:8

**conduct** 68:6 104:22

**conference** 108:25

**conforming** 25:12

**confused** 107:25

**conjunction** 25:7

**connected** 121:13

**consecutively** 51:5

**consent** 85:15 119:11,14,17

**consider** 58:24

**Consistent** 32:2

**contact** 13:14,15,16 22:8,9 36:12


**UNIVERSAL COURT REPORTING**

877.291.3376
www.UCRinc.com

42:25 43:3
48:17
49:20,23
72:16
80:8,11,12,16
82:15 123:12

**contacted**
80:14

**contacting**
123:11

**content** 49:6
62:1,4,5,6

**contents**
101:22

**continuing**
79:20 90:10

**contracts**
26:2,4,5

**control** 65:1,9
90:14
110:17,19
111:13,15

**controlled**
65:4 110:15

**conversation**
91:8,9

**conversations**
72:23 73:13
91:24

**convicted**
6:8,11

**copies** 98:15

**copy** 8:3,5
12:6,14 13:20
41:20 58:11
76:10 84:19
95:7 100:18

**corporate**

27:20 37:22
38:8,10,11,13
,15,16

**corporation**
93:13
111:12,13,16,
17 112:24

**correct** 7:4
13:9 24:1,3
25:23 31:25
32:1,14,24
33:2
34:17,19,21
37:13 43:6
44:5 49:16,18
50:11,12,14,1
6,18 54:18
56:10,25
58:13 59:3,6
64:1 67:6
69:7 74:17
77:23 78:4
85:13
88:1,17,22
94:16
96:11,12,19
99:17
100:1,15
101:2 102:19
103:19 104:15
106:11 110:2
116:7,8,12,23
,24
117:4,8,9,12,
13,15,17
118:2,4,16,22
119:6,15
120:4

**could** 28:20
68:19,20,24
81:9
108:13,15

117:3,5

**Council** 35:24

**counsel** 2:1
82:14 87:17
97:25 117:10
121:11,13

**counselor**
19:23

**COUNTY** 121:3
122:3

**couple** 67:10
115:17

**course** 60:12
71:8 87:3,6

**court** 1:1,24
13:4 19:20
29:7 32:17
42:24 115:15
118:8
121:5,23
122:18
123:15,20,21

**courtesy** 8:3
12:5 13:20

**coverage** 75:17

**create** 114:3

**created** 39:25
40:1
57:1,3,4,24

**creating**
113:14

**crime** 6:9,11

**Criminal** 18:13

**crisis** 19:23

**CROSS** 3:4
115:23

**custody** 9:1

69:2

———————
D
———————

**daily** 24:10,11
26:12 29:3
34:23,24
48:18 51:1
58:25
107:1,4,16,22
108:3

**Dana** 15:23

**date** 12:18
14:23 28:3,4
42:7 45:25
46:2,14,16
48:22 53:23
57:12 67:11
69:12 71:21
74:1,2,3,4,10
,17 76:1
82:10 83:15
88:16
89:15,16,17
90:19 91:13
94:12,14,17,1
9 95:17,18,20
100:4,24
102:7,15,17,1
8,20,25
103:2,13
110:19,21
112:16,17
117:11 123:1
124:25

**dated** 95:25
116:16 117:8
118:15

**dates** 46:11
101:9

**David** 57:4,13



D-A-V-I-D 57:6

day 17:17,20
  25:17,19,22
  37:11 50:7
  52:17 58:3,4
  66:17 76:16
  85:4 97:7
  105:2,9,17
  107:5 108:5
  111:4,5
  113:16 121:15
  122:7,8

days 51:5
  67:5,11 105:3
  117:12,16
  123:14

day-to-day
  23:11 24:18
  50:23 55:6
  100:7 108:10

DCF 25:13
  35:11 38:15
  58:8

deal 72:6

dealt 36:15

Dear 123:8

December
  74:3,10 88:16
  90:5 94:21
  95:19 100:24
  102:16
  103:1,8,10
  112:18

decisions 87:4
  106:3

default 10:23
  68:21

Defendant 2:7
  5:14 6:2,3

27:20

Defendants
  1:11

Defendant's
  4:7,14
  115:18,21,25

defense
  92:9,13,16,18
  ,23 93:10,22

defenses 16:21
  92:4

define 39:6
  86:9

definition
  38:7

degree
  18:16,19
  19:4,12 54:10
  70:17

delegate 110:1

delivered
  103:5

delivery
  102:7,15

demand
  16:11,14

demands 16:10

denied 32:12

deny 31:10

department
  25:8 26:18
  39:5,8,17,24
  40:2 51:18
  109:2

departments
  37:3 38:19
  110:9

depo 68:15
  98:3

deposed
  5:19,22

deposition
  1:15 4:3 5:1
  7:18 9:19
  11:7 75:15
  97:21
  120:8,10
  123:9,10,11,1
  4

describe
  39:7,11

DESCRIPTION
  4:2,15

detail 73:24

detection
  18:22

diagnosis
  22:16

didn't 9:4,18
  16:11
  22:22,25
  23:3,6,13,15
  27:6,16 29:1
  37:17 47:18
  48:6,10 54:19
  59:20,25 60:3
  63:19 68:25
  69:6 71:6
  73:24 80:12
  83:13 88:13
  89:7 91:22
  95:6 98:12
  103:16 104:22
  105:5,21
  106:25 107:18
  110:12,17
  114:6,13,16

differ 55:15

different 21:2
  37:2,3 45:18
  60:16,17,22
  73:8

dig 7:17

digitally
  121:7

diligence
  69:17

diligent 9:10
  10:4

direct 3:3
  5:15 48:20,22
  109:25

directed 49:14

directly 36:15

director 26:20
  55:14 57:9,10
  105:6

directors
  26:17,18,19
  27:11

directs 6:23

disclosures
  98:13

discuss 15:11
  17:10,11,14
  72:25 73:2
  82:18 83:3
  105:7,21,24,2
  5 106:22,25
  107:2,10,15,2
  0 108:2
  109:11

discussed
  17:13 75:6
  79:11 83:11


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

98:19 100:21 107:1,18,19,21,22,23 108:21

**discussing** 50:20 51:8 74:9,19 75:1,21 76:23 79:24

**discussion** 50:6 90:3

**discussions** 74:23 94:4 107:13 109:19,20,21

**disengaged** 118:24

**distributed** 56:13

**DISTRICT** 1:1

**DIVISION** 1:2

**divisions** 38:18

**doctors** 60:21

**document** 8:9 11:16 12:11,13,18,24 13:24 14:2 29:11,14 44:18 46:1,11 66:12 78:17,19 80:23,25 89:10,14 92:9 95:2,5 96:25 98:6,7 111:25 114:25

**documentation** 118:23

**documents** 9:2,16,20,21,24 10:8,13 11:10,19 48:8,9 65:24 66:1,3 67:25 68:7,16,19,20,22 69:3,17,25 70:2,7,19 71:6,9 73:6,8,12 96:10,13,18,21 97:5,20 98:2

**doesn't** 9:15 10:12,21,24 11:1,8,9,13 21:5 68:21 69:1 70:12 86:22 103:6

**done** 6:17 8:7 10:15 13:3 20:4 29:12 66:15 68:4 69:15 92:14 111:4 118:9

**don't** 7:2,6,11,13 9:19,21,22 11:14,18 14:5,8 15:3,9 27:1 28:4,12 32:10 38:4,6,7 39:21,25 40:4 41:14,15 43:18 44:2,8,9 47:25 48:14,24 50:5,8,25

51:15 53:4,9,22 56:16 57:1,11 60:1 63:20 66:18 69:8,19,21,23 71:21 72:19 74:3,6 75:18 80:15,18 81:7,17,18 82:9 85:2,17 86:19 89:5,9 92:24,25 93:7 94:11,19 95:6,11,12 96:6,10 99:10 101:14 102:12,20 103:22,25 104:1,5,7,9,17 106:18,19 108:20 111:2,17 114:10 115:10 119:22,24

**door** 114:12

**down** 22:24 109:17

**draft** 100:17

**dream** 21:22,23,24,25 22:15 24:5 26:8 32:23 33:1 34:25 35:6

**drug** 21:4 36:6 109:11,22

**drugs** 28:18

**dual** 22:16

**due** 69:16

**duly** 5:6 122:7

**during** 54:14,22 64:13 80:9 105:11,16 113:21

**duties** 17:11 24:8 25:6 26:13 27:2 34:22 37:14,15 39:15 47:1 48:12 55:7,25 65:15 77:24 78:2 104:20,21 105:7 110:4,7

**duty** 70:24

---

E

**each** 20:2,12 26:17 82:13 108:25 109:3

**earlier** 27:16 42:11 69:5,9 96:5 98:22 104:20

**earliest** 46:1 90:5

**earn** 18:16 19:4

**East** 1:18 2:9 123:3

**education** 65:23

**educational** 14:19

**effect** 58:10 59:2 87:4



**effectuate** 28:19,21

**effort** 9:10 10:5

**efforts** 36:13 106:10

**either** 38:6 52:15 87:16

**elaborate** 18:23 23:5

**else** 11:15 16:5 19:24 21:6 32:12 33:7 38:9 49:9,13 53:2 79:18

**elsewhere** 72:10

**email** 4:9 42:4,20 43:11 44:16,21 47:20 49:6 69:15 76:14,15

**emailed** 46:13

**emails** 4:8 41:17 50:19 76:20

**EMDR** 61:11

**employ** 60:13

**employed** 13:7 27:24,25 34:16 61:3 63:22 71:11 77:20 85:7,8

**employee** 10:1 16:24 26:5 40:25

55:17,19,21 56:7,8,9 67:4,8 68:14 69:14 70:24,25 71:1,9 74:4,5 90:15 100:5 109:4 117:25 119:22 121:11,12

**employees** 13:11,15,17 15:6 17:11,13 26:8 33:19,22 39:13,14,19 40:3,15 43:9 52:13,14 56:5,13,14 58:9,12 59:4 60:17 62:21 63:12 65:17 66:8,11 69:4 73:22,25 74:11,12,15 75:2,4 76:23 77:25 80:1,9 82:4,25 83:4,12 85:6 88:14,20 90:18,20 93:11 94:13 95:16 100:3,13,23 101:19 102:19 104:23 105:8 108:4,18 110:5,7,9,10, 11,12,22 113:20,22 114:2 117:8 119:4

**employers** 21:7

74:20

**employment** 1:18 2:4 5:10 21:17 65:22 67:5,11

**encompassed** 105:23

**end** 21:17 92:10,11

**ended** 115:2

**engaged** 59:16

**engaging** 106:9

**enough** 71:3

**enter** 20:15

**entered** 8:1 12:2 13:22 29:8 30:21 41:21 44:12 78:15 80:21 94:25 111:22 115:21

**entering** 26:2

**Enterprise** 75:16

**entire** 63:22

**entirely** 7:4

**entity** 111:11 113:5

**envelope** 104:8,14,17

**ERRATA** 124:1

**Esquire** 2:3,8 3:3,5,6 123:2,25

**established** 39:18 88:25

**estate** 23:13

**estimate** 65:13

**Estra** 115:4

**Ethical** 19:15

**every** 25:17,19,22 56:16 68:14 74:4,5 105:2 117:25

**everybody** 38:11 74:18 80:4 90:22

**everything** 23:7,14 32:11 101:24

**exact** 28:4 66:18 69:12 71:21

**EXAMINATION** 3:1,3,4,6 5:15 115:23 118:12

**examiner** 18:20 19:5

**example** 50:7

**examples** 17:19 24:11 37:6

**except** 96:15 102:20

**exception** 117:25

**excluding** 74:5 90:18

**excuse** 7:13 13:21 33:20 35:7 39:18 58:22 66:6



70:4

**Executive** 24:7

**exhibit** 4:2,15
7:25 8:1
12:1,4
13:20,22
29:6,8
30:20,21
41:19,21
44:10,12 48:2
49:1
78:10,12,15
80:20,21
89:4,13
92:1,2
94:24,25
101:8 103:4
111:20,22
115:21,25
116:14
117:6,11
118:17

**EXHIBITS** 4:1

**exist** 68:7
70:3,7

**EXP** 121:25
122:19

**experience**
20:9

**explain** 17:16
18:21 56:3
63:4 65:21
66:17 72:2
78:11 92:18

**explained**
75:24
83:17,18
94:17

**expound** 59:18

**express** 4:16
102:3,15

**extended** 36:7

**extremely** 23:7

————————
F
————————

**facility** 24:2
25:14 36:16
60:23 61:8
108:11

**fact** 74:6 84:1
119:13,23,24

**false** 97:17

**familiar**
27:20,23
29:23 37:22
38:18 39:4,6
46:21 48:15
51:18 60:16
61:23 67:8

**Families** 25:8

**far** 23:11
59:21

**Federal** 8:18
9:9

**fee** 102:10

**fees** 91:15,21

**feet** 47:3

**few** 41:8 81:10
96:5 114:23

**fight** 11:10

**figure** 35:16

**filed** 82:8,14
88:25
89:8,19,25
94:18 98:23
99:2 101:4

117:15,19
123:15

**files** 69:3

**filing** 88:23
89:16 90:10
94:9 96:2
99:25 100:13
117:11

**fill**
66:5,8,21,23
67:1,4,9,10
71:9

**filled**
67:15,25
68:13 69:25
70:11,25
71:2,6

**filling** 66:12
70:19

**fills** 70:24

**finally** 7:10
54:11 119:21

**finance** 38:25
39:1

**finances** 26:21
55:16,19

**financial**
65:24

**financially**
121:14

**find** 21:5 52:3

**fine** 12:7

**finish** 30:2
83:6 116:5

**finished**
12:9,10 13:25
31:8 41:24

42:12

**firing** 27:12
33:18,21
39:13 40:3
67:21

**firm** 5:12 38:1
83:11 84:3,10
90:25 94:3

**first** 5:5 11:4
33:13 36:4
41:9 42:17
43:17 44:3,16
46:13 47:15
52:8 67:5,10
115:13
117:7,15

**first-hand**
37:11

**five** 75:12

**five-day** 105:3

**five-minute**
75:9

**Florida**
1:1,9,19,25
2:5,10 15:17
99:3 102:5
121:2,6,24
122:2,18
123:4,5

**fluctuated**
65:12

**fluent** 39:22

**focus** 106:6,7

**following**
19:11 50:7
124:2

**follows** 5:6

 **UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

forces 22:13

foregoing
  121:8

form 6:20
  40:22 55:1
  60:7 67:9,22
  68:2,8 70:8
  73:10,23
  77:17 80:2
  81:15 83:24
  84:23 85:16
  86:7,13,17
  88:8,24 94:6
  97:8,22 98:4
  100:9
  116:4,9,13
  118:3 119:7

formed
  112:6,7,9,14

forms 66:21,24
  67:2,5 68:13

Fort 1:19
  2:5,10 45:20
  123:4

forwarded
  123:15

foundation
  81:15 86:8
  93:1

founder 14:8

four 6:1 45:24

FPR 1:24
  121:23 122:18
  123:20

Frankel
  1:10,15 3:2
  5:1,4,14,17
  6:18 8:6 10:3
  11:2 12:3

13:6,21
15:9,11,23
29:5 30:19
32:19 33:12
41:2 50:10
52:3 96:9
98:17 103:9
115:25 122:6
123:1,6,8,25

fraud
  83:19,20,21,2
  5 84:2,4,9
  97:14 119:4

fraudulent
  16:4,9,25
  86:16 98:17

Friday
  16:11,13
  123:12

friend 115:6

friendly 80:13

friends 20:23

from 9:16
  10:23
  11:12,21
  19:14 20:22
  28:1 32:21
  36:9 37:10
  44:21 49:7
  50:20 52:17
  68:20 73:6
  75:17 81:4,5
  82:21 84:17
  85:4 91:24
  95:7 96:15
  97:5 98:2
  100:1,11,20
  102:3,20
  109:12,22
  113:16,23

117:7
118:15,24
120:1

front 102:13

full
  93:14,16,19

fully 70:21

function 68:12
  70:9

funds 104:8

furnish 9:7

furnished
  101:23

further 115:12
  120:5 121:10
  123:13

future 88:16
  106:1,7,8
  107:16

──────────
      G
──────────

gather 114:13

gathered
  114:11

gave 98:8
  123:9

general
  17:10,15

generalization
  60:17 63:5
  105:15

generally
  40:13 43:10
  59:17,18
  60:24 66:15
  67:10
  105:5,21

106:13 109:7

get 16:19 22:8
  35:16,21
  40:12 47:3
  59:20 65:15
  74:24
  81:23,25
  91:15 98:1

getting 16:14
  76:20 78:7
  80:5 82:21
  83:12,15
  91:13 94:20
  95:17
  100:4,24
  101:19

GG 121:24
  122:19

ghost 99:10

give
  6:21,23,25
  13:4 17:19
  24:11 53:23
  105:15 111:19

go 6:18 7:4,12
  11:22 13:5,13
  15:11 18:10
  20:12,24
  32:5,15
  37:2,14 39:22
  40:22 50:9
  62:20 67:22
  70:2 72:9
  73:24 80:3
  81:16 86:8,18
  88:9 92:10
  94:1,6 97:17
  98:4,13,14
  101:8
  104:19,22
  106:8 108:13

 UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

109:3 114:21 119:8

**goes** 104:10

**going** 13:4 15:25 17:18,20 25:21 29:5 31:1 37:16 44:15 65:15 72:4 74:25 75:25 76:24,25 78:9 80:19 83:1 94:23 98:14,16 99:15 101:6 105:18 106:1,6 107:5,16 108:5 109:1,4

**goings** 97:6 108:10

**gone** 9:16 10:23,24 11:12,21

**good** 5:19 72:8 114:8

**grad** 19:1,9

**graduate** 18:4,6,14 19:14

**graduated** 19:12

**graduation** 18:8,18

**Gray** 2:9 5:13 123:3

**group** 14:10 15:1 22:6

23:15 106:20

**groups** 20:18

**guess** 7:2 96:4 103:14,23 113:19

**guest** 108:7

**guests** 108:8

————————

H

**had** 17:17,20 21:7 23:6,21 34:24 37:7,11,15 42:4 43:11 45:18 48:13 49:20,23 56:9 67:12,24 68:9,13 69:6 70:18 71:2 74:12 76:7,25 77:5,7,8,9,10 ,11 82:9 83:11 88:5,12 89:8 90:4,9,14 91:8,9,23 93:13,14,21 94:5 97:18 98:22 99:2,24 100:1 101:20 103:14,21 104:20 105:5,8,18 108:7,18 109:16 114:23 117:10 118:19,20,23

**hadn't** 74:15 93:9

**half** 22:17

25:25

**hand** 97:18 121:15 122:8

**handbook** 56:9 58:18 59:5,8

**handbooks** 56:8

**handing** 8:5 12:3

**handled** 24:13 27:1,2 39:13 51:5 55:10,19 56:4

**handling** 50:23,25

**happen** 7:12 66:14

**has** 10:7,18 11:11,12,21,24 16:25 30:25 69:2 70:24 81:9 83:20 84:13,15,23 89:6 117:25 120:2,9 123:14

**hasn't** 68:22 69:4 99:7 119:22 120:3

**have** 5:19,21 6:8,11,17,21,23,25 7:5 9:1,6,15,20,21,22 10:8,12,17,19,21,24 11:1,6,8,9,14,18 15:18,24 16:1,2,3,5,7,20,22,23 17:7

19:16 20:11 21:1,3 22:22 23:3 26:1 27:11 28:17 29:20 31:10 33:18,21 34:9,12 38:4,14 39:18 41:13,17 43:22 44:7 48:17 49:25 51:13 56:11,23 59:4,23 60:20 62:1,17 63:5 65:19 66:5 67:4,9,13,24,25 68:3,4,5,10,19,20,21,24,25 69:1,14,15,19,21,25 70:3,6,13,25 71:6 72:23 76:3,10 77:13 79:17,22 80:15 81:10 82:24 83:19,21,25 84:2,4,9,12,14,17,18,20,25 85:10 86:19 87:10 89:5 90:3,21 92:23 93:9,17 95:6,10 96:6,10,13,20,23 98:14 99:10,12,21,23,24 100:2,11,16 101:14,15,22,24 102:1,12


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

104:1,4,11
108:15
112:12,16
114:10
115:11,12,17
117:20
118:6,10
119:4,25
120:1,2

**haven't** 10:15
20:21 72:13
88:14,24

**having** 5:5
11:10 42:20
73:13 84:21

**he** 6:22
9:14,15
10:7,11,12,18
,21,23,24
11:1,8,9,11,1
2,13,16,17,21
27:6,7,8,9
33:10,18,21,2
3 34:1,2,4,7
48:20 53:2
55:4
57:9,10,12,15
,16 62:23
68:17,18,21,2
2 69:1,2,4,20
70:12 71:24
72:4,22 73:25
74:10,22,23,2
4 75:1,24
76:23 80:4
83:11,18
84:23
86:11,15,16
87:13 88:25
89:6,7,8
91:8,12,18
93:2,24

94:8,12 96:18
97:3,14,16,23
100:23 102:18
103:16,23
111:3
113:6,7,8
115:5,6,9

**head** 6:24 20:1

**health** 60:25
61:2,7,9
62:10 63:9

**heard** 62:13
90:22

**heated** 91:9

**held** 20:11
34:9,12 64:22
108:24

**he'll** 118:7
120:6

**hello** 40:9

**help** 28:17
81:22,25 82:5
97:14

**helping** 36:5
47:2

**her** 14:16
16:1,3,4,5,7,
8,18,20,23
17:8,9,10,13,
14
41:5,7,9,11
44:6 45:4
47:14,19,22
48:7,16,17,22
49:7,12 50:10
51:11,14
52:1,4
53:20,25
54:2,4,6,8,12

,14,15,20,21,
22 55:5,25
70:19 76:2
78:10 83:6
84:10,11
88:13 94:9
97:1,18
99:17,22
103:15,16,17,
21 106:22,23
110:24 118:15

**here** 5:13 7:22
10:22 15:6
16:19 32:3
41:20 43:3,19
44:22 81:10
89:9 97:16
98:13 101:8

**hereby** 121:6
123:22

**he's** 9:16
10:9,20,21,25
70:8,11

**Hi** 5:17

**high** 17:25
18:2,3

**highest**
35:12,15

**him** 10:8 32:8
33:25
53:10,12
57:18,20
69:22 72:2
73:24 75:25
82:20 83:5
86:5,6,9,11
88:18 91:3
97:12 99:5
111:8

**HIPAA** 37:8

**hire** 40:13
52:21

**hired** 40:25
47:14
52:17,18
66:16 71:9

**hiring** 27:12
33:18,21
39:13,19
40:3,5,21
46:19 49:24
51:3
52:12,19,22,2
3 53:15
54:12,21,25
57:13,21
67:12,21

**his** 10:18 32:2
33:24 34:6
52:3 57:5,7
75:18 90:25
94:3 111:11

**hold** 25:24
32:17 64:19
83:6

**honest** 86:12

**hospital** 35:14

**hours** 48:15

**house** 28:24
29:1

**houses** 45:24

**housing** 45:18
64:24,25
65:1,4,9

**HR** 14:18
26:24,25
27:1,2,3
38:23
39:2,3,4,8,17



,18,23
40:2,13 49:22
50:1 51:16,24
54:8,23
55:7,13,19
56:24 57:9,10
65:15,16
68:4,13
70:10,14,18,1
9,22,24,25
71:2 113:25
114:1 117:24

**HR's** 68:12
70:9

**humanitarian**
35:23 36:5,25

**Hurley** 14:15
51:21 52:15
53:16 110:16

**Hypnosis** 19:15

**hypnotherapy**
19:7,13

————————————
I
————————————
**idea** 70:13
76:3
77:1,5,7,8,10
,11,14 100:16
101:14 117:20
119:25 120:2

**identify**
117:10

**I'll** 6:18
44:10 97:4

**I'm** 5:12,13,18
6:19 7:11,22
8:3,5 12:3,10
13:3,19 15:15
19:20,21,23
28:21 29:5

31:6 37:16,19
38:14
39:20,22
41:19 42:22
44:24 49:13
50:9 52:1
60:10
61:18,21
62:5,13,19
63:2 65:20
66:2,13,22
67:15
72:20,24
73:3,4,5 78:9
80:19 87:9,14
92:2,24 94:23
96:8,9,24
98:12
99:15,19
100:4,5,10
103:4 104:9
107:25
112:8,25
116:17 117:22
118:10
119:9,20

**impeach** 10:18

**implemented**
58:2,6

**Inc** 112:23
113:4,8

**Including** 74:8

**incorporate**
39:1 111:8

**incorporated**
111:10 113:8

**incorporation**
4:13 111:10
112:1 113:17

**incorporator**

112:20
113:3,10

**incorrect**
30:15 31:19
32:6 62:15

**Indeed** 42:20
43:8 44:4
47:19 48:7
53:14

**indeed.com**
42:19 53:13

**independently**
48:2

**INDEX** 3:1 4:1

**individual**
77:25

**individually**
1:10 107:10
123:6

**individuals**
40:8 77:25
81:12

**inform**
110:22,24

**information**
123:13

**inpatient**
24:24,25

**ins** 25:18
37:10

**instance** 40:25

**instructed**
79:6 84:10
87:10,17,19,2
2

**intake**
36:18,19

109:11

**intel** 107:6

**intended** 94:8

**interact**
26:8,11 41:9

**interacted**
15:5 44:3

**interaction**
13:12 37:11

**interested**
121:14

**International**
21:22 22:15
24:6

**internet** 36:14

**interventionis
t** 19:21

**interview**
41:10,12 44:6
45:4 49:21
53:5,8,20,21,
25
54:5,7,9,14,1
5,22 57:17

**interviewed**
53:10
54:2,4,8

**interviewer**
54:19

**interviewers**
54:17

**into** 7:17 8:2
12:2 13:23
20:22 23:14
26:2 29:9
30:22 41:22
44:13 47:3
73:24 78:16



80:22 95:1 106:8 111:11,23 115:22

**introduce** 40:15 78:9,10 80:19 94:23

**introduced** 53:19 54:5,14,20,22 55:4

**introducing** 89:3 111:20

**investigate** 9:23

**investigation** 68:6

**investors** 22:6

**involved** 13:12 22:19 23:12 24:4 32:20,25 35:1 36:22 37:4 40:5 52:12,19,21,23,24,25 53:15 54:9,12,13,21,24 59:20,23 60:2 80:16 81:13 91:16 100:7 104:8 107:13 109:19 113:14

**involves** 106:5

**issue** 85:15 87:8

**issued** 119:4

**issues** 28:17 73:17

**issuing** 85:22

88:15

**its** 110:22

**it's** 12:14 14:7 15:2 16:4,8 18:22 29:19 30:13 31:5,17,19,23,24 42:24 43:3 44:16,21 56:20 58:19 61:6 63:1,3 66:15 70:21 71:5,8,15 81:3,5 82:1,14 85:5 89:9 91:18 92:10 95:16 97:14 99:6 101:8,11 102:13,14 112:6,9 113:6 114:8 115:15,17

**I've** 62:13

---
J
---

**James** 27:5

**January** 28:1 58:5

**Jefferson** 18:3

**job** 34:22 43:4 47:23 60:4 81:24

**jobs** 20:11 21:7 81:23,25

**join** 22:13

**joined** 33:25 34:15

**Joint**

35:11,13,18

**Jordan** 1:18 2:3,4 5:9 11:24 75:25 91:6,12 97:16

**June** 12:19

**just** 6:18 7:5,12,22 8:19,21 9:14 10:6 11:16,17,23 16:18 23:24 31:12,15,24 33:8,9 34:4 37:19 38:4 39:3 40:8 43:16 57:19 69:14,20 75:2 80:13 84:17 89:6,9 96:5 99:14 100:1,3,20,23 101:19 102:1 103:24 104:19,20,21 105:15,17 111:3,9 114:19,23 115:16,17,18 116:17 118:14 120:1

**Justice** 18:13

---
K
---

**Karen** 109:25 110:1,4,5

**Karyn** 14:15 51:21 52:15 53:16 110:16

**Kean** 18:11

**keeping** 72:6

**Kent** 57:4,14,25

**K-E-N-T** 57:6

**knew** 22:11 25:21 37:10 38:8 70:15 81:24 83:16 88:11 89:1,2 94:3,4,8,14,20 100:19 114:17

**know** 7:2,3 8:7 9:19,21 10:14 11:17 12:8 13:25 14:8 15:10 16:16 17:2 28:12 29:12,14,16,17 30:2 31:7 37:17 38:5,6,7 39:21,25 41:2,7 43:19 45:23 46:14 50:2 51:11,13,16 55:6 56:15,16,18 58:9,17 59:7,10 60:1,5,11 63:20 66:3,18 70:12 71:13,14,15 74:6 75:4,19,25 76:6 77:13 81:7 83:13 85:2 86:4 88:13 89:7



877.291.3376
www.UCRinc.com

91:22
92:14,22,25
93:8 94:11
95:3 101:15
102:20
104:5,7,9,17,
18 111:2
115:10 117:18
119:23,24
120:4

knowing 97:17

knowledge 17:1
32:13 38:22
39:7 49:19
52:5 58:13
60:14 67:24
68:4 70:3,6
84:12,14,17,2
0 85:10 88:5
89:8 92:23
93:9,13,17,21
99:12,21,23,2
4 100:2
101:15,20
103:20 115:11
117:23

─────────
    L
─────────
large 80:6

Las 2:9 123:3

last 16:11,13
33:13 52:7
68:23 115:14

later 53:24

Latoya 1:5
5:11 17:2
41:6 42:6
43:17 44:3
46:13 50:5
69:25 81:8
102:5 103:3

106:15
110:2,19
123:4

Latoya's 97:1

Lauderdale
1:19 2:5,10
45:20 123:4

law 5:12
23:22,23
83:11 90:25
99:3

lawsuit
16:1,6,21
41:3 75:6
76:23 80:16
81:13,17
82:13 83:14
88:23,25
89:2,7 90:10
94:10,18 96:3
97:13
98:17,23,24
99:25 100:13
101:4
117:14,15,19,
21

lawsuits
74:22,25
75:1,21

lawyer 6:19,22
96:24

Lawyers 1:18
2:4 5:10

layoff 110:23

lead 105:4,5,6

least 40:24
42:15 43:23
46:18 50:2,19
74:15 75:17

leave 21:19
71:17,20,25
72:3 114:10

Lee 52:4,16
54:11 57:3,25
59:15 110:16

L-E-E 52:7

Lee's 55:23

left 9:17 11:4
23:20 42:13
57:12 69:12
70:20
75:20,22 85:4
87:20,21,22
114:7,20
118:20

leg 97:15

legal 19:20
31:1 47:2
119:8

let's 7:17
10:20 15:11
16:17,18 20:9
27:14 32:15
37:14,19 39:3
41:16 49:11
50:9 62:20
71:10 75:12
92:1 99:13
115:13

letter 4:12
16:14 42:22
95:23,25
100:11,17,19,
21 102:21,22
117:7 123:17

liability 1:10
28:5 123:6

liaison 19:20

license 38:15
58:8

licensed 60:24
64:19

licenses 19:17

lie 18:22

limited 1:9
28:5 123:5

line 50:13
124:3

list 38:21
51:20

listed 12:16
43:3 50:15
73:12 102:6
112:19 115:5

listen 10:17
99:15

little 18:23
21:14 22:23
23:5 25:5
26:15 39:4
65:21 73:1
95:14 107:25

live 15:16
25:1 31:13

lived 15:18

LLC 1:9
28:7,11
111:14 112:25
113:1,2,9,10,
11 123:5

locate 9:24

located 63:13

location 24:21
30:11
45:6,8,11,12,



14,18 63:25 64:3,25

**locations** 45:15,19 64:23 65:7

**Loffredo** 2:8 3:5 5:12 8:4,22 9:1,14 10:6,17 11:8,17,21 12:6,7,25 13:3,15,21 16:18 21:23,25 29:10 30:23,24 31:12,17,23,25 32:2,8,17 35:3 37:15,17 38:6 40:22 42:22 44:14 46:6 48:1 49:3 55:1,4 60:7 62:23 67:22 68:2,8,17 69:1,20,22 70:5,8,11 73:10,23 75:16 77:17 78:10,13 80:2 81:15 82:12 83:6,24 84:15,23 85:16,21 86:7,13,17 87:13 88:8,24 89:5,11,15 91:7,18 92:5,10 93:4,24 94:6 96:17 97:8,22

98:4,6,10,12 99:4,13,16,19 100:9 101:8,24 102:12 103:4 107:8 112:16 113:1 115:13,16,24 116:5,6,10,14 118:5,7,9,14, 17,25 119:7 120:6 123:2

**long** 15:18,24 19:1 25:24 37:8 71:3 98:19

**longer** 13:7 16:24 68:17 73:3,5 74:20 78:5 79:4 85:8 87:23 90:15 103:18 104:9

**look** 45:25 89:13 92:9 99:10 103:9

**looking** 23:8 31:6 43:20 52:3 70:2 74:24 81:23 105:18

**looks** 14:3 102:2

**losing** 20:22

**lot** 7:12 24:16

**luck** 72:8,9

———————————
M
———————————

**made** 16:11 33:11 35:9

103:23 113:7,8

**mail** 4:16 76:8 102:2,11,14 103:17 116:1

**mailed** 103:17

**major** 18:12

**majority** 25:20,21

**make** 7:14 25:14 49:10 103:14 115:16 123:11 124:2

**making** 10:6 25:8,12

**manage** 111:16,17

**managed** 37:25

**manager** 11:2 12:16,22,25 14:19 34:4 46:25 47:12,17,19,24 48:5 61:12 62:23,24 106:13,15,24 115:5

**manager-managed** 28:7,10 38:1

**managers** 12:15 27:6

**many** 5:24 19:22 20:2,20 39:11 45:23 60:13 63:12 64:2,7,9,12 65:3,6,10,13

**March** 1:16 5:2 122:7

**Mario** 33:6,8 71:19 115:7

**M-A-R-I-O** 33:14

**mark** 13:4 29:5 44:10 115:18

**marked** 12:4 115:17

**marketing** 36:13

**markets** 106:7

**marking** 7:25 13:19 30:19 41:19

**married** 15:20,24

**master** 18:20 19:5

**mates** 20:22

**matter** 5:11 86:22 123:9

**matters** 6:20 47:2

**may** 6:14,19,20 52:2 84:4 87:12 123:10,12,15

**maybe** 26:5 37:6 64:4 65:5 75:10

**Mayo** 16:12

**mayor** 36:4

**Mayors** 35:24

**me** 6:25



**UNIVERSAL COURT REPORTING**

877.291.3376
www.UCRinc.com

7:1,5,10,13,23 8:6 12:8,23 13:21,25 16:4 22:9,12,14,23 24:4,11 25:5 26:15 29:12 30:2 31:7 33:11,20 35:7 39:18 41:24 42:19 44:22 45:2,25 47:20,21 48:8,9 52:6 53:23 58:22 63:4 66:6 70:4 72:17 73:25 74:5,22 75:24 76:12 80:4,12 81:5,17 82:9 83:14,18 87:17 90:18 92:14,18 93:18 94:12 95:3,14 98:24,25 99:1 100:18,23 101:9 102:13 105:15 107:4,19 108:5,20 111:3,9,19 116:5 122:7

**mean** 24:15 27:17 30:7 33:9 36:10 55:3 70:1 102:12 107:4 111:15 113:22

**means** 108:6

**meant** 30:17

**media** 60:25

62:21

**medical** 38:23 60:21

**medication** 6:14

**meet** 40:8,10,14 41:9 107:2

**meeting** 108:13,19,23 109:1,9

**meetings** 17:21,22,23 104:23 105:4,6,8,11,16 106:12,16,17,19,20 107:1 108:21,24 109:8 111:1

**Melissa** 2:3 3:3,6 5:8 123:25

**melissa@jordanrichardspllc.com** 2:6

**member-managed** 28:7,9 38:1

**memory** 6:15 41:17 89:13 102:23 115:1

**mental** 60:24 61:2,7,9 62:10 63:9

**mentioned** 71:2 80:4

**merging** 26:6

**message** 4:5,11

14:3,10,23 15:1,3 81:3 82:10

**micromanage** 71:1

**micromanaging** 68:13

**might** 7:3,12 17:20 41:13 43:22 44:7 49:25 59:23 80:15 81:10 106:8

**Minnesota** 16:14

**minute** 75:13

**misappropriating** 119:6

**Mischaracterization** 86:18 97:9

**misrepresentative** 62:7,12

**misrepresented** 84:1

**misrepresenting** 84:5

**missed** 44:24

**missing** 103:7

**mistake** 113:8

**Mm-hmm** 45:17 53:1 90:1

**modifying** 59:14

**moment** 71:2 111:19 114:20

**Monday** 123:12

**Monello** 33:6,13,15 71:19 115:7,8

**M-O-N-E-L-L-O** 33:14

**money** 16:15 80:6 93:14 100:4

**month** 101:3

**months** 11:22 69:4 80:6

**more** 6:12 18:23 22:23 25:5 26:15 35:1 50:9 51:24 63:5 65:21 96:5 105:22 112:8

**morning** 104:22 106:25 110:25

**most** 108:18

**move** 10:20 11:6 71:10

**much** 23:19 48:17,19 55:22 91:22 93:2 111:4

**multiple** 43:13 98:15

**municipalities** 37:3

**music** 35:2,3,4 36:22 38:25 62:24 63:2,9

**musical** 108:8

**musician** 20:14


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

**must** 31:19
 66:8

**my** 5:8 6:19,24
 7:14 9:12
 14:7 15:2,23
 16:10,13
 17:1,17 18:19
 19:25 22:11
 23:7 32:21
 35:24 37:1
 44:21 58:13
 60:4
 78:8,22,24
 79:22 85:4,8
 86:19 87:23
 97:24 98:8,25
 99:8 100:17
 103:20 111:12
 113:25
 114:11,14,15,
 23 121:9,15
 122:8 123:22

**myself** 82:23
 83:13

---

**N**

**name** 5:8
 14:6,7,25
 15:2,5,22,23
 33:12 41:5
 50:10 51:20
 52:1,4,7,8
 57:5 63:6,8
 78:8
 79:8,16,22
 87:8 100:17
 114:14
 119:3,6,10,13
 ,16 123:16

**names** 66:3

**narrative** 10:7

**national** 19:21

**necessarily**
 49:25

**necessary**
 123:10

**need** 10:3,4
 32:10 38:15
 89:9

**needed** 73:6
 114:15

**negotiations**
 91:11,16,20

**never** 12:23
 17:13 40:17
 47:11 60:2
 62:13 80:14
 94:8 110:15
 111:10

**new** 36:5 65:17
 70:24
 105:18,20
 106:1

**no** 1:3
 6:10,13,16
 8:19 10:10,14
 12:25 13:7,13
 14:5 16:18,24
 17:13 21:16
 23:23 26:24
 27:10 28:4
 29:4 30:12
 32:7,8 33:17
 34:3,5,14
 36:19
 37:1,16,19
 38:2,9,11
 40:4 42:13
 47:8
 48:5,16,21
 49:21,25 50:8

51:10 53:14
57:19,23
58:16
59:17,20,25
60:24
61:5,6,11,15,
21 62:3,19
63:7,8
64:19,24
66:13,22
68:3,9,10,17
69:6,8,14,15
70:13,19
71:12
72:11,15
73:3,5,24
74:12,20
76:3,19
77:1,2,4,5,7,
8,10,11,13,20
78:5,7,24
79:4,13,17,21
,22 82:9,12
83:10,12
84:7,9,12,20
85:8,10 86:2
87:22 88:4,5
89:8,21
90:14,15
91:17 92:5
93:13,18,21,2
3 95:13
96:13,22
97:10,12,15
99:8,12,21,23
100:3,10,16,2
3
101:14,15,20
102:24 103:18
104:6,9
105:5,21
106:23 107:14
108:20

109:16,18
110:3,6,8,14,
17 111:9
114:14,15
115:3,12,15
116:20 117:20
118:20,23
119:25
120:2,5
121:24 122:19
123:7 124:3

**nod** 6:25

**noncompliance**
 23:22

**none** 116:20

**nor** 121:11,13

**normal** 17:20

**not** 6:23
 7:3,5,20,21
 8:20
 9:3,6,8,12
 10:1,2,11,21,
 22 11:6,10,11
 12:23
 13:10,11,18
 15:2,4 17:4
 18:25 19:25
 22:18 23:2,23
 24:25 25:1,3
 28:24 29:3
 30:9,12,14
 31:13,17,23,2
 4 36:19 37:25
 38:3 39:22
 42:11 43:1
 44:1 45:22
 47:9,10,13,17
 ,22 48:11,19
 49:13,25
 51:12 54:7
 59:9,12



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

61:18,21
62:8,13,17,19
63:11
64:17,18,19,20
66:4,13,22,23
67:1,15 68:12
69:9,16
71:1,3,15,16
72:7,9 74:13
77:18 78:7,24
79:6,10,22
80:7 82:3,7
84:10
85:3,8,14,24,
25 86:2,6
87:9,10,11,13
,14,17,19
88:12,20
89:21
90:4,9,12,21
91:17,18,21,2
3 92:24
93:11,17 94:5
96:8,23,24
97:19,22,24
98:19,23,25
99:2,24
100:10,16,17,
18 101:14
103:4,20,24
104:18 106:23
107:3,12,14,1
9,23 108:1,6
109:7,17
110:8,9,10
113:6 117:22
119:1,9 120:4
121:10
123:10,14
**Notary** 1:25
  121:5,24

122:18

**notes** 121:9

**nothing** 23:21
  69:15 70:18
  72:13 96:14

**notice** 4:3
  68:15 98:3
  123:9

**November**
  71:11,22
  72:10 77:21
  78:5 80:9,17
  81:14
  82:2,11,16,19
  83:8 87:15,24
  88:12,19
  89:16,20 91:3
  94:10,15 96:1
  101:1,2,11,12
  ,17
  116:16,17,18,
  19 117:8,21
  118:15,16

**now** 8:19
  10:6,8,12,25
  11:24 12:4
  27:14 47:20
  48:8 70:24
  79:21 89:22
  100:20 119:20
  123:10

**number** 5:24
  81:19,21
  91:21 92:9
  93:10 123:12

**numerous** 20:18
  72:19

**Nursing** 62:22

**NYC** 35:24

**NYPD** 35:23
  36:3 37:4

─────────
O
─────────

**oath** 10:12
  11:1,12 31:18
  122:1

**object** 6:19,20
  40:22 55:1
  67:22 68:2,8
  70:5,8
  73:10,23
  81:15 83:24
  84:23 85:16
  86:13 88:24
  94:6 97:22
  98:4 100:9
  116:9,13
  118:3 119:7

**Objection** 60:7
  77:17 80:2
  86:7,17 88:8
  97:8 116:4

**obligation**
  69:6 103:21

**observed**
  105:10

**obtain** 9:24
  58:7 68:16,19

**obviously**
  26:17 37:10
  103:8

**occasionally**
  20:25 72:17
  80:10

**o'clock**
  16:12,15

**October** 11:4,5
  13:8,17

14:20,24 15:8
28:2,3
42:8,16
46:3,8,12,15,
19 49:7
50:6,17,20,21
59:2 67:14
68:23 69:10
71:22,23
87:21,22

**off** 19:25
  75:13,20
  99:15 114:15
  120:7

**offer** 22:7
  33:11 34:6
  49:10

**offered** 21:20
  22:1,3,5
  44:23,25

**offering** 34:7

**office** 45:14
  114:23 123:12

**officer** 24:7
  55:24

**officers** 36:4
  37:4

**official** 34:6
  49:24
  55:12,23 56:9
  57:7

**often** 26:11
  104:25

**Oh** 9:21 49:3
  86:24 87:1
  96:9

**okay** 5:17,18
  6:17 7:16,17
  8:8 11:10,20



13:5 14:1,3 15:11,14 20:9 21:6,25 25:1 27:14 29:5,13 30:3 31:3,9,23 32:15,19 34:15 37:9,17,18 39:3 41:25 43:5 44:17 45:19 49:5 62:20 75:12 80:24 81:9 90:6,13 92:12,15 93:5 95:4 96:5 98:9 100:14 104:2 107:9,21 108:3,10 109:25 111:6,24 113:13 114:3 115:12,13,16 118:8,9,25 120:5,6

**Olas** 2:9 123:3

**old** 15:14

**on** 1:15 2:2,7 5:13 8:17 10:21 11:6,10,24 12:14,18,23,24 15:25 16:10,12 17:18,20 22:22 23:11 24:18,20 25:1,21 26:12 28:25 29:2,3 31:13 32:17

33:15 36:18 39:19,22 40:12 42:7,19 43:11 46:1,11 47:2,3,18,19 48:17 49:8,17 50:6,17,23 51:1 57:15,17,20 61:19 62:6,9 64:16,19,22 65:6 67:12 71:1,10 73:12,24 74:1 76:1 78:8,22 79:3,9,16 82:2,10 83:6,8,22 84:1,8 85:1,4,6 87:4 88:16 89:13,20 90:2 94:10 97:16 99:11 100:4,17 101:7,9 102:11,15 103:5,15 104:10 105:18 106:3,4 107:5 108:5,10,13 109:1,4 115:19 116:18,22 122:7 123:9

**once** 8:7 13:13 69:13 85:8,10

**one** 6:12 7:4 14:13 20:4,12 21:5 23:15 27:6 37:11 38:9 40:24

43:2 50:9 51:23 52:17 53:4,11,19,24 54:3,17 55:16 56:16 57:3 58:3 64:17,18 66:21,24 67:2 75:5 77:24 78:2 102:2,13 109:8 110:8,25 111:11 112:8 113:16 115:14 116:16

**ones** 53:24 82:25 96:15

**only** 49:20,23 51:22,23 82:14 94:20 119:22

**operating** 39:8 114:4

**operation** 24:10,12 25:12,16 64:8 65:16 97:6

**operational** 56:4 105:7

**operations** 17:6 22:14 23:11 34:23,24 50:20,23 51:1,2 58:25 73:14 77:16,18 79:25 85:12 88:6 100:8 106:22,25

**opportunity**

29:20 31:21

**order** 38:14 58:7

**ordering** 123:15

**organize** 108:22

**organized** 108:21

**orientation** 58:11,12,15 59:11

**original** 47:22 123:14

**originally** 57:9

**other** 6:20 8:23 14:9 21:6,7 23:12 32:6 34:12 35:21 37:15 40:14 45:15 46:11 48:12 50:1 61:1,6,7,10 62:10 63:4,8,9 64:7,22 81:11 82:13,25 83:2 87:17 93:24,25 101:17 106:7 110:5 114:22 123:4

**others** 1:5 38:24 46:13

**Otherwise** 10:20

**our** 30:24 31:1



36:13 40:11 56:20 83:20 84:12 94:5,9 106:25 123:12

**ourselves** 63:2

**out** 16:19 35:16,19 36:5,7 41:11 43:8,16,23 48:7 53:12 63:15 66:5,9,12,21,24 67:2,4,9,10,15,25 68:14 69:13,25 70:12,19,24,25 71:2,6,9 79:15 81:12 82:6 85:6 88:3,6 91:14 95:23 97:14 105:3 114:12

**outlook** 22:22 106:4

**outpatient** 28:23,24

**outreach** 37:1 106:10

**outs** 25:18 37:10

**outstanding** 36:2

**over** 27:12 33:18,21 36:9,14 37:14 79:18 89:9 100:22 104:22 113:8

**overnight**

64:21

**oversaw** 24:13 25:4,7,16 26:13 27:11 34:23 55:16

**oversee** 26:18,21,23,25

**owed** 80:6 91:22 92:20,21 93:2 100:3

**own** 43:11 92:19 111:10 123:11

**owner** 34:1,4 111:3,7,9 115:6,7

**owners** 32:22 33:4,5,9

---

P

---

**P.A** 2:9 5:13 123:3

**p.m** 1:17 102:9 120:10

**page** 3:2 4:2,15 8:17,20 44:14,16 102:14 124:3

**paid** 17:1 72:9 74:1,4,5,11,12,13,14,15,18,24 76:1,21,24,25 77:8,9 80:5,7 82:21 83:1,12,15,23

84:10,13,16,18 88:12,14,20 90:4,9,12,18,21,22 91:13,15,24 92:20 93:2,4,11,14,16,19 94:5,20 95:17,21 97:3,4,15,18 98:23 99:2,7,8,25 100:2,4,6,24,25 101:19 104:7,17 117:25 119:22 120:2,3

**PALM** 1:2

**paperwork** 65:16,19

**paragraph** 30:1 31:5

**part** 14:18 21:9 23:13,16 40:21 50:3 56:20 57:13,17,19,21 58:15 62:1 73:7 91:14 100:16 103:24 107:3 108:18 111:2

**participated** 113:17

**particular** 26:19 76:24

**parties** 121:11,12

**partner** 22:4 23:2 27:8

61:23 92:20

**partners** 1:9 17:6 22:21 23:1 27:17 30:11 35:2 45:14,16 61:20 92:24 102:3 111:14 112:4,22,23 113:4,11 115:2 116:18 117:19 123:5

**partnership** 22:19 26:6

**parts** 8:10,11

**past** 20:11,13

**Patient** 64:10

**patients** 24:16 25:1 28:25 29:2 30:14 36:10,11,15,21 37:6 64:2,12 65:3,6,10 107:11

**pay** 16:11,14 94:9,12 100:12 102:18 103:21

**paychecks** 33:15 77:25 78:3

**paying** 73:22 113:20,22

**payment** 82:18 87:8 88:7,16 104:12 119:4

**payroll** 26:23 39:1,14,16


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

55:17 116:2

**payrolls** 55:10 116:23

**penalty** 6:6

**people** 14:9 28:17 30:8 36:6,8,10 39:11 43:13 49:22 50:1 53:4,11,19 54:3 55:7 57:4 60:13,25 72:17,19 74:21,24 75:3 80:12 81:10,11,22,2 5 82:6 83:2

**percentage** 35:13

**period** 35:14 63:18,23 82:18,19 86:21

**perjury** 6:4,6

**person** 16:25 36:19 51:24 53:3 81:7,8 86:12 100:22 108:25

**personal** 43:11 100:2 116:25

**personally** 41:11 48:16 76:12 122:6

**personnel** 69:3

**phone** 52:3 81:21 100:22

**pick**

103:15,16,22

**place** 25:9 47:15 58:7

**Plaintiff** 1:15 2:2 5:10 6:2 8:24 11:25 17:2 41:2 75:25 92:21

**Plaintiff(s** 1:7

**Plaintiff's** 4:1,6,7 7:25 8:1 12:1,4 13:19,22 29:6,8 30:19,21 41:19,21 44:10,12 78:12,15 80:19,21 89:3 92:1,2 94:24,25 111:20,22

**plan** 83:4 88:7

**planned** 107:24

**play** 21:2

**pleading** 31:17

**please** 6:25 8:6 12:8 13:24 29:11 30:1 31:4 39:7,11 41:23 42:9 43:20 46:4 51:20 52:10 56:3 57:5 60:20 78:17 80:23 82:10 86:3,4 89:10,13 92:8,9,13

93:6 95:2 101:10 114:9 123:9

**PLLC** 1:18 2:4 5:9

**PM** 123:12

**point** 22:19 42:25 49:19 59:24 91:24 117:14

**police** 37:3

**policies** 25:9,11,13 35:5,9 39:23 56:2,4,5,7,20 ,21,24 57:1 58:18 59:21 60:3,10 65:16 70:15,22,23

**policy** 39:19,21,25 57:24 58:2,10 59:2,4,14 66:8,14,23 67:1,4 71:7 114:3

**polygraph** 18:19,20,21 19:5,6

**Ponds** 21:10

**portion** 25:7 37:2 54:16 57:11 69:11,13 70:19

**position** 21:20 22:1,3,5,7 24:5 25:24 32:21,23

33:24 34:7,9 37:21 43:20,24 44:23,25 46:21,24 47:1,11,16 48:3 49:11 55:15 57:7 81:24

**positions** 34:12 60:16 81:11

**possession** 9:11,13 10:9

**possibility** 79:20

**possible** 43:25 71:10,15

**possibly** 21:13 49:2 106:7 119:9,12

**postage** 102:10

**potential** 17:23

**potentially** 50:21

**practice** 66:11 79:15 85:5 114:17

**premises** 24:20 25:2 28:25 29:2,3 30:8,10,16 31:13,14 40:11,12 63:12,17 64:13,16,20,2 2 65:11

**preparation**



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

7:18 10:15 97:21

**prepare**
7:18,20,21
9:19 11:9

**prepared**
11:7,11

**present** 38:16
108:25

**presented**
67:16

**presuming**
70:11

**pretty** 6:18
55:22 111:4

**previous** 22:11
32:21,23 49:1
65:22

**previously**
45:3

**prior** 48:9
90:10 98:24
99:25 117:12

**priority** 4:16
102:2,14
103:17 116:1

**prison** 6:12

**privileged**
6:22

**privy** 58:20

**probably**
21:13,14
63:14 64:14
84:11 92:5

**problems** 73:21

**procedure** 8:18
58:19 71:8

**procedures**
25:9,11,13
39:23
56:2,5,6,7,20
,21,24 57:2
58:20,24
59:21 60:4,10
70:22,23

**proceedings**
121:8

**process**
40:5,21 50:3
51:3 52:19
53:15
54:9,13,21,25
57:13,18,21
59:16 67:12
113:14

**procure** 20:3

**produce**
9:11,12,15
10:19 38:15
69:17 97:20
98:9,13

**Production**
8:17

**professional**
19:16 20:13
24:14,15

**program** 24:13
25:4 35:2,4
36:23 105:6

**programs**
109:12,22

**prohibition**
82:12

**promised**
102:18 103:13

**promptly**

123:17

**proof** 76:21
97:4 98:5
104:2

**property**
116:25
117:1,2 119:2

**proves** 100:12

**provide** 12:5
13:10 47:7,9
65:16

**provided** 68:15
96:18 103:3
116:2,6

**providing** 8:3

**Public** 1:25
121:5,24
122:18

**pull** 89:9

**punishable**
6:12

**purportedly**
116:15

**purpose**
28:13,15,19,2
2

**Pursuant** 8:18

**put** 58:7 65:20
115:19

**putting** 62:1

---
Q
---

**question**
7:1,11,15
9:14
10:7,10,20
11:18 28:8
31:12 37:18

64:11 69:20
83:7 86:8
93:7 98:14
99:4,20
101:21 109:15
111:18
114:8,9 116:5
118:25

**questioned**
118:14

**questioning**
6:20

**questions**
6:21,24 7:22
16:19 32:9
99:14
115:12,17
117:6 118:10
120:5

**quick** 75:12
115:25

**quicker** 16:19

**quickly** 98:16

---
R
---

**ran** 27:9

**ranking** 35:15

**rare** 40:23

**rarely** 40:18
109:10

**Raton** 15:17
21:10 30:15
102:4

**RE** 123:4

**reach** 35:19
41:11 43:8
81:12

**reached**



43:16,23 48:7 53:12

**read**
8:15,17,19,20 9:5,10 11:16 25:15 29:15,20 30:3,17 31:7,15 56:21,24 89:17 92:13 100:20 118:7 120:6 123:14

**Reading** 120:8

**ready** 95:3

**real** 23:13 115:25

**really** 59:20 86:22

**reason** 68:9,10 69:16 124:5,7,9,11, 13,15,17,19,2 1,23

**reasonable** 9:23 68:6

**reasons** 124:2

**recall** 5:24 13:18 20:7 26:19 27:1 36:1 39:23 40:4 41:1,15 42:20 43:18 44:2,9 45:21 47:25 48:2,5,6,24 50:5,8,25 51:8,15,16 53:9,12,22 57:1,12 71:21

72:19 74:3 77:19 80:15,18 81:17,18 94:19 95:11 106:18

**receipt** 4:16 76:7,9,11 84:19 97:1,12 99:9 102:15 116:1

**receive** 56:18 76:11,15 95:6 98:5 100:18

**received**
8:12,13,15 35:12,24 56:14 58:11,12,17 59:5,7,10 76:7,9,14 84:19 98:7 99:9 103:10 104:11,14,16

**receiving**
56:17 97:5

**recess** 75:14

**recognition**
35:21

**recognize**
8:9,11 12:11,13 14:2,4,9,13,1 4 42:1,3 44:18,20 78:19,21 80:25 81:2 95:5,8,12 111:25 112:5,11

**recollection**
47:21 48:25

**recommended**
53:2 81:10

**record** 5:8 7:24 8:2 11:8,23 12:2 13:20,23 29:9 30:22 31:25 41:20,22 44:11,13 52:2 75:13 78:16 80:22 89:17 95:1 102:1 103:5 111:6,21,23 115:19,22 120:7 121:9

**records** 4:4 8:23 9:7,8,11 10:25 11:1

**Recovery** 21:22 22:15 24:5 26:9 32:23 33:1 34:25 35:7

**recruit** 33:10

**recruited**
32:21 33:3 40:17

**recruiting**
39:19

**RE-DIRECT** 3:6 118:12

**refer** 89:6 92:1

**referral** 17:24

**refers** 8:22

**reflect** 7:24 11:23 52:2 97:6

**reforming**
59:22

**refresh** 41:16 48:25 89:12 102:23 114:25

**refreshing**
47:21

**regard** 36:20 49:23 50:6 51:2 88:19 119:2

**regarding** 23:3 42:4 79:25

**regardless**
10:10

**regards** 75:17

**registered**
12:15 113:7

**regularly** 43:8 105:1,2

**reintroduce**
89:5

**relationship**
22:24

**relationships**
24:14,15 36:14 106:1

**relative**
121:10,12

**remember** 15:3 27:4 28:3,4 40:24 41:14 47:18 48:10 53:3



**removed** 73:6

**repayment** 82:19 83:4

**repeat** 28:8,20 64:11

**rephrase** 7:10,13

**replaced** 12:23

**report** 121:7

**REPORTED** 1:24

**reportedly** 116:1

**Reporter** 1:24 13:4 29:7 32:18 42:24 115:15 118:8 121:1,5,23 122:18 123:20

**Reporting** 123:21

**represent** 5:10 75:18

**request** 8:17,22 9:25 96:21,25 98:2

**requested** 68:16,20 69:18 96:15 114:14

**required** 9:10

**reserved** 120:9

**reside** 30:8,14 64:16

**resided** 65:10

**resources** 47:4

**respond** 43:20

**responded** 46:14 47:18

**responders** 36:4

**response** 6:25 31:1

**responses** 6:24 31:1

**responsibiliti es** 39:15 48:12 55:7,25

**responsible** 59:13 113:20

**responsive** 9:24 98:2

**resume** 42:4 65:22

**resumed** 75:15

**retract** 31:21

**return** 123:17

**returns** 8:24

**revamp** 60:4

**review** 8:6 12:8 13:24 29:11 41:23 44:15 49:4 78:17 80:23 89:10 92:8 95:2

**reviewed** 35:5 102:22

**reviewing** 25:11

**revising** 59:13

**Richards** 1:18 2:3,4 5:9 11:23,24

75:9,12 94:3 101:21 102:1 120:7

**right** 7:17 8:25 10:11,25 19:10 20:16 37:12 39:3,5 42:13 47:15,25 62:21 75:22 95:22 99:9,13 101:24 113:12

**Robinson** 2:9 5:13 123:3

**role** 14:20

**roles** 24:8

**room** 108:25 109:3

**rough** 53:23

**row** 51:6

**rules** 8:18 9:9 10:3,4 25:15

**run** 23:25 39:12 109:9 110:9,10,11

**running** 23:7 27:7 109:8 110:8

---
S
---

**safe** 57:24

**said** 10:10 11:18 12:25 13:6 16:5,7 33:9 35:3 55:4 62:10,23 69:11 70:9 72:4 74:24 76:23 84:16

87:13 91:18 97:3,13,14,23 ,24 98:17 102:18 107:23 108:3,5,22 111:6

**salary** 66:2

**Samantha** 116:15

**same** 22:22 23:3,15 52:18 54:13 57:15,20 61:11,12 63:1,3 65:8 90:17 95:20 100:4,5 101:3

**saw** 48:2 99:10 102:24 117:7

**say** 7:12 21:13 23:12 25:4 27:17 39:4 40:8 43:19 54:19 57:24 59:25 103:6 105:13,14,16 107:18 110:1 112:8

**saying** 7:14 32:11 36:2 37:19 46:6 95:16 96:17

**says** 15:9 102:6

**schedule** 44:6 45:3 48:20 53:8

**scheduled** 45:6 53:9 102:7



**schedules**
  107:1,4,17,22
  108:3 110:18

**scheduling**
  108:1

**school** 17:25
  18:2,3,19
  19:2,9

**science** 19:6

**Scott** 1:10,15
  2:3 3:2,3,6
  5:1,4,8,9,14,
  16 7:24 8:3,5
  9:4,18 10:14
  11:2,16,20
  12:3,5,8
  13:5,6,16,19,
  24 15:9 16:20
  22:1 29:10,11
  30:23
  31:4,14,20
  32:4,11,19
  35:5
  37:16,19,21
  38:8 40:24
  41:23 42:25
  44:15 46:9
  48:6 49:4
  52:2,5 55:2,6
  60:8 62:25
  67:24
  68:5,10,24
  69:5,24
  70:6,14 73:11
  74:2 75:20
  77:19
  78:9,12,14,17
  80:8,19,23
  81:19 82:15
  83:8,25
  84:20,25

85:18,22
86:11,14,22
88:11
89:3,10,12,17
91:10,19
92:3,7,8,13
93:6
94:1,8,23
95:2 96:20
97:11
98:1,9,11,16
99:6,17,21
101:9 102:17
103:9 107:9
112:19 113:3
116:4,9,13
118:3,11,13,1
9 119:10
122:6
123:1,6,25

**search** 9:23

**searched** 10:11

**second** 32:17
  44:16 67:14
  68:17

**see** 14:7
  15:7,9 32:5
  41:16 43:23
  44:22 46:11
  68:13
  72:19,24 81:9
  88:2 95:9
  102:11 105:25
  112:13

**seeing** 95:11
  100:2

**seen** 95:10
  100:11 112:12

**send** 42:5,7
  97:4

**sense** 17:11
  86:9

**sent** 42:4
  44:21
  76:1,3,25
  77:3,6
  79:11,15 80:1
  84:21
  85:1,6,11,25
  88:3,5 91:14
  95:23 97:24
  102:3 103:16
  116:2

**sentence** 49:9

**separate**
  64:24,25
  111:11
  113:4,6

**separately**
  64:13

**served** 117:21

**service**
  36:3,24

**set** 64:20
  74:17 83:15
  94:12,14

**shake** 6:24

**she** 12:25
  14:18,20,22
  16:16 17:2,4
  41:8,10 43:23
  44:23,25
  46:14
  47:7,9,11,16
  48:1,3,15
  49:7,14,17,21
  ,23,25 50:1
  52:11
  53:20,21,24
  56:4

63:19,20,22,2
5 66:23,25
67:1,15,16,17
,25 70:11,15
71:5 76:7,21
77:8,9,11,13
81:9 82:8
84:16,18,19
90:4,9,12
91:12
93:4,16,19
94:17
97:3,4,15
98:23
99:2,7,8,9,21
,24 100:2
103:15,18
104:11,14,16,
17
106:15,17,18,
19,20,21
110:21

**sheet** 102:2
  124:1

**she's** 16:10
  31:1 46:6
  47:10 49:20
  96:17

**shipped**
  103:7,8

**shock** 114:20

**short** 63:18

**should** 23:24
  59:4

**show** 103:16,22
  118:24

**showed** 47:20
  48:3,8

**showing** 48:9



sick 16:13

sign 33:15
  66:19 77:24
  78:3,23 85:3
  101:14 119:3
  123:10,14,16

signature
  50:13 78:25
  79:3 84:22
  85:1,4,6,8,15
  ,21,23
  86:5,16,19
  87:2,23,25
  88:2
  114:1,4,15
  116:22
  123:10,16,22
  124:25

signatures
  78:22

signed 79:12
  84:21 112:17
  113:23

signing 114:17
  120:8

silently 31:7

similar 34:24
  35:6 57:16

similarly 1:5
  123:4

since 9:16
  11:13 20:21
  21:8 68:23
  72:13

single 56:16

singular 33:9

sit 99:10
  109:17

situated 1:5
  123:5

situation
  57:16 90:17

situations
  90:21

six 11:22 69:4

skipped 104:19

social 60:25
  62:21

society 47:3

solely 38:9
  43:3 111:7

soliciting
  82:4,5

some 17:19
  20:25 26:14
  36:17,18
  41:17 59:23
  74:15 94:4
  104:21 105:15
  107:1 117:6

somebody 40:13
  109:5

somehow 10:18

someone 38:5
  49:13 53:2
  79:18

something 62:9
  103:7 114:19

sometime 94:21

sometimes
  59:18 109:6,9

somewhere
  21:18 67:13

son 16:13

sorry 11:22
  28:21 42:22
  44:24 50:9
  73:4 92:2
  96:9 99:19
  107:25
  112:8,25
  118:10

sort 13:12
  67:25

sounds 102:13

sources 17:24

SOUTHERN 1:1

Southwest
  30:14 45:10
  63:13 102:4

speak 13:10
  17:5 37:2
  49:11,12,14
  73:16,21
  105:11
  109:1,4

speaking 50:5
  73:8

specialized
  61:10

specific 24:11
  25:5 50:6
  63:6

specifically
  36:1 37:6
  68:16 82:25
  88:13

speculate
  7:2,6 44:8
  103:25

speculating
  103:24

Speculation
  119:8

spell 33:12
  52:6,10 57:5

spelled 52:11

spoke 24:16
  37:5 49:22
  74:16 75:24
  76:22 82:24
  88:18,21 91:3
  97:16

spoken 16:1,20
  49:25 83:11

spread 23:17

stamp 78:24
  79:3,16
  112:16 113:25
  114:4,6
  116:22,25

stamped 31:5
  79:9 85:1
  101:7 114:1

stamping 84:6

stamps 116:21
  119:3

stand 97:15

standpoint
  75:18

start 22:2
  39:3 46:1
  48:22 49:8,17
  67:11 89:15
  110:21

started 20:18
  67:17 110:20

state 1:25
  47:22 102:10
  121:2,6,24



122:2,18

**statement** 32:3

**statements**
11:15

**States** 1:1
35:15 102:14

**staying** 64:20

**still** 10:3
20:24,25
21:15 32:25
37:16 42:15
43:20,21
71:10,24
72:1,6,8,14,1
6 73:7,12
76:17 77:15
79:7 80:8
85:19 86:5,20
87:7,9,11,24
90:4,16 97:16
100:7 113:10
115:9

**stipulate**
75:16

**stopped** 20:21

**stories** 37:12

**Street** 30:15
45:10 63:13
102:4

**structure**
37:23 38:9,10
66:2

**study** 19:1

**stuff** 11:14

**subpoenaed**
68:19,24

**substance** 61:9
62:11 63:10

91:10 94:4
95:15
100:19,21
108:22

**success** 37:12

**sue** 75:3

**sued** 16:25

**suggested**
49:14,17
110:21

**suing** 82:25

**suit** 16:4,9,12
82:8,9

**Suite** 1:18
2:5,9 123:3

**sum** 80:6

**SunBiz** 4:4
12:14

**supposed**
56:17,18
68:18
79:17,22 85:3
106:17,21

**sure** 6:19
7:4,5,15
15:13 18:24
20:10
25:9,12,14
27:15 29:1
35:9 37:8,25
38:14 39:20
41:18 49:13
50:2 60:1
65:20 66:2
69:12 74:13
75:11 98:10
108:7,17
115:16

**surprised**

98:12

**switched** 79:17

**sworn** 5:6 32:2
122:7

**Synthia**
52:1,4,9,16
54:11 55:23
57:3 59:15
110:16

**system** 18:22
19:20

**S-Y-T-H-I-N-A**
52:11

———————————
T
———————————

**take** 8:6 20:2
31:20 32:4
41:23 49:4
75:9 108:8
114:6,16
123:9

**TAKEN** 1:15

**taking** 4:3
6:14

**talk** 16:17
20:9 27:14
37:5,19
105:17

**talked** 37:9
83:10 108:4

**talking** 32:15
74:21 75:20
82:13

**tasks** 105:7
109:25
110:1,12,15,1
7

**tax** 8:24

**team** 14:18
105:22,23
106:13,14
107:2,12,16
109:14,16

**tell** 7:5
17:8,9
22:14,23 24:4
25:5 26:15
41:24 42:19
44:22 45:25
95:14 101:9
107:4 108:5
110:4

**telling**
10:11,25 16:8
18:24,25 72:3
85:12 88:6
99:5

**tells** 18:24

**ten** 20:11,13

**tendered** 93:14

**term** 62:13,14

**terms** 79:24

**testified** 5:6
11:11 31:16
54:24 77:19
82:24
88:15,18 89:7
90:3 94:3
96:6,9 98:22
107:15 108:4
116:10,21
118:19 119:21

**testify** 6:15
7:6

**testimony**
10:18 30:9,13
42:11 69:5,9



70:21 82:1

**text** 4:5,11
14:3 81:3
82:10

**than** 6:12
61:1,7 62:10
63:9 93:24,25
101:17

**Thank** 33:15
46:18 98:11

**that** 6:14,21
7:5,7,12,15,2
2 8:9 9:11
10:12,14,15,1
8 11:1,23
13:3,6,11,13,
18 14:6,20,25
15:6,10
16:10,11,12,1
7 17:11
19:1,9,10,25
20:7,15,20,24
21:5,7,11,14,
17,21
22:2,19,24
23:6,16
24:8,15,18,23
25:5,6,10,15,
24 26:3,15
27:2,6
28:8,12,17,19
,20,21
30:4,6,8,9,13
31:15,21
32:6,11
34:7,9,10
35:9,16,18
36:15,24
37:7,9,15,18
38:4,5,6,9
39:21,22
40:23 41:23

42:11 43:6
44:24
45:6,11,12,14
46:11,14
47:1,4,13,14,
18 48:3,6,13
49:9,14,20
50:2,3,5,6,9
51:11,13,18,2
4 52:2,6,10
53:3,19 54:17
56:1,11,15
57:19,21
58:4,17
59:16,25
60:1,4
61:3,6,18,19
62:2,6,8,9,10
,12,13,14,15,
19
63:4,5,7,11,1
7,18,22 64:2
65:10
66:8,13,14,18
67:13,21,25
68:1,15,16
69:2,5,7,9,12
,17
70:6,15,19,21
,23
71:2,5,13,14
73:3,5,25
74:2,7,11
75:2,21,24,25
76:6,7,21,23
77:2,7,20
79:6,8,14,15,
19,20 80:1,4
81:2,13,19,21
,22
82:1,7,10,24,
25
83:10,11,14,1

5,16,19,23
84:1,18,19
85:2,5,17
86:3,10,19,20
,25 87:7
88:5,15,18,19
,21
89:8,19,24
90:2,7,9,17
91:6,12,14,23
,24
92:16,20,22,2
3 93:8,13
94:2,3,5,8,11
,12,14,20
95:16,18,20,2
3,25
96:6,10,15,18
,23 97:6
98:2,3,7,19,2
2 99:6,21,24
100:2,3,11,12
,15,18,23,24,
25
101:3,6,15,19
,24
102:2,10,11,1
3,17,18
103:2,3,10,13
,15
104:2,4,8,11,
14,16,20,21,2
2,25 105:8,19
106:7
107:5,9,15
108:4,5,6,25
109:14
110:2,19,25
111:2,4
112:8,24
113:21
114:4,11,14,1
7,20,21,24,25

115:10
116:1,2,6,11,
15,21,22,25
117:1,11,15,1
9,21,22
118:14,19,20,
23,24
119:3,19,21,2
2,23,24
121:6,8,10
122:6
123:9,10

**that's** 5:19
7:4 12:7
20:21
30:15,23
43:25
50:10,13 65:4
68:12 70:25
90:22 92:5
93:11 94:21
96:2 97:22,24
102:3 106:14
108:6,9
109:15
118:5,25
120:6

**theft** 117:4

**their** 23:1,2
26:13 36:22
47:3 51:20
55:12 62:20
65:20 66:2
67:5,11 70:15
84:15 90:20
104:10 109:1
110:17 117:14
123:12

**them** 9:12,15
13:12,14
14:13
22:8,13,17,25



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

24:20 26:11
27:12,24
36:17,18 37:5
38:21
40:9,10,12,14
,15,16 43:2
47:3 57:4
59:21,22
60:4,5,20
64:25 67:10
68:20 69:1
70:11,24,25
71:2,4 84:5
95:7 101:14
105:5 109:4

**then** 16:19
20:21 21:1
46:13 51:1
70:20 71:5
74:12 78:11
79:18,24
87:16 88:11
95:22 103:19
104:1 113:10
115:18

**therapist**
47:10,12,17
61:7,9,10,12,
14,15,17,21
62:11,18
63:1,3,9,10

**therapists**
60:21,22,24
61:1,2,12
62:10,24,25

**therapy** 28:23
36:22 47:7,9
61:11 63:3

**there** 10:14
12:23 13:11
14:7 15:18

16:11 20:17
21:12,15,18
25:17,19
26:17 28:14
32:5 34:10
36:25 37:10
38:9,11,13,14
,16 39:9,11
45:15,23
48:12 50:1,10
51:23 52:17
54:10 60:22
61:1,6,13,16
62:6,9,10,25
63:1,4,8,17,1
9 64:8,21,24
65:3 67:18
69:4,8,10,11,
13 70:16
71:3,16
74:17,21,25
77:20 79:19
81:23 82:12
83:12,13,14
85:7 89:15
91:13
94:12,14
97:15
98:14,15
99:8,9,10
101:22,25
104:2
106:18,21
109:17 114:25
118:23

**thereafter**
90:11

**Therefore**
88:19

**Thereupon** 5:3
8:1 12:1
13:22 29:8

30:21 41:21
44:12 78:15
80:21 94:25
111:22 115:21

**these**
9:2,7,11,15,2
2,24
10:3,8,12,24
11:1,9,18
21:3 36:15
37:9 50:19
51:2 55:7
58:24 60:17
65:6 66:21,24
67:2,5 68:16
69:2,17,25
70:7 71:6
78:22,23
79:16 80:1
88:2
101:10,13
106:12 116:14

**they** 9:8,12
12:23 19:19
20:4
22:7,9,11,16,
21
23:6,8,12,14,
17,19 25:3
30:9,12 31:13
35:19 36:2,12
39:13,20
40:13,15
45:18,20,24
51:22,23
52:17 55:9,10
56:17,18
57:3,20
58:11,13,17
60:6,11
65:12,19,20
66:5,15,18

67:10,11
68:13 70:3
71:9 72:5,6,7
75:2 78:24
79:1,6,7,17,2
1 83:1,15
84:1 86:20,25
87:9,11,12,16
,17,19,22,24
88:3,5 90:21
94:20 95:20
98:7 100:12
108:19,20
109:12,22
110:24
117:3,5
119:18

**thin** 23:18

**thing** 54:13
94:20

**things** 26:2
27:7
105:18,20,24
114:22,23

**think** 7:3
19:25 21:18
52:1 63:11
67:7
84:2,7,9,11,2
3 85:17 92:1
103:15,23
106:19

**thirty** 123:14

**this** 5:11
6:17,18
7:18,25
8:13,20,22
9:5,10,19
11:7,14,25
13:19
14:10,23 15:3



16:1,21 19:10 22:7,24 24:2,23 29:5,14,21,24 30:16,17,19,24 31:10,15 32:25 36:25 41:3,16,19 42:1,5,7,12,13,14,19,23 43:4,16 44:10,14,18 45:25 46:1 48:25 49:6,19 58:10 59:2 67:9 70:9 74:9 78:19 80:25 82:8 83:11 84:2,9 88:18 90:10,18 92:25 93:1,21 94:17,19 95:5,6,11 97:6,13,15,16,21 98:17 100:16 101:1 103:4 104:19 111:19 115:13,18 121:15 122:8 123:17

Thomas 2:8 3:5 18:3 123:2

those 20:2,3 23:5 39:15 45:19 52:13 55:15 57:1 68:6 74:23 85:11 91:2,19,24 104:8

105:4,8,11,16 106:9,16 107:13 109:19 110:8,25

though 11:6

thought 23:24 37:18 114:19

threatening 75:2

three 6:1 51:5 52:16 55:7 105:3

through 6:18 8:15 10:9 20:12 32:5 36:13 44:4 48:7 53:2,13,14 57:11 97:17 109:25

throughout 20:19 34:10

time 8:6 19:10 23:1,9 25:20 27:2 30:16 31:15 32:4 34:10 40:2 41:24 42:13 44:3 49:4 52:18 57:4,15,20 62:5 63:18 66:10,18 67:21 68:1,14 69:7 70:1,15,18 72:5 73:6 77:2,7 81:18 83:10,13,14 88:20

89:8,21,24 93:12 100:25 102:9 112:8,14 113:12,21 114:14,21 118:20 123:10

times 40:6 105:12 108:17 109:7,24

title 15:2 55:23 61:13,16,19

titles 55:12 60:18

today 6:15 7:19 11:16 30:13 31:21 32:3,5 86:21 97:13,20 98:9 117:7

together 20:5

told 16:3,4,23 35:18 71:17,20,24 73:25 74:5,7,10,18,22,23 84:18 90:23 91:12 93:16,19,24,25 94:12,19,22 95:20 100:1,3,23 101:17 104:13 111:3 117:24 120:1

Tom 5:12 101:22

tom.loffredo@gray-

robinson.com 2:11

tomorrow 49:11

took 23:19 47:11 99:11 114:22 117:3 123:11

top 14:6 19:25 89:13

total 63:15

totality 50:19

totally 28:24

touring 20:18,25 72:14

tours 108:8

TPA 14:8,17 15:6 27:14,17,21 28:5 32:20 34:9,16 35:22,25 36:7 37:6,14 38:19 39:8 41:8 43:9,24 48:13 49:20 50:20 56:9,11 58:21,22 60:13 63:21,22 64:7,22 65:1,2,4,10 72:16 75:22 77:16,20 78:2,5 80:9 81:12 83:13,20,21,22 85:5 93:14 98:2,25 104:21 106:24



110:22
113:21,23
114:18

**TPA's** 28:13

**TPR** 58:20

**trainer** 19:21

**transcribe** 121:7

**transcript** 120:9 121:8 123:25

**transitional** 47:5,6,12 61:13,15,16,21 62:11,17

**treatment** 1:9 17:6 21:4,9 22:16 24:23 27:17 29:3 30:11 35:2,14 45:14,16 61:20,23 92:20,24 102:3 108:8,11 111:13 112:4,22 113:4,11 115:1 116:18 117:19 123:5

**true** 94:11 99:18 121:9

**truly** 123:18

**trust** 85:14 86:5,6,9

**truth** 18:25

**truthfully** 6:15

**try** 7:14

**trying** 23:14,17 52:1 81:22,24 82:5

**Tuesday** 49:8,17

**turn** 30:1 31:4

**two** 14:9 19:3 22:17 25:25 46:18 51:22,23 117:12,16

**type** 24:2 36:1 56:7 61:7 109:20

**types** 26:4 60:22

**typical** 102:14

——————————
         U
——————————

**U.S.C** 1:6 123:5

**unaware** 47:14

**uncertain** 7:7

**under** 1:5 9:9 10:3,12,25 11:12 31:18 63:5 65:9 99:2 123:5

**undersigned** 122:5

**understand** 6:4,6 7:8,11,13,15 9:9 27:17 30:4 38:10 89:19,24 90:2,7,9,12,1

4 92:16 93:7 103:10 104:21 111:18

**understanding** 30:6 61:6 71:5 74:11 86:14 92:19 95:15 99:6,8

**understood** 30:16 31:14 32:12 93:11,12

**United** 1:1 35:15 102:14

**Universal** 123:21

**University** 18:11

**unless** 6:22 103:7 118:9,10

**until** 28:1 74:12 90:4 94:9 98:23 100:12

**untruthfully** 7:7

**up** 17:17 21:8 64:20 74:12 86:20,21 89:9,15 103:15,16,22 105:19

**upon** 7:23 62:1 117:23

**us** 17:19 103:3 123:17

**USA** 1:18 2:4

5:9

**use** 43:8 78:24 79:7 85:14 87:17,19,23 114:14,15 119:13

**used** 37:6 85:9 86:5 116:22 119:3,16

**using** 79:22 85:21 86:16,20,25 87:8,9,11,16, 24 119:10

**USPS** 102:2

**usually** 66:15 109:14

——————————
         V
——————————

**Vanderhoof** 116:16 118:15

**verbal** 6:23,25

**verbally** 104:13

**via** 123:25

**vs** 1:8

——————————
         W
——————————

**w-2** 10:19 66:5,10

**w-2s** 8:24

**w-4** 66:9

**w-4s** 69:3

**wages** 92:20 93:14

**wait** 7:1 68:17 108:19,20



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

**waive** 123:10,16,22

**walk** 40:14

**walked** 69:13 114:12

**want** 7:6 21:13 22:18,21,25 23:2,13,15 32:8,10 43:19 75:9 97:17 103:25 104:19 115:16

**wanted** 91:14

**wasn't** 25:19 53:14 57:19 60:3,4 69:12 71:16 74:13 82:5 87:16 90:17 100:2,5 111:2 114:19

**watched** 25:17

**way** 9:7 10:14 57:22 77:20 100:4

**we** 5:10 10:14 11:10,14 22:22 23:3 30:10 32:15 36:8 44:15 49:10 57:19 61:11 63:2 64:19,20 65:15 68:15,24 69:17 72:8 75:18,20 76:10 83:10 89:3 98:3 102:1 106:6,7,25

107:1 108:7,21 111:20 115:18 118:9 120:7

**website** 61:20,24 62:2,9 114:15

**week** 11:4 42:17,18 66:17 67:14 105:3

**weeks** 41:8 46:18

**we'll** 11:6 12:5 16:19 20:12 31:25 32:1 75:16 94:1

**went** 18:9,19 62:20

**were** 5:22 6:2 11:2 12:22,25 13:7,11 20:4 22:1,16 23:6,12,14,17 ,19 24:4,8 25:9,17 27:25 32:6,15,25 34:16,18,20,2 2 36:2,8 37:10,22 38:18 39:9,11,15 40:5,21 42:15,25 45:19,20,24 46:19 47:22 50:2,23 51:23 52:12,17,19,2 1,24 53:15,25 54:7,9,11,15,

17,21,24 55:9,12,25 57:3,13,17,19 ,21 58:15 59:16,19 60:1 61:3 62:10,25 64:2,8,12,19, 20,22 65:3,6 67:20 69:17 70:14,21 71:10,20,24 72:5,10,12,14 ,16 73:7,8,13,25 74:9,19,20,24 ,25 75:2,20,21 76:23,24 77:15,20 78:5 79:6,14,17,21 ,24 80:1,8 81:13,23 82:4,7,15,18, 25 83:1,12 85:11 87:16,17,19,2 2,24 88:3,5,19,20 90:18 91:2,5,10,14, 19,23 93:11 94:20 97:5 98:1 99:11 100:3,4,23 101:13,19 104:8,21 105:19 106:6,9,21 107:13 108:21,24 109:19 111:6 113:3,13,21 116:15,17,23

117:6,21 119:19,22 122:7

**weren't** 22:21 23:8 82:1 83:23 87:15 91:16 113:13

**WEST** 1:2

**what** 6:4 7:11,13 10:19 12:4 14:8,16,23 15:10,22 16:3,23 17:8,9,10,14, 17,19 18:8,12,16,18 ,21 19:4,19 20:7,11,21 21:11 23:5,10 24:8 25:21 26:4 28:13 29:14,16,17 30:6,10,16 31:10 32:10,15 33:24 34:6,22 35:6 36:1,2,20 44:14,22 45:8,11,12,25 46:11,24 47:1 48:3 49:6 55:9,12,23,25 56:7 57:7 65:19 66:2 69:22 72:12,23 73:2 74:2 75:1 78:7 81:9 82:10 83:10 84:17 85:20



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

86:9 90:2,23 91:5,18 92:22 93:2,24,25 94:21 95:9 97:23,24 99:19 100:1,20 101:17 102:11,20 103:2 104:10 105:2,13,14,15,18,20,23 107:4,5 108:5,6,22 109:4,11,20,21 111:15 112:6,19 113:22 115:14 117:23 120:1

**whatever** 66:10 101:23 104:8 111:4 115:19

**what's** 12:14,18 24:5 41:5 42:22 45:6 95:18 102:25 107:24 109:1

**whatsoever** 116:20

**when** 5:22 8:15 12:9 13:25 18:6,14 20:15 21:17 25:4 27:17,25 28:13 29:12 30:2,17 31:8 34:15 37:5 39:8 40:13,25 41:9,10,24 42:7 53:20,21 57:10 58:2

63:22 66:15 67:8,15,16,17 69:25 71:20,24 73:8 74:9,10,16 76:3,15,22 77:5 79:11 83:1 87:19,20,21,22 88:25 89:7 91:2 92:14 94:19 95:3,25 99:11 103:6 104:20 112:6,9,13,14,15 113:6 114:3,4,7,20 115:1 116:23 117:18

**where** 15:16 16:25 18:10 19:14 37:2 40:10 45:19 54:5,14 57:16 63:20 70:17 105:25 106:6 107:16

**whether** 10:11 11:11 68:6 84:12,15 85:11 90:21 93:4 117:18

**which** 8:11,24 14:8 18:2 21:21 26:16,19 52:14 55:18 66:1 75:4 84:20 101:3 106:5 107:2 112:3,15,21 117:7,11

123:14

**while** 32:25 50:1 64:8 85:7

**who** 14:12,14 22:5 27:4 33:3,5 39:25 41:2 42:5 51:11,13,16 52:21 53:3 57:1,4 59:13 68:21 72:18 74:13 79:1,12 80:11 81:7 85:2 86:4 93:19 95:23 106:12 113:20,23 115:4 117:24 120:2 123:11

**whole** 7:1 34:10

**whom** 17:22 45:1 52:21 71:18 81:4,6

**why** 9:4 21:19 22:20 23:2 38:3 68:10 71:18 74:19,21 76:17,20 79:3,24 86:20 96:23 101:13 103:14 109:12,22 114:6,16

**wife** 17:5

**wife's** 15:22,23

**will** 7:14 30:1

41:16 111:19

**Williams** 5:11 17:3 41:6 42:6 46:22 48:13 59:7,10 63:17 66:20 67:13 74:8 75:5,6 76:24 81:8 82:8 88:11,20 89:19,24 91:23 93:8,15 98:22 101:3 102:6 104:7 116:2 123:4

**William's** 51:8

**WILLIAMS** 1:5

**Williams's** 96:2 97:1

**wish** 72:8 123:16 124:2

**with** 8:23 9:6 10:1,2,21 12:5 13:3,7,11,12 14:17 15:5,6 16:1,13,20 17:6,10,13,14,22,23 19:12 20:18,24 21:2,20 22:8,9,13,17,19,22 23:10,21,22,23,24 24:5,16,20 25:8,15 26:8,11 27:7,9,20 28:18 29:23 32:2,20,25


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

33:25
34:9,12,16,25
35:1,2,10,25
36:5,6,15,20,22
37:4,12,14,22
38:15,18
39:2,3,4 41:9
44:3
46:1,19,21
47:2,3
48:13,15,17,22
49:12,15,20,23 50:6
51:2,11,13,18
53:6,25
54:15,23 56:5
57:7,18,25
58:8 59:20
60:16 61:23
67:8,12
68:14,22
70:14,18
71:17 72:16
73:3,5,13,16,19,22,24
74:9,16,19,20
75:6,17,21,24
76:17,22
77:15,20
78:22,24
79:3,4,18,23,25 80:8 81:18
82:8,15,19
84:21 85:22
88:2,18 89:15
90:3,15,24
91:3,8 96:24
97:14,17
98:19 100:22
102:6 103:3
104:9,10,23
106:16,22,23,24 107:5,15
108:4 109:16
111:3,7,8
113:25
114:1,6,16,17,22 115:1
116:18 117:25
119:2,3
121:13 123:15

**within** 20:4,11
35:13 36:3
67:5 123:14

**without** 47:21
66:12
85:1,11,15
88:6
119:10,13,16

**witness** 3:2
5:5,7 8:25
9:3 11:15
21:24 35:4
75:11 121:15
122:8

**words** 92:19

**work** 10:2 20:9
35:22,25 36:2
42:12 47:2
63:17,19
69:6,8,10,23,24

**worked** 17:12
21:7 24:20
28:14 34:10
41:8 48:15
51:16,24
63:12,25
69:11,12
70:15 72:13

**working** 13:11

21:11,15
42:12,15
46:19 66:12
67:17,20
71:1,16,17,24
72:1,10 82:3
103:18 110:20
115:9

**works** 68:18

**world**
20:19,22,24

**would** 7:5 9:6
22:12 26:18
31:20 32:4
37:2
38:5,9,11
40:8,13,14,15
48:25 49:10
51:13 58:24
62:12,15
63:5,7,8
66:14,18,23
67:1,3,4,7,8,13,24,25
68:4,5,10
69:22,25
70:3,6 71:6
74:11 76:17
77:5,8 79:3
83:15 84:11
85:2,10 89:12
90:4 95:20
100:25
102:18,22
103:14,23
105:16,17,25
106:14
107:2,9,10,12,15
109:1,3,5,7,9,14,25
110:1,21

114:25 119:4

**wouldn't** 68:3
70:1 84:25
85:2 104:4

**Wow** 20:20
35:21 36:1

**wrote** 22:25

_____
            Y
_____

**yeah**
31:13,19,22
32:1 38:14
42:17 43:7
55:3,22 60:19
62:13
63:4,16,18
64:6 70:1
71:15 73:12
89:11 90:22
95:22 99:16
102:13 103:22
108:12 109:5
110:12,25
113:19
118:11,18

**year** 6:12
12:20 19:11
20:4,7 21:11
42:9 46:4,9
53:23

**years** 5:23,25
6:1 15:19,25
19:3,22
20:2,12,13,20
22:17 25:25
36:14

**yes** 8:10,14
13:16 16:22
17:7 20:6
21:9 27:13
28:9,16,21

 UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com

29:7,18 30:18
34:11 36:11
39:2,10,18
40:20 43:15
45:9,13
46:20,23
50:4,22
51:4,7,17,25
53:7,11
54:1,10 55:8
58:1,23 59:1
60:10 61:4
62:16 63:24
64:12 65:18
66:7,10
67:3,11,19,23
70:10 72:1
73:15,18,20
74:8 75:8
76:13 78:18
82:17,22 83:2
88:10,22
89:23 90:12
91:1,4,7,25
92:6 93:3
94:7 95:9
96:4 97:3
98:21 101:5
103:12 104:24
105:15 114:2
115:8

**Yesterday**
  76:16

**yet** 87:24

**York** 36:6

**you**
  5:17,19,22,24
  6:2,4,6,8,11,
  14,17,19,21,2
  2,23,24,25
  7:2,3,5,6,7,8
  ,10,11,13,14,

15,18,21
8:5,7,9,11,13
,15,17,20
9:1,4,9,10,18
,19,23
10:3,4,6,7,8,
11,15,17,19,2
5 11:2,6
12:3,5,9,11,1
3,16,22,25
13:3,6,10,11,
14,16,25
14:2,4,9,14
15:3,14,16,18
,20,24
16:1,3,5,20,2
3
17:5,8,10,11,
12,14,16,19,2
5
18:2,4,6,8,10
,14,16,18,21,
23,24,25
19:1,4,6,9,14
,16
20:7,11,15,20
,24
21:1,7,11,15,
19
22:1,2,5,7,8,
23
23:2,5,6,24
24:4,11,15,18
,20
25:4,5,6,10,1
4,15,17,21,24
26:1,8,11,13,
15,19,21,23,2
5
27:4,6,9,11,1
7,20,23,25
28:3,8,13,20
29:1,12,14,16

,20,23
30:1,2,4,16,1
7
31:2,4,7,8,10
,14,15,20
32:4,8,10,11,
12,19,25
33:3,9,10,12,
15,25
34:7,9,10,12,
15,16,18,20,2
4
35:3,5,6,9,16
,19,21
36:1,10,12,15
,18,20,24
37:5,6,7,9,10
,11,15,22,25
38:5,8,15,18,
21
39:4,9,21,25
40:5,10,12,17
,19,21,24,25
41:2,7,9,11,1
4,20,24
42:1,3,5,7,11
,12,15,20,25
43:3,8,11,14,
16,19,20,23
44:1,3,6,18,2
0,22
45:3,6,21,23,
25
46:1,11,13,14
,18,19,21
47:11,14,18,2
0,22,25
48:1,2,3,6,8,
9,15,17,20,22
49:10,12,14,1
5,17,19,23
50:2,5,15,19,
23

51:5,8,11,13,
16,18,20
52:6,10,12,19
,21,24
53:3,8,10,12,
15,25
54:2,4,7,9,11
,15,17,21,24
55:2,6
56:3,15,18,21
,24
57:1,5,13,17,
21
58:9,15,17,20
,24
59:7,10,16,18
,23
60:1,5,8,11,1
6 61:19,23
62:1,4,20
64:8,11 65:21
66:3,17,20
67:8,12,17,20
,24
68:5,10,15,16
,19,20
69:1,6,9,18,2
2,24
70:3,6,14,21
71:10,13,15,2
0,24
72:2,3,8,10,1
2,14,16,18,21
,23,25
73:2,7,8,11,1
3,16,21
74:6,7,9,10,1
6,19,20,23
75:4,6,9,19,2
1,22,23
76:3,6,9,11,1
5,17,20,22,25
77:5,8,11,15,


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

19,20
78:5,7,11,19,21,23
79:4,8,11,12,14,19,24
80:8,11,14,16,17,25
81:2,12,13
82:1,4,7,8,15,18,24
83:1,3,7,16,17,19,20,21,23,25
84:2,4,10,12,20
85:10,12,14,18,25
86:3,4,5,6,9,11,23
87:7,11,15,21
88:2,6,11,15,18,19,21,24
89:5,6,12,13,19,22,24
90:2,7,9,16,20,24
91:2,5,10,14,16,19,23
92:8,14,16,18,19,22,23,25
93:8,9,13,17,19,21
94:2,3,4,8,14,17
95:3,5,8,10,12,14,20
96:5,6,9,10,13,15,18,20,23,25
97:4,5,14,16,20
98:1,3,9,11,12,13,14,17,19

,22
99:4,5,9,10,11,12,21,24
100:7,11,19,22
101:6,8,9,17,22 102:11,22
103:9,22,25
104:5,7,11,16,17,20,21,22,25
105:4,7,11,13,16,24
106:9,16,21
107:4,10,13,15,19,21
108:3,4,5,13,19,22
109:3,6,9,11,16,19,25
110:1,4,7,10,12,15,19
111:6,8,10,13,15,16,25
112:5,11,13,16,19
113:3,10,13,17,21,22
114:3,6,7,9,13,16,22
116:6,17,21,23
117:3,4,6,7,10,18,21
118:1,10,14,19,20,23,24
119:4,19,21,22,25 120:2
123:9,10,12,14,16

**your**
6:15,19,22,24 7:17 8:6

9:11,14,17
10:7,9,10,18,20,24
11:13,18
14:6,25
15:5,12,22
17:5,11 18:12
20:9 24:5,8
30:6,9,13
32:5,13
34:7,22 35:22
37:14,21
38:15,21 39:7
41:16,23
42:11 43:11
47:21 48:25
49:19 50:13
52:5 60:14
61:6 65:13
69:5,9,16,20
70:21 71:5
73:16 74:11
77:24 78:2
79:3,8,16
81:19,21 82:1
84:5,10,22
85:1,6,14,15,21,22
86:5,14,16
87:2,8,25
88:2 89:13
90:3 91:15
92:18 95:15
97:17 99:6
101:7
102:20,23
103:2,22
111:10
114:1,3,25
115:1 116:25
117:23
119:3,6,10,13,16

123:9,10,11,14,16

**yours** 123:18

**yourself** 80:14
93:17,21

**you've** 88:5
116:10 117:23


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com